## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

TIMOTHY LEWIS, TERESA MASSA,
LINDA GAZIE, STEVEN WALLACH,
ANA SCHWARTZ, JOSEPH
MONOPOLI, JAMES FITZPATRICK, and
SYNTHIA PRAGLIN on behalf of themselves
and all others similarly situated,

      Plaintiffs,

      v.

      **CLASS ACTION**

      **JURY TRIAL DEMANDED**

MERCEDES-BENZ USA, LLC, DAIMLER AG,
and GRAMMER AG,

      Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs Timothy Lewis, Teresa Massa, Linda Gazie, Steven Wallach, Ana Schwartz,

Joseph Monopoli, James Fitzpatrick, and Synthia Praglin file this class action complaint on behalf

of themselves and all others similarly situated against Defendants Mercedes-Benz USA, LLC,

("MBUSA"), Daimler AG ("Daimler"), (together referred to herein as "Mercedes" or the

"Mercedes Defendants"), and Grammer AG ("Grammer"), and allege as follows:

### I.      INTRODUCTION

1.      For more than a decade, Mercedes has been manufacturing, advertising, selling,

and leasing cars with headrests containing a defect which threatens occupants' safety. Embedded

in the headrest is a mechanism, known as an "active head restraint" ("AHR"), which is designed

to spring forward upon a rear-end collision and rapidly push the headrest out to catch the

occupant's head and prevent whiplash.  The headrest and AHR is manufactured by Grammer and installed in Mercedes vehicles.  Mercedes has branded the AHR in its vehicles as "NECK-PRO."

2.       All NECK-PRO active head restraints share a common, uniform defect. Under normal conditions, the NECK-PRO restraint can deploy without warning or external force from a collision, and forcefully strike the back of the occupant's head.  The force of the impact not only causes serious bodily harm to the head and neck, but also creates a risk of collision when the headrest deploys—suddenly and without warning—while the vehicle is being driven.

3.       The AHR spontaneously deploys when, under normal operating conditions, a cheap plastic component inside the device prematurely fails.  The AHR contains a plastic bracket that acts as the triggering mechanism and holds the spring-loaded release in place until a sensor alerts signaling a rear-end collision.  As a cost-saving measure, Defendants designed this bracket with an inferior and inexpensive form of plastic which cracks and breaks down prematurely under the constant pressure exerted by the springs in the AHR.   The vehicles equipped with the defective NECK-PRO in the United States number at least in the hundreds of thousands, and there is no way for a vehicle owner to predict when the AHR in the headrest will deploy.

4.       The defective AHR is a "safety-related defect," as defined by the National Highway and Traffic Safety Administration (NHTSA).  Specifically, the NHTSA states that examples of defects related to safety include:

> Car seats and booster seats that contain defective safety belts, buckles, or *components* that create a risk of injury not only in a vehicle crash, but also in the nonoperational safety of a motor vehicle.[1] (emphasis added).

---

[1] *See* https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/14218-mvsdefectsandrecalls_041619-v2-tag.pdf

11O4776                                                      2

5.      Defendants became aware of this safety defect through the investigations of spontaneously deployed headrests brought into Mercedes service dealerships by customers, as well as from consumer complaints to the National Highway Transportation Administration, if not sooner.  Further, Defendants were intimately involved in the design and testing of the AHR systems and were aware that they were designed with an inferior, inexpensive plastic that cannot withstand the constant force applied by the springs.  Despite this knowledge, Mercedes nevertheless approved the defective AHRs for use in its vehicles and denies that this defect exists.

6.      Grammer is further aware of the defect because the same defective AHR system, which it manufactures and sells, is the subject of a class action lawsuit against Fiat-Chrysler.[2]

7.      Despite knowing of the dangers caused by the poorly designed bracket, Defendants have taken no action to correct the problem and continue to manufacture, sell or lease, and knowingly misrepresent as safe, vehicles containing the defective NECK-PRO.  Mercedes has not issued a recall or made any attempt to notify Mercedes owners of the defect.  To the contrary, when presented with deployed, defective headrests, Mercedes refuses to cover the cost of replacing the defective AHR after it spontaneously deploys, blaming the consumer and disclaiming any responsibility.

8.      Mercedes has also attempted to conceal the defect by blaming the spontaneous deployments on other issues.   In Service Bulletins sent to the NHTSA, Mercedes has acknowledged that the "active head restraints activate for no reason" and then falsely state that "this may be caused by damage to the seat wiring harness causing a short circuit."  Mercedes has at all relevant times, been aware of the true issue: the AHR was designed with an inferior, inappropriate, and inexpensive plastic component that breaks under the tensed force of the springs.

---

[2] *See Alger v. FCA US LLC*, No. 18-cv-00360 (E.D. Cal.).

9.      Consumers rely on automobile manufacturers to design, manufacture, market, and sell vehicles that are safe and protect against the risk of bodily injury.  Consumers do not expect vehicle manufacturers to make or install products that increase the risk of injury or malfunction while the vehicle is in ordinary use.

10.      This lawsuit is intended to compel Defendants to notify owners of all affected vehicles of the defect in the AHR; to issue a recall so that defective and dangerous headrests are replaced with headrests containing a non-defective AHR; and to compensate Mercedes owners for their losses arising from the defect.

11.      There are no differences in the NECK-PRO headrests installed in any particular Mercedes vehicle model. The Mercedes vehicles equipped with headrests containing the defective NECK-PRO are referred to herein as the "Class Vehicles."

## II.      PARTIES, JURISDICTION, AND VENUE

### Plaintiffs

*Timothy Lewis*

12.      Plaintiff Timothy Lewis is a Florida citizen ███████████████████ ██████████████████ He is a natural person over the age of twenty-one, and otherwise *sui juris*.

13.      Lewis owns two 2013 C250 vehicles, one of which he purchased from Mercedes-Benz of Fort Lauderdale, and one of which he purchased from Mercedes-Benz of Palm Beach. Both dealerships operate as agents of the Mercedes Defendants.  This model of Mercedes is equipped with headrests containing the defective AHR.

14.      Lewis bought his vehicles, and paid a premium price, because he trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicles, Lewis reviewed or

heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability. These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Lewis's vehicles has been diminished as a result of the defective NECK-PRO.  Had Lewis known of the AHR defect, he would not have purchased either vehicle, or would not have paid as much for them as he did.

### Linda Gazie

15.     Plaintiff Linda Gazie is a Florida citizen residing at 3711 Longford Circle, Ormond Beach, Florida 32174. She is a natural person over the age of 21 and otherwise *sui juris*.

16.     Gazie owns a 2010 Mercedes E350, which she purchased used from the Mercedes-Benz of Fort Lauderdale dealership, operating as an agent of the Mercedes Defendants. This model of Mercedes is equipped with headrests containing the defective AHR.

17.     Gazie bought her vehicle, and paid a premium price, because she trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicles, Gazie reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability. These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Gazie's vehicle has been diminished as a result of the defective NECK-PRO.  Had Gazie known of the AHR defect, she would not have purchased her vehicle, or would not have paid as much for it as she did.

### Steven Wallach

18.     Plaintiff Steven Wallach is a Florida citizen residing 2600 S. Ocean Blvd., Boca Raton, Florida 33432.  He is a natural person over the age of twenty-one, and otherwise *sui juris*.

19.     Wallach owns a 2012 Mercedes E350 Cabriolet, which he purchased new from Mercedes-Benz of Delray in Delray Beach, Florida, operating as an agent of the Mercedes Defendants.  This model of Mercedes is equipped with headrests containing the defective AHR.

20.     Wallach bought his vehicle, and paid a premium price, because he trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicles, Wallach reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability.   These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Wallach's vehicle has been diminished as a result of the defective NECK-PRO.  Had Wallach known of the AHR defect, he would not have purchased his vehicle, or would not have paid as much for it as he did.

### Teresa Massa

21.     Plaintiff Teresa Massa is a Florida citizen residing at 22041 SW 94th Avenue, Cutler Bay, Florida 33190. She is a natural person over the age of twenty-one, and otherwise *sui juris*.

22.     Massa owns a 2006 Mercedes C230, which she purchased used in Florida in 2016. This model of Mercedes is equipped with headrests containing the defective AHR.

23.     Massa bought her vehicle, and paid a premium price, because she trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicles, Massa reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability. These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Massa's vehicle has been diminished as a result of the defective NECK-PRO.  Had Massa

11O4776                                          6

known of the AHR defect, she would not have purchased her vehicle, or would not have paid as much for it as she did.

### Ana Schwartz

24.     Plaintiff Ana Schwartz is a Florida citizen residing at 2130 Bellcrest Court, Royal Palm Beach, Florida 33411.  She is a natural person over the age of twenty-one, and otherwise *sui juris*.

25.     Schwartz owns a 2011 C300, which she purchased new from Mercedes-Benz of West Palm Beach, Florida, operating as an agent of Mercedes.  This model of Mercedes is equipped with headrests containing the defective AHR.

26.     Schwartz bought her vehicle, and paid a premium price, because she trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicles, Schwartz reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability.  These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Schwartz's vehicle has been diminished as a result of the defective NECK-PRO.  Had Schwartz known of the AHR defect, she would not have purchased her vehicle, or would not have paid as much for it as she did.

### Joseph Monopoli

27.     Plaintiff Joseph Monopoli is a New York citizen residing in Stony Brook, New York 11780.  He is a natural person over the age of twenty-one, and otherwise *sui juris*.

28.     Monopoli owns a 2011 GL450s, which he purchased used in 2017.  This model of Mercedes is equipped with headrests containing the defective AHR.

11O4776

29.     Monopoli bought his vehicle, and paid a premium price, because he trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicle, Monopoli reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability.   These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Monopoli's vehicle has been diminished as a result of the defective NECK-PRO.  Had Monopoli known of the AHR defect, he would not have purchased his vehicle, or would not have paid as much for it as he did.

### *James Fitzpatrick*

30.     Plaintiff James Fitzpatrick is a North Carolina citizen residing at 44 Tynecastle Drive, Banner Elk, North Carolina 28604.  He is a natural person over the age of twenty-one, and otherwise *sui juris*.

31.     Fitzpatrick owns a 2009 R320, which he purchased used in Boone, North Carolina. This model of Mercedes is equipped with headrests containing the defective AHR.

32.     Fitzpatrick bought his vehicle, and paid a premium price, because he trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicles, Fitzpatrick reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability.  These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Fitzpatrick's vehicle has been diminished as a result of the defective NECK-PRO.  Had Fitzpatrick known of the AHR defect, he would not have purchased his vehicle, or would not have paid as much for it as he did.

*Synthia Praglin*

33.     Plaintiff Synthia Praglin is a California citizen residing 2345 Mandeville Cyn Road, Los Angeles, California 90049.  She is a natural person over the age of twenty-one, and otherwise *sui juris*.

34.     Praglin owns a 2014 C250, which she purchased used in Santa Monica, California. This model of Mercedes is equipped with headrests containing the defective AHR.

35.     Praglin bought her vehicle, and paid a premium price, because she trusted Mercedes to provide high-quality and safe automobiles. Prior to purchasing the vehicle, Praglin reviewed or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability. These materials or advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicles were not, in fact, fit for everyday use.  The value of Praglin's vehicle has been diminished as a result of the defective NECK-PRO.  Had Praglin known of the AHR defect, she would not have purchased her vehicle, or would not have paid as much for it as she did.

36.     There are no material differences between Plaintiffs' facts and those of the putative Class members. Each Plaintiff and putative Class member owns or leases a Class vehicle with the defective NECK-PRO system.  Each Plaintiff and putative Class member was similarly damaged by Defendants because they did not receive the benefit of their bargain and purchased or leased Class Vehicles that are of a lesser standard, grade, or quality than represented.  Defendants knew, or should have known, that the AHR system in the headrests are defective but concealed this knowledge from the public, Plaintiffs, and the putative Class members, and instead marketed the Class Vehicles as safe, reliable, and defect-free.

11O4776

37.     Each Plaintiff and putative Class member was deprived of having a defect-free headrest installed in their vehicle and Defendants have been, and are being to this day, unjustly enriched from their unconscionable delay in issuing a recall (and thereby saving the cost of a recall) on the defective NECK-PRO headrests.

**Defendants**

*MBUSA*

38.     Defendant MBUSA is a corporation doing business in every state and the District of Columbia and is organized under Delaware law with its principal place of business at One Mercedes-Benz Drive, Sandy Springs, Georgia 30328.   MBUSA employs more than 1,600 workers in the United States.

39.     At all relevant times, MBUSA, directly or through its agents, manufactured, distributed, warranted, sold, and leased the Class Vehicles throughout the United States and in this District.  Further, MBUSA, directly or through its agents, marketed and promoted the sale of the Class Vehicles throughout the United States and in this District.

40.     MBUSA approved and installed the defective NECK-PRO in the Class Vehicles and approved and publicized marketing and advertising designed to sell the Class Vehicles as equipped with an AHR as a feature for "Occupant Safety."  MBUSA sold Class Vehicles with the defective AHR in all fifty states, including Florida.

41.     Daimler is MBUSA's parent corporation. Daimler and MBUSA are collectively referred to herein as "Mercedes" or the "Mercedes Defendants."  MBUSA is a wholly owned subsidiary of Daimler and engages in business, including the advertising, marketing, and sale of Mercedes-Benz automobiles, including Class Vehicles, in all fifty states, in furtherance of Daimler's interests.

11O4776

42.     MBUSA employs over 1,600 workers in the United States. MBUSA is Daimler's principal North American subsidiary.  MBUSA renders services on behalf of Daimler that are sufficiently important to Daimler and its sale of Mercedes-Benz vehicles in the United States that Daimler would perform those services itself if MBUSA did not exist.  Daimler controls the public name and brand of MBUSA and the NECK-PRO head restraints.  In consumer transactions, like those with Plaintiffs, Daimler's unified brand and logo serve as its and MBUSA's official seal and signature as to consumers.

43.     There are approximately 380 authorized Mercedes dealerships in the United States. In 2018 alone, Daimler and MBUSA sold more than 320,000 vehicles in the United States, generating more than $10 billion in revenue. Daimler established MBUSA expressly for the purpose of targeting the United States market.  Daimler, directly or indirectly, through MBUSA and other agents (Mercedes-branded dealerships) has sold hundreds of thousands of cars, including the Class Vehicles, to consumers, including Plaintiffs, in the United States.

*Daimler*

44.     Defendant Daimler Aktiengesellschaft is a foreign corporation headquartered in Stuttgart, Baden-Wurttemberg, Germany. Daimler develops, manufactures, markets, and sells Mercedes-Benz vehicles around the world, including in the United States. Daimler manufactured and designed the Class Vehicles specifically for sale in the United States.

45.      Daimler markets itself to American consumers as Mercedes-Benz, a single entity, and purposely avails itself of the United States automobile market.  For example, Daimler uses a Daimler Twitter account to market and advertise Mercedes-Benz brands and to tout MBUSA's economic impact on, and physical presence in the United States.  Daimler also advertises its connection to Florida on its website, representing that its Jacksonville, Florida parts distribution

center "supports dealers in the region with parts supply and houses parts inventory."

46.    MBUSA and Daimler engineered, designed, developed, and manufactured, the Class Vehicles, and approved and installed the Defective NECK-PRO headrest for use in the Class Vehicles and for sale in the United States and this District. They also developed, reviewed, and approved the marketing and advertising campaigns designed to promote the NECK-PRO system and sell the Class Vehicles in the United States and this District.

47.    Importantly, Daimler is the registrar and owns all rights, title, and interest in U.S. Trademark Registration No. 3,026,206 for NECK-PRO.

48.    During the relevant period, Daimler continuously engaged in business in the United States by, among other things, interacting with its wholly owned subsidiaries in the United States, including MBUSA, and developing, reviewing, and approving the marketing and advertising campaigns designed to sell Mercedes-Benz-branded automobiles in the United States. The relationship between Daimler and MBUSA is governed by a General Distributor Agreement that gives Daimler the right to control nearly every aspect of MBUSA's operations—including sales, marketing, management policies, and warranty terms.  Daimler has, and at all relevant times had, the contractual right to exercise, and has in practice exercised, control over MBUSA's marketing, the scope of its written warranties, and representations made and facts withheld from consumers and the public about the AHR defect in Class Vehicles.

49.    Daimler uses MBUSA as alter ego for all purposes in the United States, including for sales and marketing of Mercedes Class Vehicles and for ongoing management of relationships with owners and lessees of the Class Vehicles.

50.    Daimler established MBUSA as its wholly owned subsidiary and exerts close control over its actions.  Daimler provided MBUSA with marketing and technical materials and,

in practice, avoids any distinction between it and MBUSA.  Daimler does not distinguish between itself and MBUSA for purposes of selling and leasing Mercedes-branded vehicles and providing related services in the United States.

51.     Daimler exerts control over the daily affairs of MBUSA through, *inter alia*: requiring weekly reports to be sent from the U.S. to Germany so that German supervisors can oversee U.S. work; regular meetings held at U.S. facilities to direct activities and establish policies; and directing the method of promotions for workers at MBUSA. Daimler also regularly implements common policies for MBUSA and other U.S. agents by installing Daimler executives at U.S. affiliates including in Florida.

52.     Daimler exercises control over the work of MBUSA with respect to the manner of Class Vehicles' marketing and representations concerning the defective NECK-PRO headrests equipped in Class Vehicles including but not limited to the decision not to issue a recall for the headrests despite prior knowledge of the defect.  Daimler operates MBUSA with a unity of interest and ownership such that MBUSA is a mere instrumentality of Daimler. MBUSA and Daimler engage in the same business enterprise and share common board members and employees.

53.     Daimler worked together with MBUSA to develop the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the NECK-PRO system and/or the sale of Class Vehicles in the United States, with the intent that these materials or advertisements be distributed in all fifty states and caused those materials or advertisements to be disseminated throughout the United States and this District.

54.     Daimler controls MBUSA as its alter ego through, *inter alia*, Daimler's Board of Management, which is the ultimate body responsible for managing the Daimler Group, an operating unit identified by Daimler that includes MBUSA.  As Daimler acknowledges in its

annual report, Daimler's Board of Management establishes sales and other targets and requirements for its subsidiaries in the Daimler Group, including MBUSA.

55.     Daimler acknowledged in a recent annual report that the United States is a key sales market for it.  Daimler purposefully avails itself of the U.S. automotive market because its sales to the United States are voluntary, intentional, and regular.

56.     Daimler designed and/or manufactured the Class Vehicles, including Plaintiffs' vehicles, for sale in the United States and this District.  The United States and each state therein have a collection of federal and state laws that require manufacturers to build their passenger vehicles specifically to meet the standards established by those laws.  Daimler specifically designed Plaintiffs' Class Vehicles to meet federal and state regulations and standards, including the Federal Motor Vehicle Safety Standards.

57.     Daimler supervisors certified to U.S. government officials that the Class Vehicles met U.S. federal requirements and standards so that the vehicles could be sold in the United States. Daimler further instituted means for marketing and advertising Class Vehicles and/or the NECK-PRO system and providing instruction to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and this District by licensing its trademarks to dealerships and authorizing dealerships to sell its vehicles.

58.     Daimler marketed Class Vehicles, including the Class Vehicles, through an affiliated distributor, MBUSA, which agreed to serve as a sales agent for Daimler in the United States.

59.     Daimler, directly or indirectly, engaged in the financing of authorized dealerships throughout the United States and this District.

11O4776                                      14

60.    Daimler, through its alter ego MBUSA, established and/or managed the distribution network for Mercedes vehicles including the Class Vehicles, that brought Class Vehicles, including the Class Vehicles, to the United States and this District for sale or lease.

61.    Daimler, through its affiliates including MBUSA, was involved in providing information to train personnel in the United States and this District in the repair, servicing, and preparation of Class Vehicles, including Class Vehicles.

62.    Daimler directed, managed, or funded nationwide advertising campaigns that were intended to reach consumers in the United States and this District and that marketed not only the NECK-PRO headrests but also the alleged safety and reliability of Class Vehicles. None of these advertisements or marketing materials disclosed that the NECK-PRO headrests were designed with inappropriate and inexpensive plastic and were defective.

63.    From 2004 through the present, Daimler, through MBUSA, regularly communicated with authorized dealerships in the United States and this District to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles, in the United States and this District.

64.    From 2004 through the present, employees, managers, and officers of Daimler regularly travelled to the United States to facilitate the sale and service of Mercedes vehicles, including Class Vehicles and Plaintiffs' vehicles, in the United States and this District.

65.    Daimler's website, from 2005 through the present, has been accessible and accessed in the United States and this District. Through the website, Daimler solicits the sale of Mercedes vehicles and connects U.S. customers with its agents – the Mercedes authorized dealers.

66.    Daimler, through MBUSA, solicited the sale or lease of Class Vehicles, including Plaintiffs' vehicles, in the United States and this District.

67.     Daimler owns all rights, title, and interest in U.S. Trademark Registration No. 657,386 for MERCEDES-BENZ, which is a word mark for goods including automobiles, motor trucks, and parts thereof.  The MERCEDES-BENZ mark was registered on January 21, 1958 based on a corresponding German trademark registered on October 10, 1927.  Daimler also has registered and maintains registration with the U.S. government trademarks for the design of its distinctive emblem, the three-pointed star.

68.     Daimler identified the United States as one of its "most important markets" and referred to "our customers" to include U.S. customers.[3] In 2015, the U.S. was the second-largest market for Mercedes-Benz vehicle sales.[4]

69.     Daimler licenses the use of the Mercedes trademarks to MBUSA to promote the sale of Mercedes-Benz vehicles in the United States and this District.

**_Grammer_**

70.     Defendant Grammer AG is a foreign for-profit corporation with its principal place of business in Amberg, Germany.  Grammer develops and manufactures automotive interior components including headrests, armrests, and center consoles which manufacturers then install in their vehicles that are sold throughout the United States.

71.     Grammer manufactures the headrests that include the defective AHR and supplies them to the Mercedes Defendants for installation in the Class Vehicles.

72.     During the relevant time period, Grammer purposefully availed itself of the United States consumer market by, among other things, sending thousands of shipments of vehicle components from Germany to the United States, purposefully availing itself of the U.S.

---

[3] _See_ Daimler AG, 2015 Annual Report.

[4] _Id_.

automotive market in a continuous and systematic fashion.

73.    In the last decade, Grammer has specifically targeted the U.S. markets. In 2007, Dimitri Moustakeas, Grammer's vice-president of sales and engineering for Grammer's North America Automotive division, stated that "[m]y primary objective is to get more business from the American [original equipment manufacturers], and it's progressing well."[5]

74.    Specifically, since 2007, Grammer has sent thousands of shipments of vehicle components, including headrests equipped with defective NECK-PRO, from Germany to a ports of entry in Norfolk, Virginia, Charleston, South Carolina, Savannah, Georgia and Miami, Florida.

75.    Further, upon information and belief, Grammer supplies replacement NECK-PRO headrests directly to the Mercedes Defendants' distribution center in Jacksonville, Florida as well as to Mercedes-Benz dealerships in the United States and this District after the inherent defect has caused the headrest to spontaneously deploy.

76.    Grammer designed and manufactured the NECK-PRO headrest to comply with U.S. automotive rules and regulations.

77.    Grammer has also availed itself of the protection of the U.S. patent laws as the owner or assignee of sixty-six patents registered with the U.S. Patent Office.

**Jurisdiction and Venue**

78.    This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d) because members of the proposed Class are citizens of states different from MBUSA's home state of Georgia, and Daimler and Grammer's home country of Germany, and upon information and belief the total amount in controversy in this action exceeds $5,000,000 exclusive of interest and costs.  Jurisdiction is also proper in this Court

---

[5] *See* https://www.wardsauto.com/news-analysis/grammers-us-gameplan.

under 28 U.S.C. § 1331 because Plaintiffs bring federal Magnuson-Moss claims.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

79.     This Court has personal jurisdiction over Defendants pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6) because Defendants, directly or through an agent, conduct substantial business in this judicial district; some of the actions giving rise to the claims took place in this judicial district; and some of the claims arise out of Defendants, directly or through an agent, operating, conducting, engaging in, or carrying on a business or business venture in Florida, committing a tortious act in this state, and causing injury to property in Florida arising out of Defendants' acts and omissions outside of Florida; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within Florida, or products, materials, or things processed, serviced, or manufactured by Defendants were used or consumed within Florida in the ordinary course of commerce, trade, or use and/or Defendants, directly or through an agent, derived substantial revenue from their activities within this State.

80.     Florida has significant contacts with the Mercedes Defendants, as there are more than thirty MBUSA dealerships in Florida.  MBUSA dealerships are agents or alter egos of the Mercedes Defendants.   In addition, since approximately 2010, MBUSA has maintained its Southern Region Office at 13470 International Parkway, Jacksonville, Florida 32218.

81.     According to Daimler's website, the Southern Region Office is "responsible for advertising, sales and marketing initiatives for Mercedes-Benz dealers located in the region."[6]  The Regional General Manager for the Southern Region, the top executive at the Southern Region Office, is responsible for overseeing service, sales, marketing, and franchising for all Mercedes dealer operations in the Southern United States.

---

[6] *See* https://www.daimler.com/career/about-us/locations/location-detail-page-329628.html.

11O4776                                                        18

82.     Four major business units comprise the operations at the Southern Region Office: Sales Operations, Parts Distribution, Quality Evaluation, and a Learning and Performance Center. The Quality Evaluation Center in Florida is one of only two divisions of its kind outside of Germany.

83.     In 2016, Mercedes expanded its corporate presence in Florida when it relocated an Engineering Services division, previously in New Jersey, to the Jacksonville plant.  Mercedes represented that this was a crucial move for serving its customers.  Christian Treiber, Vice President for Customer Services for Mercedes-Benz USA said of the move, "[t]his consolidation in our state-of-the-art Jacksonville campus will facilitate the interaction between key technical and engineering support areas which is a key component to providing a world-class customer experience."[7]

84.     Both Mercedes' and Grammer's purposeful availment of Florida renders the exercise of jurisdiction by this Court over them and their respective affiliated or related entities permissible under traditional notions of fair play and substantial justice.

85.     In the alternative, this Court has personal jurisdiction over Daimler and Grammer under Fed. R. Civ. P. 4(k)(2) with respect to Plaintiffs' federal claims, and under supplemental or pendant jurisdiction with respect to Plaintiffs' state law claims.

86.     As alleged above and throughout the Complaint, Daimler and Grammer have purposefully availed themselves of the privileges and laws of the United States as a whole.  Neither Defendant has submitted itself to personal jurisdiction in a single, particular forum.

87.     In addition, Grammer has received substantial benefit from knowingly engaging in manufacturing activities directed at automobile purchasers in this judicial district and the United

---

[7] *See* http://www.coj.net/welcome/news/mercedes-benz-usa-to-expand-in-jacksonville

States.  Specifically, Grammer has purposely availed itself of the United States automotive market by producing and selling components specifically intended for installation in vehicles sold in the United States automotive market.  Plaintiffs' claims against Grammer arise directly from the sale of its products in the United States

88.     Daimler has purposefully availed itself of the United States automotive market by producing and selling certain classes of Mercedes vehicles, including Class Vehicles, specifically intended to be sold in the United States. Daimler uses its American subsidiary (MBUSA) as its means for selling, marketing, and warranting Class Vehicles in the United States and this District and has set up distribution chains and taken other affirmative measures to make its vehicles, including Class Vehicles, available to consumers in the United States and this District thereby availing itself of the benefits and protections of conducting business in the United States.

89.     Plaintiffs' claims arise out of Daimler's and Grammer's contacts with the United States, including this District.  Plaintiffs could not have purchased the Class Vehicles with the defective NECK-PRO headrest if not for these Defendant's intentional acts of designing and installing the defective AHR systems and exporting them for sale to customers in the United States.

90.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because many of the named Plaintiffs reside in this judicial district and purchased vehicles installed with headrests containing the defective AHR in this district.  In addition, both the Mercedes Defendants and Grammer transact business in Florida, and a substantial portion of the practices, events, and omissions complained of herein occurred in this judicial district.

91.     All conditions precedent to this action have occurred, been performed, or have been waived.

11O4776

### III.   FACTUAL ALLEGATIONS

**Background**

92.     In the race to innovate, vehicle manufacturers face a trilemma: work can be done well, work can be done quickly, and work can be done inexpensively, but manufacturers can satisfy only two of these criteria at a time.  When designing and incorporating new bells and whistles, manufacturers must decide which goals are most important:  being the first, being the cheapest, or being the best.  Of course, the safety and satisfaction of would-be customers hang in the balance.

93.     Mercedes has intentionally cultivated, and long enjoyed, a reputation for manufacturing top of the line vehicles.  The Mercedes brand slogan is "Das Beste oder Nichts," or "The best, or nothing."  And yet, when Mercedes introduced active head restraint technology to its vehicles, that commitment to "the best or nothing" was compromised.  As a cost-saving measure ("being the cheapest"), Mercedes approved the use of an inexpensive, inferior, and inappropriate plastic for key components of the AHR in its headrests by Grammer, sacrificing the level of quality that customers expect and for which they pay a premium.

94.     Mercedes and Grammer knew, or should have known, that the cheap plastic used in the AHR could not withstand the constant pressure being applied by the tensed springs and would prematurely fail under ordinary use.  Consumers, relying on Mercedes' longstanding reputation for quality vehicles, paid heightened prices for Class Vehicles that pose a serious and unpredictable risk of injury to drivers, occupants and the public because of the defective AHR manufactured by Grammer and installed by Mercedes.

95.     Since 2006, Mercedes has advertised, distributed, leased, and sold numerous Class Vehicle models equipped with headrests containing the defective AHR while simultaneously

11O4776

publicizing and promoting the safety of its vehicles.

96.     The AHR is marketed as a critical safety device for preventing or reducing cervical injuries, such as whiplash, during rear-end collisions.  It is designed to propel the headrest forwards, towards the head, to cushion and arrest the abrupt backward movement of the driver or passenger head after impact.

97.     The internal components of the defective AHR are the same across all Mercedes Class Vehicles: the forward-facing padded surface of the headrest is mounted to a plastic carriage that is loaded by pre-tensioned springs when stowed in the headrest prior to deployment. The carriage is secured in the stowed position by a pin-and-hook latch assembly.  The pin is secured in a nest in the carriage and the latch, in turn, is linked to the vehicle's electronic computer control unit.  When the control unit detects a rear-end collision exceeding some threshold of severity, a signal triggers the pin-and-hook latch to release the pin allowing the carriage to be forced forward by the springs, rapidly deploying the face of the headrest forward.  Below is an illustration of the AHR system before it has deployed:



98.     When a vehicle is involved in a rear-end collision, the device propels the face of the headrest forward by 40 millimeters and upwards by 30 millimeters, to meet the head as it travels backwards.  The device fully deploys in .027 seconds.  This is known as a commanded deployment, and is the intended function of the AHR

99.     However, rather than operating as intended, the defective NECK-PRO poses a serious risk of harm because it malfunctions.  The crucial internal component that restrains the AHR is the plastic carriage that is secured by the latch pin against the force of the compressed springs.  As a cost-saving measure by Defendants, the bracket keeping the pin in place until a

rear-end collision is sensed, is made from a low-quality, inexpensive plastic.  The two linear springs combined are exerting 75 pounds of force on that plastic bracket at all times.  As Defendants are aware, this particular plastic cannot withstand this constant pressure and is prone to cracking and breaking, allowing the pin to be released from the carriage, rather than from the latch, and spontaneously deploying the headrest even when the vehicle has not been involved in a rear-end collision.  The image below illustrates the AHR system after the plastic has broken and the AHR has randomly deployed.



100.   When the plastic breaks down, the carriage deploys at random—rather than only in a rear-end collision—suddenly striking the driver or passenger in the back of the head.  The AHR deploys the headrest at a rate of 12 miles per hour, or nearly 18 inches per second, impacting the back of the passenger's head with enough force to cause injuries, and can occur at any time, including while the vehicle is driving on highways or public roads.  (*See infra* ¶ 124).

101.    Inspection of headrests in which the defective AHR has randomly deployed reveals that the AHR will deploy when *not* commanded by the vehicle's computer sensor.  The latch and pin assembly remains engaged, but when the plastic bracket that holds the pin fails and breaks under the strain of the pent-up spring tension, it causes the springs to release and deploy the AHR *without* the hooks releasing the pin.

102.    One can determine, through visual inspection, whether a deployment was commanded or uncommanded.  Because the hooks retract in a commanded deployment, an intact hook-and-pin assembly (as well as the broken plastic) indicates that an uncommanded deployment has occurred.

103.    The defective AHR in the headrests installed by Mercedes makes the Class Vehicles unsafe to drive and Plaintiffs and putative Class members would not have purchased, or would have paid less, for the Class Vehicles had they known of the defect.

**Mercedes Markets the AHR as a Safety Feature**

104.    Mercedes uses the brand name NECK-PRO to identify the AHR installed in its vehicle headrests.

105.    According to a Mercedes-Benz manual on passive safety systems:

> The NECK-PRO head restraints are connected to an electronic control unit, which evaluates the longitudinal deceleration or acceleration of the vehicle at the start of a collision. If the control unit detects a rear collision that exceeds a certain severity threshold, pretensioned springs inside the head restraints are triggered. The release of these springs moves the head restraint forward and upward toward the seated occupant. The head of the occupant is then supported early on in the collision, which can significantly reduce the strain on the cervical vertebrae and associated muscles and soft tissue.[8]

---

[8] Mercedes Benz, *Passive Safety Systems: Advanced Engineering for Protection During and After an Accident*, 18 (2018).

106.    The owner's manuals Mercedes provides with the Class Vehicles make specific

claims about protection from whiplash-related injuries afforded by NECK-PRO:

> The NECK-PRO active front head restraints are intended to offer the driver and
> front passenger increased protection from whiplash-type injuries. In the event
> of a rear-end collision, the NECK-PRO active front head restraints on the front
> seats are designed to move forward in the direction of travel, they thus provide
> the head with increased support earlier on in the collision sequence. The NECK-
> PRO active front head restraints will move forward whether the seats are
> occupied or not.[9]

107.    The brochure on Mercedes' Passive Safety Systems also claims that the NECK-

PRO reduces cervical-spine injuries:

> The crash-responsive NECK-PRO active head restraints for the driver and front
> passenger are standard equipment in many Mercedes-Benz models. This
> important safety feature improves the protection of the front occupants during
> a rear impact by reducing the risk that the occupant will experience whiplash
> injury . . . Through the targeted design of the front seats and their head restraints,
> an exceptional level of protection can be achieved, even in purely passive
> systems that are provided in some Mercedes-Benz models. In the event of a rear
> impact, the occupant is pushed deeper into the seat cushion by inertia. If the
> head restraint is correctly adjusted, the head and upper body are accelerated
> simultaneously and the cervical vertebrae are spared.[10]

108.    Mercedes advertises the NECK-PRO as being carefully calibrated to deploy at the

appropriate time, that is, in the case of a collision.  A Mercedes blog post states that "on detection

of an imminent collision of a pre-defined impact severity, either rear end or head-on, springs

inside the head rest are released allowing the frontal movement of the headrest."[11]

109.    Likewise, Daimler states that "if the sensor system detects a rear-end collision of a

---

[9] Mercedes-Benz 2010 C-Class Owner's Manual, p. 52.  Similar descriptions are included in the
Owner's Manuals for other years and models that contain NECK-PRO.

[10] Mercedes-Benz, *Passive Safety Systems: Advanced Engineering for Protection During and
After an Accident*, 18 (2018).

[11] Nathalie Godoy, Mercedes-Benz NECK-PRO Head Restraints Technology (May 20, 2016),
https://www.mercedes-benz-brampton.ca/mercedes-benzs-neck-pro-head-restraints-technology/

predefined degree of severity, it releases pre-tensioned springs inside the head restraints, causing the latter to move forwards."[12]

110.    Mercedes' advertisements and other public statements highlight the ideal, intended function of NECK-PRO: a safety device that protects vehicle occupants during a collision. However, due to the low-cost plastic used to manufacture the bracket holding the AHR rod in place, the reality is that the AHR in the headrest poses a risk of injury to drivers, passengers, pedestrians, and occupants of surrounding vehicles because the AHR deploys unpredictably, when no external force has occurred.

**NECK-PRO Has a Common Uniform Defect**

111.    Grammer manufacturers the headrests with the defective AHR that Mercedes installs in the Class Vehicles.  The plastic bracket in the AHR is made from Acrylonitrile Butadiene Styrene, or ABS. ABS is a lightweight, recyclable, thermoplastic polymer with relatively cheap production costs.  ABS is frequently used for inexpensive consumer products such as children's toys, kitchen utensils, and faceplates for electric outlets.

112.    ABS is unsuitable for use in the AHR, as it does not withstand fatigue well.  The resistance to the stored potential force of the two compressed springs in the AHR creates continuous pressure which, over time, leads to a premature component failure. ABS is prone to tell-tale "stress-whitening," where the cracking is occurring, allowing one to see where the plastic's integrity has been compromised and where the plastic will break and cause the headrest to deploy spontaneously.  Pictured below is an exemplar NECK-PRO headrest that is showing signs of this stress-whitening due the force of the tensed springs:

---

[12] NECK-PRO: crash-responsive head restraints standard in four Mercedes model series, https://media.daimler.com/marsMediaSite/ko/en/9918459.



113.    While the ABS plastic will break solely due to the force of the springs, it is even more susceptible to failure in extreme climates.  ABS has a low melting point that is affected by hot climates including, Florida.  It is also affected by cold climates because of its tendency to become brittle and crack.

114.    Despite being aware of the safety issues caused by a sudden and unexpected AHR deployment, and similarly being on notice that the NECK-PRO has a dangerous safety defect, the Defendants refuse to warn customers, issue a recall, or take responsibility for repairing or

replacing the NECK-PRO headrests in the Class Vehicles.  Plaintiff Gazie's experience with the defective AHR in her Mercedes is indicative of Defendants' approach to the problem.

115.    On June 3, 2019, Gazie's driver-side headrest AHR deployed without warning while her vehicle was parked in her home garage.  The vehicle was stationary and was not struck by any object or external force that would have caused the AHR to deploy.

116.    On June 6, 2019, Gazie took her vehicle to a MBUSA dealership in Daytona Beach, Florida, to have the headrest repaired.  As the service representative drove the vehicle into the service area, the AHR in the passenger side headrest deployed without warning and without external force.

117.    The service representative gave Gazie a phone number for MBUSA's corporate office and instructed her to contact them.  Gazie called and spoke to a corporate representative, who informed Gazie that someone would get back in touch with her.

118.    An MBUSA representative with the title "Executive Referral Manager" called Gazie and sent her a packet of paperwork to fill out regarding the AHR deployment.  Despite the fact that the AHR did not deploy as a result of external force, the paperwork was an accident questionnaire. Gazie filled out the questionnaire and informed Mercedes that the vehicle was not involved in a collision when the deployment occurred.

119.    On June 10, 2019, Gazie returned her vehicle to the MBUSA dealership for inspection of the headrest.  A week later, on June 17, the service representative told Gazie that an MBUSA engineer had inspected the headrest but he could not give her any information about the inspection results.  Gazie requested that the dealership return her vehicle so she could take it to another dealership for inspection.  However, the dealership would not permit Gazie to retrieve her vehicle until MBUSA "completed" its investigation, which Gazie was told could take as long as

four to six weeks.

120.    On June 24, an MBUSA corporate representative called Gazie and told her that the NECK-PRO headrest in her vehicle appeared to have deployed in response to external force.  The MBUSA representative could not explain how that conclusion was possible, given that the AHR in the driver-side headrest had deployed while the vehicle was sitting in a garage, and the AHR in the passenger-side headrest had deployed while a service representative drove the vehicle at the dealership.

121.    On June 27, Gazie received a letter from Mercedes informing her "MCUSA did not find evidence of a manufacturing or design defect.  In fact, the inspection revealed evidence that indicates the [AHR was] damaged as a result of outside influence."  The correspondence did not provide, or even describe, any such evidence, or how it reached this conclusion and the Mercedes Defendants refused to pay to replace the headrests.

122.    Plaintiff Gazie paid the dealership for replacement headrests which, upon information and belief, are the same defective Neck-Pro headrests manufactured by Grammer.

123.    Contrary to what Mercedes told Gazie, photographs of Gazie's headrest, taken while the vehicle was still at the dealership, reveal that Gazie's NECK-PRO deployed due to the common uniform defect present in each of the Class Vehicles.  As shown in the photograph of Plaintiff Gazie's headrest below, the cheap plastic components of the AHR cracked and broke thereby deploying the headrest even though the latch and pin remained in place.



Rear Cover
Frame
Base
Latch Pin
Latch
Guide Spring
Guide (Broken)
Guide Rod
Spring
Carriage
Pin Nest (Broken)
TOP
Head Rest Face
Limit Strap

124.    Other Mercedes vehicle owners have shared their experiences with the AHR defect

online,[13] including:

- 3/03/13 – Today, while driving my son and his friend to the park, I was suddenly struck in the back of the head by my headrest. I pulled over and stopped my car and could see the headrest on my 2010 GLK 350 had literally exploded? Has this ever happened to anyone???

- 03/06/13 – The Mercedes dealership has had my car for 3 days now. They are saying that they need to have an engineer look at it to try to figure out why the head rest exploded hitting me in the back of the head. I was going no more than 15 mph and didn't experience any kind of bump or impact? I don't have confidence in my car. What if it happens to me again on the freeway? My neck is still sore and I have tenderness where the head rest hit.

---

[13] *See* www.mbworld.org/forums

If this is a safety mechanism that is supposed to deploy in an accident . . . I don't know if I want something hitting me in the back of my head that hard while trying to avoid getting smashed in the fact by a deploying airbag from my steering wheel?

- 04/07/13 – My 2010 GLK headrest exploded and was not preceded by any accidents, bumps, etc. I am seeing that others have posted that this has happened to them as well. Has anyone rec'd a response from Mercedes on this very dangerous flaw? How do I reset the headrests now that they are popped open?

- 5/25/17 – My headrest has popped out twice that I reset myself, then it popped a third time. I brought it to the dealer they reset it and said all parts to it tested good [sic] and when they drove it, it did not pop. Less than 1 hour of picking up the car it popped, this time it serious [sic] hurt me and chipped two teeth from the impact to the back of my head….

- 4/15/19 – Hi, 30 seconds after starting my C300 4 Matic 2009 after day work [sic], rolling about 5 mph, my headrest deployed with a big noise but I did not have any accident! I then parked and checked all around the car and there was no mark at all. The red warning light—airbags—is on and the message center tell me [sic] 2 messages: there is a problem with the left side contact your dealer, and the same for the right side (even though the right headrest is ok).

**Grammer and Mercedes Fail to Divulge the Defect**

125.    Grammer knew, prior to supplying its AHR product to Mercedes, that the AHR is defective.  Despite this knowledge, Grammer has continued to use inferior and cheap plastic to manufacture the AHR bracket, and has neither addressed the plastic bracket design defect, nor advised Plaintiffs or the putative Class members about the safety risk.  As the manufacturer of the headrests with the defective AHR, Grammer has, and has had for years, knowledge superior to consumers about the quality of the plastic bracket in the AHR and should have known that buyers and owners of the Class Vehicles could not discover the defect before purchasing or leasing their Mercedes.

126.    Mercedes knew or should have known, prior to installing the defective NECK-PRO, that the design was defective and the AHR is likely to malfunction.  Similarly, given the location of the AHR and its intended purpose, Mercedes knew or should have known that such a

malfunction could cause injury to drivers and passengers, and that an uncommanded deployment might cause a driver to lose control of his or her vehicle while driving, thus endangering not only the occupants of the vehicle, but other people on the road.  At the very least, Mercedes learned of this defect from the service records of its dealerships, complaints to NHTSA, and warranty claims (which, as identified by the complaints outlined in paragraph 124, *supra* date back to at least as early as 2013).  Despite being aware of the AHR defect, and the potential for harm to human life, Mercedes has failed to notify owners of Class Vehicles of the defect, not recalled affected Class Vehicles to replace the defective AHR, and made no attempt to compensate Class Vehicle owners for the diminution in vehicle value.

127.    In fact, Mercedes has taken affirmative steps to conceal this defect by, among other things, notifying NHTSA that the issue is a "short circuit" in the wiring. (¶8, *supra*),

128.    Grammer intentionally has taken no action to reveal the defect in its AHR, and instead concealed and failed to disclose the safety issue caused by the defective AHR components.

129.    Likewise, Mercedes intentionally misrepresents the safety features of its headrests and conceals the defect from consumers in its owner's manuals, affirmative statements about the safety of its vehicles, and advertising.  As in the case of Plaintiff Gazie, MBUSA, despite evidence to the contrary, falsely told her that the headrest deployment was caused by external force when her vehicle experienced no such force and the headrest deployed while her vehicle was in her garage.

130.    The Mercedes Defendants continue to fail to cover the cost to repair or replace headrests that have spontaneously deployed, recall the Class Vehicles, or warn vehicle owners and the general public about the defect and corresponding safety risk of driving or riding in a Mercedes vehicle installed with the defective NECK-PRO.

**Plaintiffs Have Been Damaged**

131.    As a result of Grammer's and Mercedes' conduct in manufacturing and then installing the headrests with the defective AHR, and further in concealing the defect, Plaintiffs and proposed Class members were harmed and suffered actual damages. The defective NECK-PRO installed in the headrests diminish the value of the Class Vehicles.

132.    Plaintiffs and the proposed Class members were deprived of the benefit of their bargain. The Mercedes vehicles they purchased or leased were of a lesser standard, grade, and quality than Mercedes represented, and they did not receive vehicles that met ordinary and reasonable consumer standards for safe and reliable operation.  Plaintiffs and Class members paid more for their vehicles than they would have had Mercedes disclosed the defective AHR, whether in monthly lease payments or through a higher purchase price.

133.    Mercedes and Grammer each has unjustly benefitted from putting a defective product on the market, and Plaintiffs and Class members were deprived of safe, defect-free components in their vehicles.

134.    Plaintiffs and Class members have also suffered out-of-pocket damages, including but not limited to loss-of-use expenses, paying for rental cars or other transportation arrangements, and paying to replace headrests damaged by the spontaneous deployment of the AHR that the Mercedes Defendants would not cover.

135.    Plaintiffs bring this action on behalf of themselves and the putative Class members to recover damages for their lost benefit of the bargain; out-of-pocket expenses, including repair costs due to the defective AHR; and to obtain an injunction requiring the Mercedes Defendants and Grammer to issue a recall and cure the defect and prevent risk of future harms.

## Mercedes Breaches Express and Implied Warranties

136.    The Mercedes Defendants sell and lease Class Vehicles with express and implied warranties that assure buyers the vehicles are free from defects. The NECK-PRO defect violates the warranties.

137.    Mercedes provides a written express warranty to each consumer who purchases or leases a Class Vehicle directly from Mercedes. The warranty specifically provides that "any authorized Mercedes-Benz Center will make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period."  Mercedes, however, continues to deny and conceal that NECK-PRO has a defect.

138.    Under the Uniform Commercial Code, a warranty that goods are merchantable is implied in all contracts for sale, so long as the seller is a merchant with respect to goods of that kind.  U.C.C. § 2-314 (1).  To be "merchantable," goods must be fit for the ordinary purposes for which they are used, and must conform to the promise or affirmations of fact made on labels.

139.    The defective AHR renders Class Vehicles unfit and unsafe for ordinary use. Further, the AHR fails to conform to the promises of safety and appropriate deployment as described in Mercedes owners' manuals.

140.    The AHR has an inferior, low-grade plastic component despite the availability of several commercially-viable superior alternatives.  For example, fiber reinforced plastics, which contain either glass fibers or carbon fibers, are readily available to manufacturers and can be used in injection-mold applications like the AHR.  In fiber-reinforced plastics, the strength comes from the glass fiber or carbon fiber, while the plastic holds the fibers together and gives the object its shape. These plastics are better suited to withstand the constant force being applied by the two springs.

11O4776

141.     Because the NECK-PRO headrest has cheap, inferior, low-grade plastic, the Mercedes Defendants have breached the warranties of merchantability.

## IV.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

142.     Within the time period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered, through the exercise of reasonable due diligence, that Defendants were concealing the defect in the headrests and misrepresenting the safety and reliability of the AHR contained in the headrests installed in Class Vehicles.

143.     Mercedes has refused to issue a recall and Class Members have no way of knowing about the defect until the AHR in their vehicle spontaneously deploys.  Even after a spontaneous deployment, Plaintiffs and Class members had no ability to discover the actual nature of the defect—the use of the cheap plastic that is unable to withstand the constant force of the springs—because Defendants' active concealment, and prior knowledge, of the defect.

144.     For these reasons, all applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

### B.     Fraudulent Concealment Tolling

145.     All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the defect in the AHR throughout the time period relevant to this action.

146.     Mercedes is under a continuing duty to disclose the true character, quality, and nature of the Class Vehicles to the Plaintiffs and the Class members.  Neither Mercedes nor Grammer disclosed information about the defective AHR, and instead, as discussed above, knowingly, affirmatively, or actively concealed such character.

11O4776

147.     Grammer is under a continuing duty to disclose the defect in the AHR that it provided to Mercedes as it knew that the AHR would be placed in the headrests installed in Class Vehicles and sold in the U.S. automotive market.

148.     Plaintiffs and Class Members reasonably relied upon Defendants' knowing, affirmative, or active concealment when they decided to purchase or lease Class Vehicles.

149.     Because Defendants actively concealed, and continue to actively conceal, the defect in the Class Vehicles, they are estopped from relying on any statutes of limitations defense.

**C.     Estoppel**

150.     Mercedes and Grammer were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the AHR placed in the headrests installed in the Class Vehicles. Instead, they actively concealed the true character, quality, and nature of the AHR and knowingly made misrepresentations about the quality, reliability, safety characteristics, and performance of the AHR.

151.     Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and active concealment of material facts. Therefore, Defendants are estopped from relying on any defense based on statutes of limitations in this action.

# IV.     CLASS ALLEGATIONS

**A.     Class Definitions**

152.     Plaintiffs bring this action on their own behalf, and on behalf of all persons similarly situated, pursuant to Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**The Nationwide Consumer Class:**

153.    Plaintiffs bring this class action and seek to certify and maintain it as a class action under Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed nationwide class and state subclasses:

> **All persons in the United States who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, which are equipped with headrests containing the defective AHR.**

**The Florida Consumer Subclass**:

154.    Plaintiffs allege statewide class action claims on behalf of:

> **All persons in Florida who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.**

**The New York Consumer Subclass**:

155.    Plaintiffs allege statewide class action claims on behalf of:

> **All persons in New York who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.**

**The California Consumer Subclass:**

156.    Plaintiffs allege statewide class action claims on behalf of:

> **All persons in California who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.**

**The North Carolina Consumer Subclass:**

157.    Plaintiffs allege statewide class action claims on behalf of:

**All persons in North Carolina who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.**

158.    Excluded from each class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; business entities for purposes of claims for relief under the California Consumers Legal Remedies Act, Civil Code section 1750, *et seq*.; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded are claims for any personal physical injuries related to the AHR defect.

159.    Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

160.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**Numerosity**

161.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are hundreds of thousands of Class Vehicles nationwide equipped with headrests that have the defective NECK-PRO, including thousands in Florida.  Individual joinder of all Class members is impracticable.

162.    The identity of Class members is ascertainable, as the names and addresses of all

11O4776                                            39

Class members can be identified in Mercedes' or their agents and dealerships' books and records, as well as state vehicle registrations and sales records. Plaintiffs anticipate providing appropriate notice to each certified class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Commonality**

163.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, without limitation:

a.  Whether the inferior plastic that Grammer used in the AHR could withstand the force of the springs under normal operating conditions;

b.  Whether Defendants knew that the inferior plastic could not withstand the force of the springs under normal operating conditions;

c.  Whether there were other commercially viable plastic options to use in the manufacture of the AHR;

d.  Whether Defendants knowingly failed to disclose and warn U.S. consumers of the defect in the AHR;

e.  Whether Defendants had a duty to disclose to U.S. consumers material facts relating to the defect in the AHR and the safety risk it presents;

f.  Whether the headrest installed by Mercedes in the Class Vehicles is defective and a safety risk due to a defective AHR;

g.  Whether the owner's manuals provided by Mercedes to consumers who purchased Class Vehicles sufficiently warns owners about the safety risk associated with the AHR;

h.  Whether the Class Vehicles have suffered diminution of value as a result of containing headrests with the defective AHR;

i.  Whether Mercedes' marketing of Class Vehicles was likely to deceive or

mislead consumers;

j.   Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by failing to disclose that the headrests installed in Class Vehicles have defective AHR;

k.   Whether a reasonable consumer likely would be misled by Defendants conduct;

l.   Whether Mercedes' conduct as alleged in this action, including the sale of the Class Vehicles installed with the defective NECK-PRO, constitutes a breach of applicable warranties; and

m.   Whether Plaintiffs and the Class members suffered damages as a result of Mercedes' refusal to replace the headrests or repair Class Vehicles after the AHR deploys due to the defect.

**Typicality**

164.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Mercedes and Grammer.   Each Class member purchased or leased a Class Vehicle with a defective AHR installed in the headrests and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiffs.   The relief Plaintiffs seek in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

165.   Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiffs and the unnamed Class members.   Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

166.   To prosecute this case, Plaintiffs have chosen the undersigned law firms, who have substantial experience in the prosecution of large and complex class action litigation and have the

11O4776

41

financial resources to meet the costs associated with the vigorous prosecution of this type of litigation.  Plaintiffs and their counsel will fairly and adequately protect the interest of all Class members.

**Superiority**

167.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.  The joinder of individual Class members is impracticable because of the vast number of Class members who own the affected Class Vehicles.

168.    Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to the Defendants, by even a small fraction of the Class Members, would be enormous.

169.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).

170.    Plaintiffs are unaware of any obstacles likely to be encountered in the management

11O4776

of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.  The Court may, on motion of Plaintiffs or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; utilize the provisions of Fed. R. Civ. P. 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

**Requirements of Fed. R. Civ. P. 23(b)(2)**

171.    Mercedes and Grammer have acted or failed to act in a manner generally applicable to the Class members in the Nationwide Class and the Florida, New York, California, and North Carolina subclasses, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**("FDUTPA"), Fla. Stat. § 501.201 *et seq.***
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiffs Lewis, Gazie, Massa, Schwartz, and Wallach, and the Florida**
**Subclass**

172.    The Florida Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

173.    The Florida Plaintiffs and Florida subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA.  Fla. Stat. § 501.203 (7), (8).

174.    The Mercedes Defendants engages in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

175.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla.

Stat. § 501.204(1).

176.    Mercedes engaged in unfair and deceptive trade practices that violated FDUTPA,

including but not limited to the following:

     a.   Mercedes represented that the Class Vehicles have safety characteristics that they do not have;

     b.   Mercedes represented that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

     c.   Mercedes knew of the inferior plastic used in the NECK-PRO and that it fails under normal use but failed to disclose the existence of this defect to consumers or the NHTSA. Mercedes knew that such information was material to consumer transactions and vehicle safety;

     d.   Mercedes actively conceals and misrepresents the true nature of the NECK-PRO defect;

     e.   Mercedes intended for the Florida Plaintiffs and Florida subclass members to rely on their misrepresentations and omissions so that the Florida Plaintiffs and Florida subclass members would purchase or lease Class Vehicles.

177.    Mercedes' unfair or deceptive acts or practices, including concealing, omitting, or

suppressing material facts about the defective NECK-PRO, had a tendency or capacity to mislead;

tended to create a false impression in consumers; and were likely to, and did in fact, deceive

reasonable consumers, including the Florida Plaintiffs and the Florida subclass members, about

the safety and reliability of Class Vehicles; the quality of the Mercedes brand; and the true value

of the Class Vehicles.

178.    Mercedes intentionally and knowingly misrepresented or omitted material facts

regarding the Class Vehicles and the defective AHR installed in the vehicle headrests with an

intent to mislead the Florida Plaintiffs and the Florida subclass members.

179.    Mercedes knew or should have known that its conduct violated the FDUTPA.

180.    The Florida Plaintiffs and Florida subclass members were and are injured as a result

of Mercedes' conduct because the Florida Plaintiffs and Florida subclass members paid to own or lease a Class Vehicle without a safety defect in the headrests and instead received and overpaid for a vehicle containing the defective AHR.

181.    Mercedes' failure to disclose, and active concealment of, the defective AHR system and the dangers and risks it posed were material to the Florida Plaintiffs and the Florida subclass members.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

182.    The Florida Plaintiffs and the Florida subclass members have suffered ascertainable losses as a result of Mercedes' misrepresentations and failure to disclose information about the defective AHR. Had they been aware of the defect that existed in the headrests in Class Vehicles, the Florida Plaintiffs and Florida subclass members either would have paid less for their vehicles or would not have purchased or leased the vehicle. The Florida Plaintiffs and the Florida subclass members did not receive the benefit of their bargain due to Mercedes' misconduct.

183.    As a direct and proximate result of Mercedes' violations of FDUTPA, the Florida Plaintiffs and the Florida subclass members have suffered injury-in-fact and actual damages.

184.    The Florida Plaintiffs and the Florida subclass members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

185.    The Florida Plaintiffs, on behalf of the Florida subclass members, request that the Court award them actual damages and issue an order requiring Mercedes to notify the Florida subclass members of the defect and recall the Class Vehicles to remedy the defect as well as award the Florida Plaintiffs' and Florida subclass members' attorneys' fees; and any other just and proper relief available under FDUTPA.

11O4776

**COUNT II**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW**
**N.Y. Gen. Bus. Law. § 349**
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiff Monopoli and the New York Subclass**

186.     Plaintiff Monopoli incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

187.     Monopoli and the New York subclass members are "persons" within the meaning of New York General Business Law **§** 349(h).

188.     The Mercedes Defendants are a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law **§** 349(b).

189.     The New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce." N.Y. Gen. Bus. Law. **§** 349. Mercedes' conduct towards consumers, described above and below, constitutes "deceptive acts or practices" within the meaning of the N.Y. Gen. Bus. Law.

190.     Mercedes' actions set forth above and below took place in the conduct of trade or commerce.

191.     Mercedes failed to disclose, and actively concealed, the safety issue posed by the defective AHR in the headrests installed in the Class Vehicles, and otherwise acted with a tendency or capacity to deceive consumers of its vehicles.

192.     Mercedes engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts regarding the safety defect in the AHR with the intent that others would rely on such misrepresentations, concealment, suppression, or omissions in connection with the purchase of Class Vehicles.

193.    Mercedes intentionally and knowingly misrepresented or omitted material facts regarding the defective AHR in the headrests installed in Class Vehicles with an intent to mislead Monopoli and the New York subclass members.

194.    Mercedes knew, or should have known, that its conduct violated the N.Y. Gen. Bus. Law.

195.    Mercedes made material written and oral statements about the safety of the Class Vehicles, as alleged above and below, that were either false or misleading.

196.    Mercedes owed Monopoli and the New York subclass members a duty to disclose the true safety and reliability of the Class Vehicles because Mercedes:

   a.    Possessed exclusive and superior knowledge of the dangers and risks posed by the defective AHR;

   b.    Intentionally concealed the defect and the dangers and risks posed by the defective AHR; or

   c.    Made incomplete representations about the safety and reliability of the Class Vehicles generally, while knowingly, willfully, and purposefully withholding material facts about the defective AHR that contradicted those representations.

197.    Monopoli and the New York subclass members were injured as a result of Mercedes' conduct because Monopoli and the New York subclass members now own or possess Class Vehicles for which they overpaid.

198.    Mercedes' failure to disclose, and active concealment of, the dangers and safety risks posed by the defective AHR in Class Vehicles were material to Monopoli and the New York subclass members.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles

11O4776

47

that conceals defects rather than promptly remedies them.

199.    Monopoli and the New York subclass members suffered ascertainable losses as a result of Mercedes' misrepresentations, and failure to disclose information, about the defective AHR.  Had they been aware of the defect that existed in the headrests installed in the Class Vehicles, Monopoli and the New York subclass members either would have paid less for their vehicles or would not have purchased or leased their vehicles.  Monopoli and the New York subclass members did not receive the benefit of their bargain due to Mercedes' misconduct.

200.    Monopoli and the New York subclass members risk irreparable injury as a result of Mercedes' conduct in violation of the N.Y. Gen. Bus. Law.  These violations present a continuing safety risk to Monopoli, to the New York subclass members, and to the general public.

201.    As a direct and proximate result of Mercedes' violations of the N.Y. Gen. Bus. Law, Monopoli and the New York subclass members have suffered injury-in-fact or actual damage.

202.    Monopoli and the New York subclass seek punitive damages against Mercedes because Mercedes' conduct was egregious in that Mercedes willfully and knowingly concealed and misrepresented a material fact relating to the safety of Class Vehicles and risk to Class Vehicle drivers, occupants, and the public.

203.     Monopoli, on behalf of the New York subclass members, seeks actual damages; discretionary treble damages; punitive damages; an order enjoining Mercedes' unfair or deceptive practices; an order requiring Mercedes to notify the New York subclass members of the defect, issue a recall, and remedy the defect in the Class Vehicles; and awarding Monopoli and the New York subclass members' attorneys' fees; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT III**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW**
**("N.Y. Bus. Law") N.Y. Gen. Bus. Law. § 350**
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiff Monopoli and the New York Subclass**

204.     Plaintiff Monopoli incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

205.     The Mercedes Defendants are engaged in the "conduct of business, trade, or commerce" within the meaning of New York General Business Law § 350.

206.     New York General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

207.     Mercedes made and disseminated in New York, or caused to be made and disseminated in New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and that were known by Mercedes to be untrue, or that through the exercise of reasonable care should have been known to Mercedes to be untrue and misleading to consumers, including Monopoli and the New York subclass members.

208.     Mercedes violated New York General Business Law § 350 because the misrepresentations and omissions regarding the safety of the Class Vehicles, and Mercedes' failure to disclose and active concealment of the dangers and risks posed by the defective AHR in headrests installed in Class Vehicles, as set forth above, were material and likely to deceive a reasonable consumer.

209.     Monopoli and the New York subclass members have suffered injury, including the

11O4776

49

loss of money or property, as a result of Mercedes' false advertising.  In purchasing or leasing Class Vehicles with the defective AHR, Monopoli and the New York subclass members relied on Mercedes' misrepresentations and omissions with respect to safety and reliability of the Class Vehicles. Mercedes' representations were false and misleading because Mercedes concealed the existence of a defective AHR affecting the safety, reliability, and value of the Class Vehicles. Had Monopoli and the New York subclass members known that the Class Vehicles were unsafe due to the defective AHR, they would not have purchased or leased the vehicles, or would have paid less for them.

210.    Pursuant to New York General Business Law § 350-e, Monopoli, on behalf of himself and the New York subclass members, seeks monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial; or (b) statutory damages of $500 each. Because Mercedes' conduct was committed willfully and knowingly, Monopoli and the New York subclass members are entitled to recover treble damages up to $10,000 each.

211.    Monopoli, on behalf of himself and the New York Subclass Members, seeks an order enjoining Mercedes' unlawful, unfair, and deceptive practices; attorneys' fees; and any other just and proper relief available under New York General Business Law § 350.

**COUNT IV**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**N.Y. U.C.C. Law §§ 2-315 and 2-A-213, *et seq*.**
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiff Monopoli and the New York Subclass**

212.    Plaintiff Monopoli incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

11O4776

213.    In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the New York subclass against the Mercedes Defendants.

214.    The Mercedes Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. U.C.C. Law §§ 2-104(1) and 2-A-103(3), and "seller[s]" of motor vehicles under § 2-103(1)(d).

215.    With respect to leases, the Mercedes Defendants are and were at all relevant times "lessor[s]" of motor vehicles under N.Y. U.C.C. Law § 2-A-103(1)(p).

216.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2-A-103(1)(h).

217.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. U.C.C. Law §§ 2-315 and 2-A-213.

218.    The Class Vehicles and/or the defective NECK-PRO systems installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and headrests are used. Specifically, they are inherently defective and dangerous in that the AHR prematurely deploys and can cause serious injury to occupants or others on the road, instead of protecting vehicle occupants from bodily injury during accidents.

219.    Mercedes was provided notice of these issues by their knowledge of the issues, by customer complaints, by complaints filed against them and/or others, and by internal investigations.

220.    As a direct and proximate result of Mercedes' breach of the warranties of merchantability, Plaintiffs and the New York Sub-Class have been damaged in an amount to be

proven at trial.

## COUNT V
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
#### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
#### against Defendant Mercedes-Benz USA, LLC
#### on behalf of Plaintiff Praglin and the California Subclass

221.    Plaintiff Praglin incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

222.    Cal. Bus. & Prof. Code § 17200 makes unlawful "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

223.    Mercedes knew, or should have known, that the Class Vehicles contained a dangerous defect and were likely to be dangerous when used in a reasonably foreseeable manner. Mercedes continued to advertise, market, and sell vehicles with the defective AHR after becoming aware of the potential for danger, and failed to recall such vehicles and cure the defect.

224.    Mercedes concealed the existence and nature of the defective AHR, and the dangers and safety risks posed by the Class Vehicles, and continued to represent that the Class Vehicles were safe and reliable when, in fact, they are not.

225.    Mercedes' misrepresentations and omissions regarding the safety and reliability of the Class Vehicles were likely to deceive a reasonable consumer, and the information withheld through these misrepresentations and omissions would be material to a reasonable consumer.

226.    Mercedes committed a fraudulent business act or practice in violation of § 17200 when it concealed, misrepresented, or omitted material information about the existence and nature of the defective AHR, and the dangers and risks posed by the Class Vehicles, while representing in marketing, advertising, and other publications that the Class Vehicles were safe and reliable.

Mercedes' active misrepresentation and concealment of the dangers and risks posed by the defective AHR in its vehicles are likely to mislead the public.

227.    Mercedes acted unfairly within the meaning of § 17200 because the acts and practices described above and below, including the manufacture, marketing, advertising, and sale of the Class Vehicles; and the failure to adequately investigate, disclose, and remedy the defective NECK-PRO, offend normal public policy. The harm Mercedes causes to consumers greatly outweighs any benefits associated with those practices. Mercedes' conduct also impaired and impairs competition in the automotive market and has prevented consumers, including Praglin and the California subclass members, from making fully-informed decisions about whether to purchase or lease a Class Vehicle, and how much to pay for that vehicle.

228.    Praglin and the California subclass members have suffered injuries, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and deceptive practices. Praglin and the California subclass members relied on Mercedes' misrepresentations and omissions with respect to the safety and reliability of the Class Vehicles.  Had Praglin and the California subclass members known the truth, they would not have purchased or leased their vehicles, or would have paid less for them.

229.    The wrongful conduct alleged above and below occurred and continues to occur in the conduct of Mercedes' business.  Mercedes' wrongful conduct is part of a pattern or generalized course of conduct that is perpetuated and repeated to date.

230.    As a proximate and direct result of Mercedes' unfair and deceptive practices in violation of § 17200, Praglin and the California subclass members have suffered, and continue to suffer, actual damages.

231.    Praglin, on behalf of herself and the California subclass members, requests that this

Court enter any and all such orders or judgments as may be necessary to enjoin Mercedes from continuing its unfair, unlawful, and deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203.

**COUNT VI**
**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750, *et seq.***
**against Defendants MBUSA and Daimler**
**on Behalf of Plaintiff Praglin and the California Subclass**

232.     Plaintiff Praglin incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

233.     The Class Vehicles are "goods" within the meaning of Cal. Civ. Code. § 1761(a).

234.     Praglin, the California subclass members, and Mercedes are "persons" within the meaning of Cal. Civ. Code § 1761(c).

235.     Praglin and the California subclass members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

236.     The California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

237.     Mercedes engaged and engages in unfair or deceptive acts in violation of the CLRA as described above and below.  Mercedes represented and represents that the Class Vehicles and the AHR in the installed headrests have qualities, characteristics, benefits, and uses which they do not have; that they are of a particular standard, grade, and quality when they are not; advertised and advertises the Class Vehicles with the intent to sell or lease them in a quality or condition not as advertised; and represented and represents that the goods subject to transactions have been

supplied in accordance with previous representations when, in fact, the goods are of a condition other than represented.

238.     As a pattern and in the normal conduct of business, Mercedes failed to disclose and actively concealed dangers and safety risks posed by a defective AHR in the headrests installed in the Class Vehicles, and otherwise acted with a tendency or capacity to deceive consumers.

239.     Mercedes acted unlawfully in its trade practices by representing that the Class Vehicles and the AHR in the headrests installed in the Class Vehicles have qualities that they do not, in fact, have; that they are of a particular standard when they are not; and by omitting material facts in describing them.

240.     Mercedes intentionally and knowingly misrepresented and omitted material facts regarding the Class Vehicles with an intent to mislead Praglin and the California subclass members.  As alleged above and below, Mercedes made material statements and representations in marketing materials, advertisements, and other publications, about the safety and reliability of the Class Vehicles that were either false or misleading.

241.     Mercedes owed Praglin and the California subclass members a duty to disclose the true safety and reliability of the Class Vehicles because Mercedes:

    a.  Possessed exclusive and superior knowledge about the dangers and safety risks posed by the defective AHR in the headrests installed in the Class Vehicles;

    b.  Intentionally concealed that information from consumers; and

    c.  Made incomplete or inaccurate representations about the safety and reliability of the Class Vehicles while purposefully withholding material information from consumers that contradicted those representations.

242.     Mercedes' incomplete, inaccurate, misleading, or false representations and other

unfair and deceptive acts were likely to deceive reasonable consumers including Praglin and the California subclass members.

243.    Mercedes knew or should have known that its conduct violated the CLRA.

244.    Mercedes acted unfairly within the meaning of the CLRA because the acts and practices described above and below, including the manufacture, marketing, advertising, and sale of the Class Vehicles and the failure to adequately investigate, disclose, and remedy the defective AHR offend normal public policy. The harm Mercedes causes to consumers greatly outweighs any benefits associated with those practices. Mercedes' conduct also impaired and impairs competition in the automotive market and has prevented consumers, including Praglin and the California subclass members, from making fully-informed decisions about whether to purchase or lease a Class Vehicle, and how much to pay for that vehicle.

245.    Praglin and the California subclass members have suffered injuries, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and deceptive practices. Praglin and the California subclass members relied on Mercedes' misrepresentations and omissions with respect to the safety and reliability of the Class Vehicles.  Had Praglin and the California subclass members known the truth, they would not have purchased or leased their vehicles, or would have paid less for them.

246.    The wrongful conduct alleged above and below occurred and continues to occur in the conduct of Mercedes' business.  Mercedes' wrongful conduct is part of a pattern or generalized course of conduct that is perpetuated and repeated to date.

247.    As a proximate and direct result of Mercedes' unfair and deceptive practices in violation of the CLRA, Praglin and the California subclass members have suffered, and continue to suffer, actual damages.  Praglin and the California subclass members currently own or lease

Class Vehicles inherently unsafe to operate in a normal and expected fashion due to the defective AHR in the headrests.

248.    Praglin, on behalf of herself and the California subclass members, requests that this Court enter judgment against Mercedes under the CLRA for an injunction requiring Mercedes to adequately and permanently repair at its cost the headrests in the Class Vehicles, and for an award of attorneys' fees pursuant to Cal. Civ. Code § 1780(d).

**COUNT VII**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**against Defendants MBUSA and Daimler**
**on Behalf of Plaintiff Praglin and the California Subclass**

249.    Plaintiff Praglin incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

250.    California Bus. & Prof. Code. § 17500 makes it unlawful "for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

251.    Mercedes made and disseminated, or caused to be made or disseminated, through California and the various states, statements in advertising, marketing, and other publications, that were untrue or misleading and which were known to Mercedes, or reasonably should have been known to Mercedes, to be untrue and misleading to consumers including Praglin and the California subclass members.

11O4776                                      57

252.    Mercedes violated and violates § 17500 because it made and makes misrepresentations and omissions regarding the functionality, safety, and reliability of the Class Vehicles, as set forth above and below. These misrepresentations and omissions are and were material and likely to deceive a reasonable consumer, including Praglin and the California subclass members.

253.    Praglin and the California subclass members have suffered injuries-in-fact, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and deceptive practices. Praglin and California subclass members relied on Mercedes' misrepresentations and omissions with respect to the safety and reliability of the Class Vehicles.  Had Praglin and the California subclass members known the truth about the defective AHR, they would not have purchased or leased their Class Vehicles, or otherwise would have paid less for them. Accordingly, Praglin and the California subclass members were deprived of the benefit of their bargains.

254.    The wrongful conduct alleged above and below occurred, and continues to occur, in the conduct of Mercedes' business as part of a pattern or generalized course of conduct that is still perpetuated and repeated in the state of California and the various states.

255.    Praglin, on behalf of herself and the California subclass members, requests that this Court enter any such judgment necessary to enjoin Mercedes from continuing its unfair, unlawful, and deceptive practices and to restore to Praglin and the California subclass members any money that Mercedes acquired by unfair competition, including restitution and disgorgement in an amount to be determined at trial, and for any such other relief as is right and just.

## COUNT VIII
## VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT
## FOR BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### Cal. Civ. Code §§ 1791.1 and 1792
### against Defendants MBUSA and Daimler
### on behalf of Plaintiff Praglin and the California Subclass

256.    Plaintiff Praglin incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

257.    In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the California subclass against the Mercedes Defendants.

258.    Praglin and the California subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

259.    The Class Vehicles, the headrests and the AHR are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

260.    The Mercedes Defendants are "manufacturers" within the meaning of Cal. Civ. Code § 1791(j).

261.    Mercedes impliedly warranted to Praglin and the California subclass members that the Class Vehicles were merchantable within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792.  However, the Class Vehicles do not have the qualities of safety and reliability that a buyer would reasonably expect, and were therefore not merchantable due to the defective AHR in the headrests.

262.    Cal. Civ. Code § 1791(a) states that "implied warranty of merchantability" means that consumer goods meet the following criteria:

a.    Pass without objection in the trade under the contract description;

b.    Are fit for the ordinary purpose for which such goods are used;

11O4776

c.   Are adequately contained, packaged, and labeled; and

d.   Conform to the promises or affirmations of fact made on the container or label.

263.   The Class Vehicles and the headrests installed in them would not pass without objection in the automotive trade because the defective AHR deploys the headrest unexpectedly and at inappropriate times, posing a risk of serious injury to passengers and all other persons on the road.

264.   Because of the defective AHR, the Class Vehicles are not safe to drive, which is in fact the ordinary purpose for which vehicles are intended.

265.   The Class Vehicles and headrests with the defective AHR are not adequately labeled because the labeling fails to disclose the defect.

266.   Thus, Mercedes breached the implied warranty of merchantability because it manufactured and sold Class Vehicles in which the defective AHR deploys at random and risks serious injury to drivers, occupants, and others on the road.  In selling Class Vehicles without disclosing the existence or nature of the defective AHR, Mercedes deprived Praglin and the California subclass members the benefit of their bargain.

267.   Mercedes had notice of the defect from customer complaints, from repair requests at dealerships and service centers, from internal investigations, and from the defect of the same nature affecting the Grammer AHR head restraints in Fiat-Chrysler branded vehicles. *See* fn. 2, *supra*.

268.   Mercedes' breach of duty under the Song-Beverly Act directly and proximately caused Praglin and the California subclass members to overpay for goods whose dangerous and defective condition substantially impairs their actual value.

269.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Praglin and the California subclass

members are entitled to damages and other legal and equitable relief including, at their election,

the overpayment or the diminution in value of their vehicles.

270.    Pursuant to Cal. Civ. Code § 1794, Praglin and the California subclass members

are further entitled to costs and attorneys' fees.

**COUNT IX**
**VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE**
**TRADE PRACTICES ACT**
**("N.C. UDTPA"), N.C. Gen. Stat. §§ 75-1.1** *et seq.*
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiff Fitzpatrick and the North Carolina Subclass**

271.    Plaintiff Fitzpatrick incorporates by reference paragraphs 1 through 171 as though

fully set forth herein.

272.    The Mercedes Defendants engage in "commerce" within the meaning of N.C. Gen.

Stat. § 75-1.1(b).

273.    N.C. UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting

commerce." N.C. Gen. Stat. § 75-1.1(a).

274.    Mercedes engaged in unfair and deceptive trade practices that violated N.C.

UDTPA, including but not limited to the following:

a.    Mercedes represented that the Class Vehicles have safety characteristics that they do not have;

b.    Mercedes represented that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

c.    Mercedes knew of the defective AHR, but failed to disclose, and actively concealed, the existence of the defect to consumers or NHTSA. Mercedes knew that such information was material to consumer transactions;

d.    Mercedes intended for Fitzpatrick and the North Carolina subclass members to rely on their misrepresentations and omissions so that Fitzpatrick and the North Carolina subclass members would purchase or lease Class Vehicles.

275.    Mercedes' unfair or deceptive acts or practices, including concealing, omitting, or

11O4776                                    61

suppressing material facts about the defective AHR, had a tendency or capacity to mislead; tended to create a false impression in consumers; were likely, to and did in fact, deceive reasonable consumers, including Fitzpatrick and the North Carolina subclass members, about the safety and reliability of Class Vehicles and the headrests installed in them, the quality of Mercedes brand, and the true value of the Class Vehicles.

276.    Mercedes intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the headrests installed in them, with an intent to mislead Fitzpatrick and the North Carolina subclass members.

277.    Mercedes knew or should have known that its conduct violated the N.C. UDTPA.

278.    Fitzpatrick and the North Carolina subclass members were injured as a result of Mercedes' conduct because Fitzpatrick and the North Carolina subclass members now own or possess Class Vehicles for which they overpaid.

279.    Mercedes' failure to disclose, and active concealment of, the dangers and safety risks posed by the defective NECK-PRO in Class Vehicles were material to Fitzpatrick and the North Carolina subclass members.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

280.    Fitzpatrick and the North Carolina subclass members suffered ascertainable loss as a result of Mercedes' misrepresentations and failure to disclose information.  Had they been aware of the defect that existed in the Class Vehicles, Fitzpatrick and the North Carolina subclass members either would have paid less for their Class Vehicles or would not have purchased or leased their vehicles.  Fitzpatrick and the North Carolina subclass members did not receive the benefit of their bargain due to Mercedes' misconduct.

281.     Fitzpatrick and the North Carolina subclass members risk irreparable injury as a result of Mercedes' conduct in violation of the N.C. UDTPA.   These violations present a continuing safety risk to Fitzpatrick, the North Carolina subclass members, and the general public.

282.     As a direct and proximate result of Mercedes' violations of the N.C. UDTPA, Fitzpatrick and the North Carolina subclass members have suffered injuries-in-fact or actual damage.

283.     Fitzpatrick, on behalf of the North Carolina Subclass Members, seeks treble damages; an order enjoining Mercedes' unfair or deceptive practices; an order requiring Mercedes to notify the North Carolina subclass members of the defective AHR and remedy the defect in the Class Vehicles; attorneys' fees; and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT X
## FRAUD BY CONCEALMENT
## against Defendants MBUSA and Daimler
## on behalf of all Plaintiffs and Class Members

284.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 171 as if fully set forth herein and further allege as follows.

285.     Plaintiffs bring this claim on behalf of all Class members under the common law of fraudulent concealment, as there are no true conflicts of law (case-dispositive differences) among the various states.   In the alternative, Plaintiffs bring this claim against the Mercedes Defendants under the laws of the states where Plaintiffs and Class members purchased their vehicles.

286.     Mercedes concealed and suppressed material facts concerning the defective AHRs installed in the headrests, namely that they are, in fact, defective and prone to cracking, breaking, and deploying without warning; that the defect causes the AHR to deploy without the vehicle

being involved in a rear-end collision; and that the defect poses a threat of serious injury to occupants.   Mercedes knew these representations and omissions were false when made.

287.    Mercedes had a duty to disclose the defect because Mercedes consistently represented that Class Vehicles were reliable and safe; identified the AHR as a safety feature; and proclaimed that it maintained the highest safety standards, and the defects were known or accessible only to Mercedes, who had superior knowledge and access to the facts, and knew that the facts were not known to or reasonably discoverable by Plaintiffs and the Class members. These omitted and concealed facts were material because they directly impact the safety of the Class Vehicles as well as the price Plaintiffs and Class members would have been willing to pay for their Class Vehicles.

288.    Mercedes actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class members to purchase or lease the Class Vehicles at high prices, and to protect its profits and avoid a costly recall, and Mercedes did so at the expense of the safety of Plaintiffs and the Class members.

289.    Plaintiffs and the Class members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed or suppressed facts. Plaintiffs' and the Class members' actions were reasonable and justified.

290.    On information and belief, Mercedes has still not made any disclosure regarding the defective AHR, despite having knowledge through agents at Mercedes dealerships and Mercedes service centers that the defect is evident in vehicles.

291.    Because of the concealment or suppression of the facts, Plaintiffs and the Class members sustained damages because they did not receive the benefit of their bargain and the value of the Class Vehicles has been diminished, which is a direct result of Mercedes' wrongful

conduct.

292.    Mercedes' acts were done oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights and well-being to enrich itself. Mercedes' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT XI**
**FRAUD BY CONCEALMENT**
**<u>against Defendant Grammer AG</u>**
**<u>on behalf of Plaintiffs and Class Members</u>**

293.    Plaintiffs and the Class members re-allege and incorporate by reference paragraphs 1 through 171 as if fully set forth herein and further allege as follows.

294.    Plaintiffs bring this claim on behalf of all Class members under the common law of fraudulent concealment, as there are no true conflicts of law (case-dispositive differences) among the various states.

295.    Grammer concealed and suppressed material facts concerning the defective AHRs installed in the headrests, namely that they are, in fact, made with inferior plastic and defective and prone to cracking, breaking, and deploying without warning; that the defect causes the AHR to deploy without the vehicle being involved in an accident; and that the defect poses a threat of serious injury to occupants. Grammer knew these facts; knew that they were material to consumers; concealed them; and failed to disclose them.

296.    Grammer had a duty to disclose the defective AHR because it had superior knowledge and access to the facts, and knew that the facts were not known to or reasonably discoverable by Plaintiffs and the Class members.

297.    These omitted and concealed facts were material because they directly impact the safety of the Class Vehicles as well as the price Plaintiffs and Class members would have been

willing to pay for their vehicles.

298.     Grammer actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class members to purchase or lease the Class Vehicles at high prices, to protect its role in the automotive industry supply chain, and to protect its profits and avoid a costly recall.  Grammer did this at the expense of the safety of Plaintiffs and the Class members.

299.     Plaintiffs and the Class members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed or suppressed facts. Plaintiffs' and the Class members' actions were reasonable and justified.

300.     On information and belief, Grammer has still not made any disclosure regarding the defective AHR, despite having knowledge of it.

301.     Because of the concealment or suppression of the facts, Plaintiffs and the Class members sustained damages because they did not receive the benefit of their bargain and the value the Class Vehicles has been diminished. Their loss is a direct result of Grammer's wrongful conduct.

302.     Grammer's acts were done oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights and well-being in order to enrich itself. Grammer's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT XII
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### ("Magnuson-Moss"), 15 U.S.C. § 2301, *et seq.*
### against Defendants MBUSA and Daimler
### on behalf of Plaintiffs and all Class Members

303.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 171, paragraphs 212 through 220, and paragraphs 257 through 270, as though fully set forth herein.

11O4776

304.    Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of the written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1) (Remedies in consumer disputes).  As alleged above, Mercedes has failed to comply with the terms of its written, express, or implied warranties.

305.    This Court has jurisdiction to decide claims brought under 15 U.C.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)–(d).

306.    The Class Vehicles are "consumer products" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(1).

307.    Plaintiffs and the Class members are "consumers" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(3).

308.    Mercedes is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)-(5).

309.    As a supplier and warrantor, Mercedes is obligated to afford Plaintiffs and the Class members, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity.

310.    Magnuson-Moss provides a cause of action for, among other things, any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

311.    Defendants breached their implied warranties of merchantability, which they cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiffs and the Class members have suffered damages as a result of Mercedes' breaches of warranties as set forth above.

11O4776

312.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

313.     Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Mercedes and the Plaintiffs and Class members.

314.     Mercedes knew that the Class Vehicles were defective and posed safety risks, and that the Class Vehicles would continue to pose safety risks after the warranties purportedly expired. Mercedes failed to disclose the defect to Plaintiffs and other Class members. Therefore, Mercedes' enforcement of any durational limitations on warranties is unlawful.

315.     Plaintiffs and Class members have had sufficient direct dealings with either Mercedes or its agents and dealerships to establish privity of contract.

316.     Nonetheless, privity is not required here because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Mercedes and its agents and dealerships, and specifically, of the implied warranties.  The warranties are intended to protect end-consumers, not dealers.  Dealers have no rights under the warranty agreements provided with the Class Vehicles.  Further, privity is not required because the Class Vehicles are dangerous instrumentalities due to the defective AHR.

317.     Mercedes' breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain.  The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

318.     Plaintiffs and the Class members have suffered, and are entitled to recover,

damages as a result of Mercedes' breach of warranty and violations of Magnuson-Moss.

319.     Mercedes had an opportunity to disclose information concerning the Class Vehicles' inability to perform as warranted, and to cure its breach of warranty. As yet, Mercedes has failed to do so.

320.     As a direct and proximate result of Mercedes' conduct, Plaintiffs and other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.

321.     Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and Revocation of Acceptance are equitable remedies available to Plaintiffs and the Class members under Magnuson-Moss.

322.     Plaintiffs also seeks under Magnuson-Moss an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiffs and the Class members intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

**COUNT XIII**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**("Magnuson-Moss"), 15 U.S.C. § 2301, *et seq.***
**against Defendant Grammer AG**
**on behalf of Plaintiffs and all Class Members**

323.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 171, paragraphs 212 through 220, and paragraphs 257 through 270, as though fully set forth herein.

324.     Plaintiffs bring this claim on behalf of all Class members.

325.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, by virtue of 28 U.S.C. § 1332(a)–(d).

326.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

327.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

328.     Grammer is a "supplier" and a "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

329.     The Magnuson-Moss Warranty Act provides a cause of action for any consumer who is harmed by a warrantor's failure to comply with a written or implied warranty. 15 U.S.C. § 2310(d)(1).

330.     Grammer provided Plaintiffs and other Class members with an implied warranty of merchantability in connection with the purchase or lease of their Class Vehicles. As part of the implied warranty of merchantability, Grammer warranted that the headrests equipped with the AHRs were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed.

331.     Grammer breached this implied warranty, as detailed above, and is therefore liable to Plaintiffs and the Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect: the AHR is made of an inadequate type of ABS plastic that fails under normal use.

332.     Any effort to limit the implied warranty in a manner that would exclude coverage

11O4776                                            70

of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability

for the Class Vehicles is null and void.

333.    Any limitations on the warranty are procedurally unconscionable because there was

unequal bargaining power between Grammer, on one hand, and the Plaintiffs and Class members

on the other.

**COUNT XIV**
**UNJUST ENRICHMENT**
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiffs and the Class Members**

334.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 171 as

though fully set forth herein.

335.    Plaintiffs bring this claim on behalf of all Class members under the common law

of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various

states' laws of unjust enrichment.  In the alternative, Plaintiffs bring this claim under the laws of

the states where Plaintiffs and Class members purchased their vehicles.

336.    The Mercedes Defendants have received and retained a benefit from the Plaintiffs

and Class members and inequity has resulted.

337.    Plaintiffs and the Class members directly conferred benefits on Mercedes: the price

paid for the Class Vehicles advertised as having the safety feature of the AHR which was

defectively designed and does not function as advertised.

338.    Plaintiffs and the Class members paid their purchase prices in reliance on

Mercedes' representations that the Class Vehicles were safe, fit for ordinary use, and equipped

with the AHR that would only deploy in the case of a rear-end collision rather than at random.

Plaintiffs and the Class members would not have purchased the Class Vehicles, or would have

paid less, if not for these representations.

11O4776                                                          71

339.     Mercedes benefitted through its unjust conduct by selling Class Vehicles equipped with headrests with the defective AHR at a profit and for more than the Class Vehicles were worth. Further, Mercedes has benefitted through it unjust conduct in refusing to recall and repair the defect in Class Vehicles and thus saving that cost.

340.     It is inequitable for Mercedes to retain these benefits. Mercedes will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Mercedes was unjustly enriched at his or her expense.

341.     Plaintiffs do not have an adequate remedy at law.

342.     The amount of Mercedes' unjust enrichment should be disgorged, in an amount to be proven at trial.

343.     Plaintiffs, on behalf of themselves and all similarly situated Class members, seek an award against Mercedes in the amount by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

**COUNT XV**
**UNJUST ENRICHMENT**
**against Grammer AG**
**on behalf of Plaintiffs and the Class Members**

344.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 171 as though fully set forth herein.

345.     Plaintiffs bring this claim on behalf of all Class members under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class members purchased their vehicles

346.     Grammer has received and retained a benefit from the Plaintiffs and Class members and inequity has resulted.

11O4776                                            72

347.    Plaintiffs and the Class members overpaid for the Class Vehicles because they would not have purchased the Class Vehicles, or would have paid less, if Grammer had disclosed the defect in the AHR.

348.    Grammer benefitted through its unjust conduct by selling the defective AHR to Mercedes at a profit and for more than the defective AHRs were worth.  Further, Grammer has benefitted through its unjust conduct in refusing to participate in a recall of the defective AHR and thereby saving the cost of a recall.

349.    It is inequitable for Grammer to retain these benefits. Grammer will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Grammer was unjustly enriched at his or her expense.

350.    Plaintiffs do not have an adequate remedy at law.

351.    The amount of Grammer's unjust enrichment should be disgorged, in an amount to be proven at trial.

352.    Plaintiffs, on behalf of themselves and all similarly situated Class members, seek an award against Grammer in the amount by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated Class members, request that the Court enter judgment against Defendants as follows:

(1)    Declare this action to be a proper class action maintainable under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiffs as class and subclass representatives and Plaintiffs' chosen counsel as Class Counsel;

(2)    Declare that the NECK-PRO headrests installed in the Class Vehicles are defective;

11O4776

(3)     Declare that Mercedes and Grammer are financially responsible for notifying all Class members about the defective AHR, issue a recall for the NECK-PRO system, and replace at its cost the headrests installed in the Class Vehicles with headrests that do not have a defective AHR;

(4)     Declare that the conduct of Mercedes and Grammer as alleged herein to be unlawful, deceptive, unfair or deceptive and issue an order temporarily and permanently enjoining Mercedes and Grammer from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this action;

(5)     Declare that Mercedes and Grammer must disgorge, for the benefit of Plaintiffs and the Class members all or part of the ill-gotten gains they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class members;

(6)     Award Plaintiffs and Class members actual, compensatory, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial under the applicable claims;

(7)     Award Plaintiffs and Class members their reasonable attorneys' fees and costs, as allowed by law;

(8)     Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law; and

(9)     Award Plaintiffs and Class members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial for any and all issues triable by a jury.

Respectfully submitted:  August 30, 2019

| | |
|---|---|
| /s/*Benjamin Widlanski*<br>Benjamin Widlanski, Esq.<br>bwidlanski@kttlaw.com<br>Harley S. Tropin, Esq.<br>hst@kttlaw.com<br>Gail McQuilkin, Esq.<br>gam@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:   (305) 372-1800<br>Facsimile:    (305) 372-3508<br><br>*Counsel for Plaintiffs* | George Franjola, Esq.<br>gfranjola@ocalalaw.com<br>**GILLIGAN, GOODING, FRANJOLA &**<br>**BATSEL, P.A.**<br>1531 SE 36th Ave.<br>Ocala, FL 34471<br>Telephone:     (352) 867-7707<br>Facsimile:      (352) 867-0237<br><br>*Counsel for Plaintiffs* |
| Jack Scarola, Esq.<br>Florida Bar No. 169440<br>jsx@searcylaw.com<br>**SEARCY DENNEY SCAROLA**<br>**BARNHART & SHIPLEY PA**<br>2139 Palm Beach Lakes Blvd.<br>West Palm Beach, FL 33409<br>Telephone: (561) 686-6300<br>Fax: (561) 383-9451<br><br>*Counsel for Plaintiffs* | Michael Burger, Esq. (*pro hac vice*<br>forthcoming)<br>mike@litgrp.com<br>**SANTIAGO BURGER LLP**<br>1250 Pittsford Victor Road<br>Bldg. 100 Suite 190<br>Pittsford, NY 14534<br>Telephone: (585) 563-2400<br>Facsimile: (585) 563-7526<br><br>*Counsel for Plaintiffs* |

11O4776