**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CIV-81220-RAR**

**TIMOTHY LEWIS, TERESA MASSA,**
**LINDA GAZIE, STEVEN WALLACH,**
**ANA SCHWARTZ, JOSEPH MONOPOLI,**
**JAMES FITZPATRICK, and SYNTHIA**
**PRAGLIN, on behalf of themselves and all**
**others similarly situated,**

        **Plaintiffs,**

**v.**

**MERCEDES-BENZ USA, LLC,**
**DAIMLER AG and GRAMMER AG,**

        **Defendants.**
_____/

## ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

Mercedes-Benz advertises its vehicles as "the best or nothing."[1]  Plaintiffs in this lawsuit—who allege that the headrests in their Mercedes vehicles spontaneously eject—might beg to differ. Specifically, Plaintiffs allege that their vehicles contained, at the time of purchase, a latent defect in the headrests that causes them to spontaneously spring forward with significant force, posing a serious threat to their safety.  Even worse, according to Plaintiffs, is that Defendants knew about this defect, failed to disclose it, and actively conspired with each other to conceal it.  Defendants have a different view, and for a host of factual and legal reasons, ask the Court to dismiss this case in its entirety.

Before the Court is Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Complaint [ECF No. 66] ("Motion").  Having reviewed the Motion, Plaintiffs' Response in

---

[1]  Daimler AG, *The Best or Nothing – Mercedes-Benz*, YᴏᴜTᴜʙᴇ (June 10, 2010), https://www.youtube.com/watch?v=HkV2dflBvcA.

Opposition [ECF No. 68] ("Response), Defendants' Reply [ECF No. 69] ("Reply"), the record, applicable law, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss is **GRANTED IN PART** as set forth herein.

## BACKGROUND

When a car is impacted from behind, or "rear-ended," the occupants of the vehicle often experience whiplash from the resulting forceful back-and-forth movement of their necks. In an effort to solve this problem, Defendants Mercedes Benz USA, LLC ("MBUSA") and Daimler AG ("Daimler" and together with MBUSA, the "Mercedes Defendants") embedded in the headrests of their vehicles a mechanism known as an Active Head Restraint ("AHR"), which is designed to spring forward in the event of a rear-end collision and rapidly push the cushioned headrest out to catch the occupant's head. First Am. Compl. [ECF No. 22] ("FAC") ¶ 1. The headrest and AHR are manufactured by Defendant Grammer AG ("Grammer") and installed in the vehicles of the Mercedes Defendants, who branded the product "NECK-PRO." *Id.*

The forward-facing padded surface of the NECK-PRO headrest is mounted to a plastic carriage that is loaded by pre-tensioned springs when stowed in the headrest. *Id.* ¶ 121. The carriage contains a plastic bracket that acts as the triggering mechanism and holds the spring-loaded release in place until an electronic sensor connected to the vehicle's computer control unit indicates that a rear-end collision is occurring. *Id.* ¶ 122. When the sensor detects a rear-end collision, it triggers the bracket to release, allowing the carriage to be forced forward by the springs. *Id.*

Obviously, these devices are only supposed to deploy upon an external force onto the car. But the First Amended Complaint alleges that Defendants designed the bracket with an inferior and inexpensive form of plastic, which cracks and breaks down prematurely under the constant

pressure of the tensed springs in the headrest, causing the AHR to spontaneously deploy. *Id*. The force of the impact not only can cause bodily harm to the head and neck, but also creates a risk of collision when the headrest deploys suddenly while the vehicle is being driven. *Id.* ¶ 2. Plaintiffs state that the vehicles equipped with the defective NECK-PRO in the United States number at least in the "hundreds of thousands," and there is no way for a vehicle owner to predict when the AHR in the headrest will deploy. *Id.* ¶ 3.

Plaintiffs' First Amended Complaint avers that Defendants possessed exclusive and superior knowledge of the defect as early as 2006 based upon

> [E]ngineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, plastic material data reports, consumer complaints to the National Highway and Traffic Safety Administration ("NHTSA"), consumer complaints to MBUSA dealerships, consumer complaints on website forums, aggregate warranty data compiled from MBUSA dealerships, and repair orders and parts data received from dealerships.

*Id*. ¶ 7. Plaintiffs also point to a Technical Service Bulletin ("TSB")[2] issued by the Mercedes Defendants to their network of dealerships in 2007 entitled "Restraints – Head Restraint Activate Without Cause," which stated that the problem "may be caused by damage to the seat wiring harness causing a short circuit." *Id.* ¶ 161. Despite having this information, Defendants purportedly conspired to conceal the defect from the public while continuing to manufacture and sell vehicles with the defect. Moreover, Defendants continued to publicly promote the safety of their vehicles. Plaintiffs allege they were misled by these public communications, which caused them to purchase Mercedes vehicles that they otherwise would not have if they had known of the defect.

---

[2] "A Technical Service Bulletin is a document disseminated internally that informs Mercedes technicians how to diagnose and repair the identified problem." *Suddreth v. Mercedes-Benz, LLC*, No. 10-05130, 2011 WL 5240965, at *1 n.3 (D.N.J. Oct. 31, 2011).

The nine Plaintiffs in this case are Timothy Lewis, Linda Gazie, Steven Wallach, Teresa Massa, Ana Schwartz, Joseph Monopoli, James Fitzpatrick, Synthia Praglin, and Sawntanaia Harris.  Lewis, Gazie, Wallach, Massa, and Schwartz are residents of Florida; Monopoli is a resident of New York; Fitzpatrick is a resident of North Carolina; and Praglin and Harrris are residents of California.  These Plaintiffs are owners of a Mercedes vehicle with NECK-PRO headrests and purchased their vehicles between 2011 and 2019.  They purport to be class representatives for a nationwide class ("Nationwide Consumer Class")—in addition to a Florida subclass, a New York subclass, a California subclass, and a North Carolina subclass—all comprised of current or former owners and lessors of vehicles with defective NECK-PRO headrests ("Class Vehicles").  *See id*.  ¶ 211.  The First Amended Complaint asserts the following claims:

- Count I: Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against the Mercedes Defendants on behalf of Plaintiffs and the Nationwide Consumer Class;

- Count II: Violation of RICO, 18 U.S.C. § 1962(d), against all Defendants on behalf of Plaintiffs and the Nationwide Consumer Class;

- Count III: Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. § 501.201 *et seq.*, against the Mercedes Defendants on behalf of a Florida subclass;

- Count IV: Violation of the New York General Business Law § 349 against the Mercedes Defendants on behalf of a New York subclass;

- Count V: Violation of the New York General Business Law § 350 against the Mercedes Defendants on behalf of a New York subclass;

- Count VI: Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*., against Defendant MBUSA on behalf of a California subclass;

- Count VII: Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, against the Mercedes Defendants on behalf of a California subclass;

- Count VIII: Violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, against the Mercedes Defendants on behalf of a California subclass;

- Count IX: Violation of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1791.1 and 1792 for breach of the implied warranty of merchantability against the Mercedes Defendants on behalf of a California subclass;

- Count X: Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*, against the Mercedes Defendants on behalf of a North Carolina subclass;

- Count XI: Fraudulent concealment against the Mercedes Defendants on behalf of the New York, California, and North Carolina subclasses;

- Count XII: Fraud by concealment against Defendant Grammer on behalf of the New York, California, and North Carolina subclasses;

- Count XIII: Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, against the Mercedes Defendants on behalf of the Nationwide Consumer Class;

- Count XIV: Violation of the MMWA, 15 U.S.C. § 2301 *et seq.*, against Defendant Grammer on behalf of the Nationwide Consumer Class;

- Count XV: Unjust enrichment against the Mercedes Defendants on behalf of the Nationwide Consumer Class; and

- Count XVI: Unjust enrichment against Defendant Grammer on behalf of the Nationwide Consumer Class.

Defendants have now moved to dismiss all counts under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(2) for lack of personal and subject matter jurisdiction, and under 12(b)(6) for failure to state a claim upon which relief can be granted.

## ANALYSIS

In their Motion, Defendants raise several arguments in favor of dismissal. Because a federal court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)[,]" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007), the Court first considers Defendants' arguments relating to jurisdiction. It is proper, although not required, for the Court to address subject matter jurisdiction first, *see Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 587-88 (1999), so the Court begins by addressing Plaintiffs' Article III standing. *Accord Gardner v. Mutz*, 962 F.3d 1329, 1337, 1339 (11th Cir. 2020) ("[T]he plaintiff who lacks standing never had a 'Case' to begin with . . . . [B]ecause standing to sue implicates jurisdiction, a court *must* satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting.") (emphasis in original). Accordingly, the Court will first address subject matter jurisdiction and then turn to issues of personal jurisdiction.

### I. SUBJECT MATTER JURISDICTION

The Court begins its analysis of subject matter jurisdiction by addressing standing under Article III of the United States Constitution and examining whether Plaintiffs have sufficiently stated a concrete injury given their allegations of economic harm in the form of overpayment. From there, the Court will analyze standing in the context of Counts of XIII-XVI of the First Amended Complaint, which assert state law claims on behalf of out-of-state class members. As explained below, these counts—which allege violations of the MMWA and unjust enrichment— must fail as to the Nationwide Consumer Class because Plaintiffs lack standing to represent a nationwide class on these claims. Finally, the Court will consider whether subject matter jurisdiction exists as to Plaintiffs' remaining MMWA claims under Counts XIII and XIV.

**A. Standing**

*i) Legal Standard*

One element of the case-or-controversy requirement under Article III of the United States Constitution is that plaintiffs "must establish that they have standing to sue" in federal court. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Thus, standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Sedlin*, 422 U.S. 490, 498 (1975). A plaintiff must establish three criteria for standing to sue: "(1) an 'injury in fact'—an invasion of a legally protected interest that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical'; (2) a 'causal connection' between the plaintiff's injury and the challenged action of the defendant; and (3) a likelihood, not merely speculation, that a favorable judgment will redress the injury." *Gardner*, 962 F.3d at 1338 (quoting *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc)). As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing, and Defendants' challenge to standing is analyzed under Federal Rule of Civil Procedure 12(b)(1). *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

Defendants bring two distinct challenges to Plaintiffs' standing. First, they contend that seven of the nine Plaintiffs lack standing because they fail to allege that their vehicles ever manifested the defect at issue. Second, they argue that the nationwide class allegations should be dismissed because Plaintiffs do not have standing to pursue relief on behalf of out-of-state class members. Because Defendants' standing arguments solely address the allegations in the First Amended Complaint rather than any extrinsic materials, this is considered a facial attack, which "requires the [C]ourt merely to look and see if the [P]laintiff[s] ha[ve] sufficiently alleged a basis of subject matter jurisdiction." *Id.* (citation omitted). Because this is a facial attack, the allegations in the First Amended Complaint are taken as true for purposes of the standing analysis. *Id.*

### ii) *Sufficiency of Plaintiffs' Factual Allegations*

Defendants argue that the seven Plaintiffs who have not alleged that the AHRs in their vehicles malfunctioned, activated, or failed in any way have not suffered an "injury in fact" or, at the least, such injury is not actual or imminent. *See* Mot. at 3-4. At first blush, this makes logical sense, but Plaintiffs' injuries stem from the purchase of the vehicles, rather than their personal experience with the defect in question. All Plaintiffs contend that they "paid a premium price" for the Mercedes vehicles "because [they] trusted Mercedes to provide high-quality and safe automobiles." FAC ¶¶ 21, 25, 28, 31, 34, 37, 39, 43, 48. Therefore, Plaintiffs allege that the "value of [their] vehicle[s] has been diminished as a result of the defective NECK-PRO[,]" and had they "known of the AHR defect, [they] would not have purchased [their] vehicle[s], or would not have paid as much for them as [they] did." *Id*. Because they adequately allege a defect in the product they purchased—causing economic injury—this is enough to establish Article III standing.

An economic injury is the "epitome" of a concrete injury. *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019). "A person experiences an economic injury when, as a result of a deceptive act or an unfair practice, he is deprived of the benefit of his bargain." *Debernardis v. IQ Formulations*, 942 F.3d 1076, 1084 (11th Cir. 2019). Thus, a plaintiff establishes standing by plausibly alleging that a product is defective, and plaintiff would not have purchased—or would have paid less—for the product had the existence of the defect been disclosed or not misrepresented.

For example, in *Yachera v. Westminster Pharmaceutical, LLC*, 477 F. Supp. 3d 1251, 1264 (M.D. Fla. 2020), the plaintiffs "suffered a concrete monetary injury" in their class action suit against the defendant pharmaceutical company "when they paid for thyroid medication that they plausibly allege[d] they would not have purchased had they known it did not contain the amount of [the active ingredient] they thought they were receiving." Ingesting a different amount of the

active ingredient could have had significant health consequences, which "support[ed] [p]laintiffs' assertion that the dosages listed on the label were 'part of the basis of the bargain' they struck in buying the thyroid tablets." *Id.* at 1263-64; *see also Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1298-99 (S.D. Fla. 2017) (denying a motion to dismiss for lack of standing where plaintiffs alleged they suffered "economic harm such as overpayment, loss of value, or loss of usefulness emanating from the loss of their benefit of the bargain" stemming from an alleged nondisclosure of manufacturing defect that had not manifested or otherwise injured plaintiffs); *Reynolds v. Wal-Mart Stores, Inc.*, No. 14-00381, 2015 WL 1879615, at *2 (N.D. Fla. Apr. 23, 2015) ("A plaintiff can meet the injury-in-fact requirement with a showing that by relying on a misrepresentation . . . they paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.").

As in *Yachera*, the potential health consequences of a headrest deploying spontaneously support Plaintiffs' assertions that the representations regarding the safety of NECK-PRO were part of the bargain they struck in buying their cars. Of course, because Plaintiffs claim they did not receive what they bargained for—namely, a defect-free vehicle—Plaintiffs must still adequately allege the existence of a defect. *See Debernardis*, 942 F.3d at 1084-85 ("To evaluate the plaintiffs' benefit-of-the-bargain theory we must consider . . . did the plaintiffs adequately allege that the supplements they purchased were adulterated?"). "As long as Plaintiffs do not simply allege that their [Mercedes] vehicles are 'defective,' but rather offer detailed, non-conclusory factual allegations of the product defect, the economic loss injury flows from the plausibly alleged defect at the pleadings stage." *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1166 (C.D. Cal. 2011).

Defendants submit that because seven of the nine Plaintiff have not alleged that the AHRs in their vehicles malfunctioned or failed, these seven Plaintiffs have failed to adequately allege the existence of a defect. Mot. at 3. But this mischaracterizes the nature of the defect alleged by

Plaintiffs—which is that the latch holding the spring-loaded headrest in place is made of cheap plastic that will inevitably wear down and cause the headrest to spontaneously deploy. In other words, Plaintiffs allege that the NECK-PRO headrests in their vehicles were ticking time bombs from the day they were purchased.

Therefore, Defendants' "argument succeeds only if one assumes that a plaintiff who has not *experienced* a safety defect *does not have* a safety defect. [But] [i]f the Court accepts the allegations that all [Mercedes] vehicles had the safety defect at the time of purchase, and the defects were not subsequently remedied . . . , all Plaintiffs suffered an economic loss at the time of purchase because they received a defective vehicle." *In re Toyota Motor Corp.*, 790 F. Supp 2d at 1165 (emphasis in original); *see also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 722-23 (5th Cir. 2007) (rejecting defendants' argument that plaintiffs lacked standing because the allegedly defective airbags in their vehicles never deployed inadvertently and explaining that each plaintiff "suffered economic injury at the moment she purchased [her vehicle] because [she adequately alleged] each vehicle was defective."); *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1121-22 (S.D. Fla. 2019) (finding that even though the allegedly defective airbags in the plaintiffs' vehicles had not deployed, the plaintiffs "suffered economic injuries . . . comprising the value they overpaid for their vehicles based on misinformation about vehicle safety."); *Precht v. Kia Motors Am., Inc.*, No. 14-01148, 2015 WL 12684342, at *9 (C.D. Cal. Apr. 8, 2015) ("Although [p]laintiff does not assert that he himself suffered any physical harm or threat of physical harm from his defective vehicle, [p]laintiff suffered concrete and particularized harm for Article III purposes because the car that he received was not the car he bargained for. Defendant's failure to disclose a potential safety defect caused the [p]laintiff economic harm by causing [p]laintiff to pay more for the vehicle than he would have had he known of the safety defect.").

Plaintiffs have adequately pleaded the existence of a defect. They have alleged that the NECK-PRO AHRs are secured by a bracket made from low-quality, inexpensive plastic, which cannot withstand the constant pressure imposed on them through normal operation. *See* FAC ¶¶ 123, 145. Plaintiffs have set forth enough factual detail to explain how the component inevitably fails and causes the AHR to spontaneously deploy, regardless of whether the vehicle has been involved in a collision. They also plead that this defect has caused them economic harm and they would not have purchased the vehicles had the defect been disclosed prior to purchase. *See id.* ¶¶ 25, 28, 31, 34, 37, 40, 43, 48; *see also Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 796 F. App'x 919, 921 n.1 (9th Cir. 2019) (finding that plaintiffs had Article III standing to bring claims under RICO and FDUTPA where "[p]laintiffs alleged that they purchased [defendant's product], which they would not have done absent [d]efendants' fraudulent scheme to conceal" the product's known risks) (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012)).

While Defendants believe Plaintiffs' general allegations of overpayment are not sufficiently imminent for Article III purposes, general factual allegations of injury (*i.e.*, overpayment) suffice at the pleadings stage because the Court must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Accordingly, accepting the aforementioned allegations as true, Plaintiffs bargained for safe vehicles free of defective headrests, but instead received unsafe vehicles with defective headrests. This overpayment constitutes an economic injury that is sufficient to confer standing.

### iii) Plaintiffs' Nationwide Class Allegations on Issues of State Law

Counts XIII-XVI raise claims on behalf of all Plaintiffs and the Nationwide Consumer Class. Defendants assert that Plaintiffs lack standing to pursue relief on these claims on behalf of

any out-of-state class members, and thus seek dismissal of these Counts as to the nationwide class. Plaintiffs, on the other hand, believe that at the pleading stage, they need only establish that they have standing to pursue their own claims, and the issue of Plaintiffs' standing as to the nationwide class should be deferred until class certification.

With due respect for the contrary out-of-circuit authority Plaintiffs cite, the Eleventh Circuit's standing jurisprudence compels the conclusion that standing is hardly an issue the Court can decide to hold in abeyance until a later date. To the contrary, "[a]s standing is a threshold issue, addressing the issue of standing at the motion to dismiss phase of the litigation, rather than waiting for the class certification phase, is not premature." *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1179 (S.D. Fla. 2019) (quoting *Sanchez-Knutson v. Ford Motor Co.*, No. 14-61344, 2015 WL 11197772, at *3 (S.D. Fla. July 21, 2015)).

When proceeding on behalf of a putative class, "[i]t is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Prado-Steinman ex rel Prado v. Bush*, 221 F. 3d 1266, 1280 (11th Cir. 2000) (internal quotation marks omitted); *see also Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019) ("It is well-settled that *prior to the certification of a class*, . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.") (emphasis added) (citing *id.*). Because "the caselaw appears clear that courts should evaluate Article III standing [issues] before those of class certification[,] . . . courts in this District have acknowledged the principles in *Prado* when reviewing motions to dismiss." *In re Zantac (Ranitidine) Prod. Liab. Litig.*, No. 20 MDL 2924, 2020 WL 7866674, at *12, *14 (S.D. Fla. Dec. 31, 2020) (collecting cases). This is only logical given the Supreme

Court's dual instructions that "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation[,]"  *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994), and "[t]hat a suit may be a class action adds nothing to the question of standing[,]"  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

Pursuant to *Prado*, "named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises." *Feldman v. BRP US, Inc.*, No. 17-61150, 2018 WL 8300534, at *6 (S.D. Fla. Mar. 28, 2018) (collecting cases).  In *Feldman*, the named plaintiff was a Florida resident who personally asserted claims under the MMWA, FDUTPA, and Florida common law, but he lacked standing to assert claims on behalf of a nationwide class because he "[did] not claim a legal injury in any state other than Florida, nor d[id] he allege an injury that arises under the laws of any other state."  *Id.*; *see also Lewis*, 518 U.S. at 357 ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.").

So too here.  Counts XIII and XIV assert violations of the MMWA on behalf of all Plaintiffs and the Nationwide Consumer Class.  The MMWA provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief."  15 U.S.C. § 2310.  Although the MMWA is a federal law, it necessarily relies on underlying state law breach of warranty claims.  *See Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1231 (11th Cir. 2016) ("[C]laims under the Magnuson-Moss Act are . . . based on state law.").  Because Plaintiffs are residents of only four states, do not claim a legal injury in any state besides their home state, and do not allege an injury that arises under the laws of any other state, they each lack standing to represent a nationwide class

on this claim.  *See Weiss*, 418 F. Supp. 3d at 1180-81; *Puhalla v. Mercedes-Benz USA, LLC (In re Takata Prod. Liab. Litig.)*, 462 F. Supp. 3d 1304, 1336 (S.D. Fla. 2020).

The nationwide claims in Counts XV and XVI fail for the same reason.  "Plaintiffs['] nationwide claims for unjust enrichment . . . are common law claims, and such claims rely on state law."  *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020).  Although the First Amended Complaint lists one generic general unjust enrichment claim, that claim is, in reality, fifty unjust enrichment claims—one for each state.  Such a claim would thus need to be brought on behalf of fifty state subclasses.  Plaintiffs here, however, do not have standing to assert an unjust enrichment claim under any state's law but their own because they did not suffer any injuries in fact traceable to alleged violations of laws in other states.  Thus, "the Court finds that Plaintiffs lack standing to bring such claims on a national basis."  *Id.*; *see also Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1174-76 (N.D. Cal. 2017) ("[The] named plaintiffs may not bring their claims for violation of the MMWA or for unjust enrichment on behalf of a nationwide class that includes citizens of unrepresented states.").

Accordingly, Counts XIII-XVI are **DISMISSED** as to the Nationwide Consumer Class given Plaintiffs' lack of standing.  Thus, Plaintiffs are left with individual claims for unjust enrichment and violations of the MMWA.  But this is not the end of the subject matter jurisdiction analysis.  Plaintiffs' individual MMWA claims cannot survive given its statutory text, which divests this Court of jurisdiction.

### B.  The Magnuson-Moss Warranty Act

Defendants posit that this Court does not have jurisdiction to hear Plaintiffs' claims under the plain terms of the MMWA, 15 U.S.C. section 2310(d)(3).  The MMWA allows Plaintiffs to bring suit:

(A) in any court of competent jurisdiction in any State or the District of Columbia; or

(B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection.

*Id*. § 2310(d)(1).  Paragraph 3, in turn, states that "[n]o claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection--if the action is brought as a class action, and the number of named plaintiffs is less than one hundred."  *Id*. § 2310(d)(1)(3)(c).  Because this suit is a class action and the number of Plaintiffs is less than 100, Defendants maintain that Plaintiffs' MMWA claims are precluded by the plain terms of the statute.

Plaintiffs contend that Congress effectively repealed this limitation by enacting the Class Action Fairness Act ("CAFA") in 2005, the statute under which Plaintiffs bring this class action suit.  According to Plaintiffs, "CAFA supersedes the MMWA's jurisdictional requirements, and negates its one-hundred plaintiff rule."  Resp. at 47 (citing *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 293 (S.D.N.Y. 2015); *Chavis v. Fid. Warranty Servs., Inc*., 415 F. Supp. 2d 620, 626 (D.S.C. 2006)).  There is a split of authority assessing the interplay between CAFA and MMWA numerosity requirements, and the Eleventh Circuit has yet to consider the issue.  Given the lack of binding authority, the Court looks first to the statute itself.

"As with any other statute, [the] interpretation of the [MMWA] begins with its text and the presumption that Congress 'says in a statute what it means and means in a statute what it says[.]'" *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1309 (D.C. Cir. 2004) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).  Here, it is difficult to conceive how the text could be any clearer: the 100-named-plaintiff limitation applies to the second category (federal district courts), but not the first (courts "of competent jurisdiction in any State or the District of

Columbia").  *See* 15 U.S.C. § 2310(d)(3) (providing restrictions for "a suit brought under paragraph (1)(B) of this subsection").

Traditional canons of statutory construction confirm that the plain text must control.  Some courts have concluded that federal courts can fall in the first category of section 2310(d)(1) on the notion that federal courts lie within the geographical boundaries of states and CAFA provides a basis for jurisdiction.  *See, e.g.*, *Barclay v. ICON Health & Fitness, Inc.*, No. 19-02970, 2020 WL 6083704, at *7 (D. Minn. Oct. 15, 2020); *McGee v. Cont'l Tire N. Am., Inc.*, No. 06-06234, 2007 WL 2462624, at *4 (D.N.J. Aug. 27, 2007).  But such a reading would render the second category redundant.  It is a "cardinal principle of statutory construction" that "a statute ought . . . to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quotation marks omitted); *accord* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("If possible, every word and every provision is to be given effect . . .  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").  If a suit such as this, brought in a district court of the United States, was considered as falling into the first category, the second "provision would be superfluous— and, worse still, its careful limitation to § [2310(d)(1)(B)] would be nullified."  *Bennett v. Spear*, 520 U.S. 154, 173 (1997).[3]

---

[3]  Some courts espousing the opposite view have noted that courts upholding the MMWA's numerosity requirement "do not consider—at least not explicitly—whether a federal court could ever be a 'court of competent jurisdiction in any State.'"  *Barclay*, 2020 WL 6083704, at *7.  But such a reading would violate the "basic principle of statutory construction [] that we should avoid a statutory interpretation that leads to absurd results."  *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 330 (3d Cir. 2006) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)).  Notably, it would mean that the MMWA's numerosity requirements would apply to federal courts within the 50 states, but not to those in the territories, where the MMWA's jurisdiction is based on the second category.  *See, e.g., Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 329 (3d Cir. 2009) (explaining that the District Court of the Virgin Islands had subject matter jurisdiction over the plaintiffs' MMWA claim pursuant to 15 U.S.C. § 2310(d)(1)(B)).  It is highly unlikely Congress meant to provide an alternative source of jurisdiction for *only* federal district courts in the

The Court is further persuaded by the Ninth Circuit's decision in *Floyd v. American Honda Motor Co.*, 966 F.3d 1027, 1034-35 (9th Cir. 2020).  "Construing CAFA to provide jurisdiction over MMWA claims despite Plaintiffs' failure to satisfy the plain-language requirement of at least one hundred named plaintiffs would have the effect of overriding a part of the MMWA."  *Id.* at 1035.  But the Supreme Court has cautioned that "the legislature's intent to repeal a statute must be 'clear and manifest.'"  *Id*. (quoting *Nat'l Ass'n of Home Builders v. Defenders. of Wildlife*, 551 U.S. 644, 662 (2007)).  The Court agrees that "CAFA does not demonstrate any intent by Congress to repeal or alter parts of the MMWA's jurisdictional requirements[,]" *id*., especially considering that CAFA relates to diversity jurisdiction, whereas jurisdiction under the MMWA is a matter of federal question jurisdiction.  *See MacDougall v. Am. Honda Motor Co., Inc.*, No. 17-01079, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) ("CAFA—a basis for federal courts to exercise jurisdiction over state law disputes between diverse parties—doesn't fill in the gaps for missing substantive requirements of a federal law.").

Ultimately, the result here is compelled by the plain text of the statute.  "If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent."  *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004).  Thus, Plaintiffs' individual MMWA claims under Counts XIII and XIV are **DISMISSED** for lack of subject matter jurisdiction.

## II.  PERSONAL JURISDICTION

Defendants challenge this Court's jurisdiction over Grammer and Daimler.  Because an analysis of personal jurisdictional is often akin to walking through a maze, it is helpful to provide a roadmap for the journey—lest the reader be left searching for breadcrumbs.  There are two types

---

mainland rather than simply meaning what the plain text states: that the numerosity requirement applies to district courts of the United States.

of personal jurisdiction at issue here.  The first is under Federal Rule of Civil Procedure 4(k)(1)(C), which permits jurisdiction over a foreign defendant when authorized by a federal statute.  This type of jurisdiction assesses Defendants' contacts with the United States as a whole, rather than any particular state.  Given that the Court has dismissed Plaintiffs' MMWA claims, the only federal statute that potentially provides a basis for jurisdiction under 4(k)(1)(c) in this action is RICO.[4]

Now here is the catch: the RICO claims can only serve as a jurisdictional hook on which to base pendent personal jurisdiction over the remaining state law claims if they survive 12(b)(6) scrutiny.  In other words, if the RICO claims survive, then the Court may exercise pendent jurisdiction over the other state law claims at issue since they arise from the same set of facts.  Crucially, however, if the RICO claims fail, Plaintiffs must independently establish personal jurisdiction as to the remaining state law claims. *Cf. Koch v. Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1374 (S.D. Fla. 2012) ("[I]f personal jurisdiction can be established under RICO, the doctrine of pendent personal jurisdiction would come into play, making it unnecessary to consider Florida's long-arm statute.").  Additionally, Plaintiffs concede that the Court lacks personal jurisdiction over Grammer outside of Rule 4(k)(1)(C), so if the RICO claims fail, Grammer will be dismissed from this suit.  Consequently, it is necessary to analyze the existence of jurisdiction under Rule 4(k)(1)(C) first and then to consider the sufficiency of the RICO claims.

The second type of jurisdiction at issue here is that under Federal Rule of Civil Procedure 4(k)(1)(A), which allows personal jurisdiction over a defendant in the state where the district court

---

[4] Defendants believe that Plaintiffs' RICO claims are "invalid" and thus "irrelevant to the jurisdictional analysis."  Reply at 3.  But the "general rule" is that courts "address issues relating to personal jurisdiction *before* reaching the merits of a plaintiff's claims." *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) (citations omitted) (emphasis added).  "The rationale for this rule is that 'a defendant . . . not subject to the jurisdiction of the court cannot be bound by its rulings.'  Consequently, the Court must determine if it has the power to bind [Defendants] with a ruling before it can reach the sufficiency of Plaintiffs' RICO allegations." *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d at 1143 (quoting *id.*).

is located.  Here, the Court looks to Florida's long-arm statute, which assesses Defendants' contacts with the State of Florida.  Because the majority of Plaintiffs are not Florida residents and do not bring Florida-based claims, they are unable to invoke this jurisdiction.  Thus, the RICO claims are the jurisdictional anchor on which the bulk of this case rests.

The Court will address each basis for personal jurisdiction in turn.

### A.  Legal Standards

A federal court may exercise two forms of personal jurisdiction: general jurisdiction and specific jurisdiction.  General jurisdiction may be exercised "over a defendant in a suit not arising out of or related to the defendant's contacts with the forum . . ."  *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n.9 (1984).  In *Daimler AG v. Bauman*, the Supreme Court clarified that a court may assert general jurisdiction over a foreign corporation only where the corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

By contrast, specific jurisdiction may be exercised "over a defendant in a suit arising out of or related to the defendant's contacts with the forum."  *Helicopteros*, 446 U.S. at 414 n.9.  The Court can exercise specific jurisdiction over a nonresident domestic defendant if authorized by a state long-arm statute or a federal statute.  *See Courboin v. Scott*, 596 F. App'x 729, 732 (11th Cir. 2014).  When analyzing a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court must "first determine whether the applicable statute potentially confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction comports with due process."  *Republic of Pan.*, 119 F.3d at 942 (citations omitted).

Where, as here, the Court does not conduct an evidentiary hearing on the question of personal jurisdiction, the burden is on the plaintiffs to establish a *prima facie* case of personal

jurisdiction over the nonresident defendants. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)). Such a case is established if plaintiffs present enough evidence to withstand a motion for directed verdict. *Id.* The Court must accept allegations as true, to the extent that they are uncontroverted by the defendants' affidavits and depositions, and must construe all reasonable inferences in favor of the plaintiffs. *Id.*

When a defendant submits affidavits contrary to the allegations in a complaint, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). Finally, where a plaintiff's complaint and a defendant's affidavits conflict, the Court must construe all reasonable inferences in favor of the plaintiff. *Madara*, 916 F.2d at 1510.

### B. RICO

Plaintiffs seek to establish jurisdiction over the foreign defendants under Rule 4(k)(1)(C), which would allow the Court to exercise pendent personal jurisdiction over the remaining state law claims. The Court therefore looks to this type of jurisdiction first. Because the parties agree that neither Grammer nor Daimler is "essentially at home in the United States" so as to confer general jurisdiction, the Court cannot establish general jurisdiction. Thus, the Court must determine whether there is a statutory and constitutional basis for exercising specific jurisdiction over each nonresident Defendant.

### i) *Jurisdiction Under RICO's Nationwide Service of Process Provision*

Under Rule 4(k)(1)(C), "[s]erving a summons or filing a waiver of service establishes

personal jurisdiction over a defendant . . . when authorized by a federal statute."[5] *See also Republic of Pan.*, 119 F.3d at 942 ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.").  Plaintiffs assert the Court can exercise specific jurisdiction over Grammer and Daimler as to the RICO claims pursuant to the RICO statute's nationwide service of process provision in 18 U.S.C. section 1965(d).[6]  Plaintiffs further contend that once the Court exercises specific jurisdiction over the RICO claims, it can then exercise pendent personal jurisdiction over the remaining state and common-law claims.

Section 1965(d) can serve as "the statutory basis for personal jurisdiction." *Id*. at 942 (citing *In re Chase & Sanborn Corp*., 835 F.2d 1341, 1344 (11th Cir. 1988), *rev'd on other grounds sub. nom, Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987)).  But Plaintiffs are "entitled to take advantage of [RICO's] nationwide service of process provision" only "insofar as" the underlying RICO claim "is not wholly immaterial or insubstantial."  *Id*.  "In other words, whether a basis exists for exercising specific jurisdiction under Section 1965(d) depends on whether [Plaintiffs] state 'colorable' RICO claims."  *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d at 1143-44 (quoting *Courboin*, 596 F. App'x at 732).

As courts have previously explained, determining whether claims are "colorable" is a separate question from whether the claims are plausibly alleged under Rule 12(b)(6).  *Id*. (citing *Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*, No. 10-80921, 2011 WL 13225179, at *3-4 (S.D. Fla. Feb. 14, 2011)).  Significantly, the Eleventh Circuit has cautioned that "[w]hen a

---

[5]  As Daimler waived service, *see* [ECF No. 14] ¶ 3, and MBUSA and Grammer were served summonses, [ECF Nos. 6, 19], the first requirement of Rule 4(k)(1)(C)—service of summons or waiver of service—has been satisfied.

[6]  As a domestic corporation, MBUSA does not contest this Court's jurisdiction regarding Plaintiffs' federal claims, aside from challenging the claims on the merits.

jurisdictional motion to dismiss depends, as in this case, on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if 'the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy.'" *Republic of Pan.*, 119 F.3d at 941 (quoting *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1055 (2d Cir. 1993)).

With this high bar in mind, the Court finds that Plaintiffs have stated a "colorable" RICO claim.  As far as the Court can discern, dismissal on this basis only occurs where the claims are frivolous, which is not the case here.  *See, e.g., Dawkins v. Glover*, No. 08-00039, 2008 WL 11423996, at *4 (N.D. Ga. Aug. 14, 2008) ("Although it is often difficult to dismiss a claim for lack of subject matter jurisdiction in these situations, dismissal is appropriate here.  Not only are plaintiff's claims frivolous, many of the facts and arguments he presents are simply unintelligible.").  This "limited finding" means only that Plaintiffs may "take advantage" of RICO's nationwide service of process provision such that it provides a statutory basis for jurisdiction.  *Republic of Pan.*, 119 F.3d at 942.

Next, the Court must determine whether there is a constitutional basis for jurisdiction. When a federal statute or rule serves as the basis for personal jurisdiction, the "minimum contacts" analysis is governed by the Fifth Amendment of the United States Constitution, instead of the Fourteenth Amendment.  *Id*. at 947.  "[The] [C]ourt must therefore examine [Grammer and Daimler's] aggregate contacts with the nation as a whole rather than [their] contacts with the forum state." *Id*.; *see also SEC v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997) ("[T]he applicable forum for minimum contacts purposes is the United States in cases where, as here, the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide or worldwide service of process.").

To constitute minimum contacts for purposes of specific jurisdiction:

> [T]he defendant's contacts with the applicable forum must satisfy three criteria.  First, the contacts must be related to the plaintiff's cause of action or have given rise to it.  Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*Carrillo*, 115 F.3d at 1542 (citation omitted).  If Plaintiffs establish that Grammer and Daimler have minimum contacts with the United States, the burden shifts to Defendants "to demonstrate that the assertion of jurisdiction in the forum will make litigation 'so gravely difficult and inconvenient that [they] unfairly [are] at a severe disadvantage in comparison to [their] opponent.'" *Republic of Pan.*, 119 F.3d at 948 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)).

Daimler does not contest its national contacts with the United States, as they insist that the RICO claims are meritless.  The Court must therefore accept Plaintiffs' jurisdictional allegations as true, *Consol. Dev. Corp.*, 216 F.3d at 1291, and upon doing so, finds that Plaintiffs have shown Daimler has sufficient contacts with the United States to be subject to personal jurisdiction as to the RICO claims.  This is based on Plaintiffs' allegations that Daimler manufactured and designed the vehicles at issue specifically for sale in the United States, FAC ¶¶ 63, 74-75; "developed, reviewed, and approved the marketing and advertising campaigns designed to promote the NECK-PRO system and sell the Class Vehicles in the United States[,]" *id*. ¶ 65; is the registrar and owns all rights, title, and interest in the United States trademark for NECK-PRO, *id*. ¶ 66; created channels and networks for distributing the Class Vehicles and for providing instruction to owners and lessees in the United States by managing, financing, licensing its trademarks to, and communicating with dealerships, *id*. ¶¶ 76-82; and marketed itself in the United States through its interactive website and sending its employees to the United States., *id*. ¶¶ 83-84.  As Plaintiffs

point out, the Eleventh Circuit has held that a nearly indistinguishable set of contacts subjected a French automaker to specific jurisdiction in *Vermeulen v. Renault, U.S.A., Inc*., 985 F.2d 1534, 1549 (11th Cir. 1993).

As for Grammer, the analysis is slightly different because it has submitted evidence challenging Plaintiffs' jurisdictional allegations. While reasonable inferences are still to be drawn in Plaintiffs' favor, Plaintiffs must counter Defendants' proffered evidence. *See Meier*, 288 F.3d at 1269. Although it is somewhat of a close call, the Court finds that Plaintiffs have shown sufficient contacts with the United States on the part of Grammer. In addition to placing an item in the stream of commerce, "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State." *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 112 (1987) (plurality opinion). Such is the case here.

Drawing all reasonable inferences in Plaintiffs' favor, the evidence shows that although Grammer often (but not always) ships its product to intermediate suppliers who then ship completed car seats to Daimler, Grammer designs its products specifically so their customers can sell them in the United States. *See* Resp., Ex. A. at 17. Indeed, Grammer performed tests on its product that were meant to comply with unique American regulations, and such tests would not have otherwise been required for other markets. *See id*. at 90. And Daimler specifically requested of Grammer that technical specifications be made to comply with American regulations. *See id*., Ex. C at 24-25*; see also King v. Gen. Motors Corp.*, No. 11-02269, 2012 WL 1340066, at *7 (N.D. Ala. Apr. 18, 2012) ("GM Canada cannot plead ignorance of the markets it explicitly targets and serves when its parent corporation directly sells the manufactured products to these markets. GM Canada possesses more than some vague awareness that its products *might* reach U.S. markets— it manufactures vehicles, such as the one at issue, to comply with federal regulations. This equates

to manufacturing a product 'in anticipation of sales in' Alabama.") (quoting *Asahi*, 480 U.S. at 113) (emphasis in original) (alterations omitted).

Moreover, Grammer obtained U.S. patent and trademark protection to facilitate the sale of the NECK-PRO in the United States.  Resp., Ex. A at 92-93; *id*., Ex. B. at 110-13; *id.*, Exs. E, F, G, & H.  "It stands to reason that one who has sought and obtained a property interest from a U.S. agency has purposefully availed itself of the laws of the United States." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1416 (Fed. Cir. 2009)*; accord Wilson v. Nouvag GmbH*, No. 15-11700, 2018 WL 1565602, at *4 n.3 (N.D. Ill. Mar. 30, 2018) ("An application for approval by the FDA is a contact with the United States in general . . . [that] unquestionably demonstrate[s] [defendant]'s intent to have its [product] reach the United States market.").  Thus, the Court concludes that Grammer has purposefully availed itself of the United States.

"Once it has been established that a defendant has purposefully directed his activities at a particular forum, courts still should determine if the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Republic of Pan.*, 119 F.3d at 945 (citation and quotation omitted).  This requires a "balance [of] the burdens imposed on the individual defendant against the federal interest involved in the litigation." *Id*. at 946 (citing *Asahi*, 480 U.S. at 114). However, "courts must engage in this balancing only if a defendant has established that his liberty interests actually have been infringed." *Id*.  None of the Defendants have attempted to show that litigating in this forum would result in "constitutionally significant inconvenience." *Id*.  As a result, there is no constitutional impediment to exercising personal jurisdiction over Defendants with respect to Plaintiffs' RICO claims.

The Court concludes that it has both a statutory and constitutional basis for jurisdiction over all Defendants to consider Plaintiffs' RICO claims.  As a result, the "pendent personal jurisdiction" doctrine comes into play, which would allow the Court to exercise personal

jurisdiction over the state law claims in this matter, which arise from the same set of facts, without engaging in the traditional personal jurisdiction analysis.  *See Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1231 (S.D. Fla. 2017) (quotations, alterations, and citations omitted); *see also Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004) ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction."); *IUE AFL-CIO Pension Fund*, 9 F.3d at 1056 ("[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact,' the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available.") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

Crucially important here, "Plaintiffs' RICO claim must survive a 12(b)(6) analysis if it is to serve as the basis for the Court's personal jurisdiction over Plaintiffs' remaining state law claims." *Leon*, 301 F. Supp. 3d at 1232.  Therefore, in order to reach the issue of pendent personal jurisdiction, the Court must assess whether Plaintiffs' RICO claims survive Defendants' Motion to Dismiss.

### ii)   *Failure to State a RICO Claim*

Plaintiffs assert two federal RICO claims under 18 U.S.C. section 1962(c) and (d).  Section 1962 makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  To state a claim under RICO, Plaintiffs must plausibly allege that Defendants: "(1) operated or managed (2) an enterprise (3)

through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [section 1962]." 18 U.S.C. § 1962(d).

Plaintiffs allege that Defendants and others operated an enterprise with the purpose of concealing the scope and nature of the defective AHRs found in "hundreds of thousands" of Mercedes vehicles in the United States in order to: sell more vehicles; sell them at a higher price or for a higher profit; and avoid incurring the expenses associated with recalling vehicles suffering from the defective AHRs. Plaintiffs allege predicate acts of mail and wire fraud, based on communications to consumers and the public touting the "safety" of the vehicles without disclosing the defect.

a.  Rule 9(b) and 12(b)(6) Standards

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A pleading that asserts mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. And "on the assumption that all the allegations are true (even if doubtful in fact)," the factual allegations pleaded "must be enough to raise a right to relief above the speculative level." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).  Even still, a complaint only survives if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. (brackets in original) (quoting FED. R. CIV. P. 8(a)(2)).  "The Supreme Court has employed a 'two-pronged approach' in applying the foregoing principles: first, a reviewing court should eliminate any allegations in the complaint that are merely legal conclusions; and second, where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 864 (11th Cir. 2017) (quoting *id*. at 679).

Although "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes[,]" *Boyle v. United States*, 556 U.S. 938, 944 (2009), the allegations must still pass muster under *Iqbal* and *Twombly*.  Moreover, because the alleged predicate acts sound in fraud, they must be pleaded with particularity under Federal Rule of Civil Procedure 9(b).  *Cisneros*, 972 F.3d at 1216.  This requires Plaintiffs to allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (citation omitted).  "In other words, a plaintiff is required to plead the

'who, what, when, where, and how' pertaining to the underlying fraud." *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1098 (S.D. Fla. 2019) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)).

> b.   Section 1962(c) Claim

Defendants argue that Plaintiffs have failed to adequately plead the second and fourth elements of their section 1962(c) claim—that Defendants engaged in an (2) enterprise pertaining to (4) racketeering activity that included at least two predicate acts of racketeering.   The Court addresses each in turn and agrees with Defendants that Plaintiffs' allegations are insufficient to establish either element required to state a claim under RICO.

> 1.   *Enterprise*[7]

Under the federal RICO statute, an "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "In the simple case, the enterprise is an 'individual, partnership, corporation, association, or other legal entity.'  The more challenging case occurs when the enterprise is alleged to be a 'union or group of individuals associated in fact although not a legal entity.'"  *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (quoting *id.*).  Plaintiffs bring their RICO case under this latter, more challenging theory of liability.  Plaintiffs allege an association-in-fact enterprise consisting of:

---

[7]  The Court reviews Plaintiffs' allegations of a RICO enterprise under the Rule 8 standards as articulated by the Supreme Court in *Twombly* and *Iqbal*.  Some courts have concluded that Plaintiff's entire RICO claim should be subject to the heightened specificity required by Rule 9(b).  *See, e.g.*, *Leon*, 301 F. Supp. 3d at 1233 n.20.  To be sure, there is some support for this conclusion under Eleventh Circuit case law.  *See Am. Dental Ass'n*, 605 F.3d at 1291 (explaining that plaintiff's "substantive RICO allegations must comply with . . . Fed. R. Civ. P. 9(b)'s heightened pleading standard.").  However, in their latest RICO decision, the Eleventh Circuit applied Rule 9's heightened requirement *only* to the plaintiff's allegations of predicate RICO acts sounding in fraud.  *Cisneros*, 972 F.3d at 1215.

(1) Grammer, who designed the AHR with the alleged defect and who, along with the Mercedes Defendants, reviewed information making them aware of the defect;

(2) Grammer's officers and executives, who colluded with the other members of the enterprise to execute the alleged scheme;

(3) The Mercedes Defendants, who designed, manufactured, and sold "millions of vehicles" that they knew or should have known contained the defective AHR while concealing and misrepresenting the existence of the defect;

(4) The Mercedes Defendants' officers, executives, and engineers, who colluded to execute the scheme;

(5) Mercedes-Benz dealers, "who sold, leased, and serviced the Class Vehicles containing the [d]efective AHR, when they knew, or should have known, or recklessly disregarded the fact that the Class Vehicles contained the AHR"; and

(6) The dealers' officers and executives, "who have collaborated with each other and with other associates-in-fact in the Mercedes RICO Enterprise to deceive Plaintiffs and Class members into purchasing, leasing, and 'repairing' dangerous and defective vehicles and actively concealing the AHR defect."

FAC ¶ 230 a-f.

An "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948. Such an enterprise "may be 'formal or informal,' and requires only 'three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (quoting *Almanza*, 851 F.3d at 1067). Plaintiffs allege that "[t]he members of the Mercedes RICO Enterprise all served a common purpose: to sell as many defective AHRs and Class Vehicles containing the defective AHRs as possible, and thereby maximize the revenue and profitability of the Mercedes RICO Enterprise's members." FAC ¶ 234. But Plaintiffs' enterprise allegations fail to advance from the possible to the plausible so as to satisfy Rule 12(b)(6).

Stripping away the conclusory allegations, the First Amended Complaint does not allege concrete facts to give rise to a plausible inference that the various members of the alleged enterprise acted with a *common* purpose, much less a fraudulent one. "The purpose prong contemplates 'a common purpose of engaging in a course of conduct' among the enterprise's alleged participants. An abstract common purpose, such as a generally shared interest in making money, will not suffice." *Cisneros*, 972 F.3d at 1211 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Instead, "where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants *shared* the purpose of enriching themselves through a particular criminal course of conduct." *Id*. at 1211-12 (emphasis added) (collecting cases).

Establishing a shared purpose requires more than alleging that all members of an enterprise acted in parallel and independently harbored a common improper motive. Rather, a plaintiff must allege, with enough factual detail, that members of the enterprise were actively collaborating to achieve that improper motive. For example, in *Cisneros*, the Eleventh Circuit found insufficient a "complaint [that] contain[ed] no allegations about specific interactions between [members of the alleged enterprise], nor allegations regarding the origins or scope of the alleged scheme. Rather, [the plaintiff] simply ask[ed] [the court] to speculate that [one defendant] decided at some point to pursue fraud, and that [the other defendants] were involved in that decision." *Id*. at 1213. The court explained that the plaintiff "was required to allege not just that [the defendant] had a fraudulent purpose, but that it was a *common* purpose, formed in collaboration with [the other members of the enterprise]." *Id*. at 1213-14 (emphasis in original).

As in *Cisneros*, the First Amended Complaint here is devoid of allegations about "specific interactions" between the various alleged participants in the alleged enterprise and utterly silent as to "the origins or scope of the alleged scheme." *Id*. at 1213. Plaintiffs allege that Grammer and

Mercedes learned of the defect at different times—Grammer in 2006 and Mercedes in 2008, *see* FAC ¶¶ 252b, 253—and generally allege that they "colluded and collaborated with each other and with other associates-in-fact in the Mercedes RICO Enterprise to deceive Plaintiffs[,]" FAC ¶ 230. But there are not enough concrete allegations to permit the Court to make a reasonable inference that Plaintiffs acted together to conceal the defect in order to sell as many Class Vehicles as possible. Thus, the First Amended Complaint impermissibly asks the Court to "speculate" that the alleged participants collectively decided at some unknown point to pursue fraudulent automotive sales. *Cisneros*, 972 F.3d at 1213. This is not enough.

The First Amended Complaint strongly resembles those that courts have found insufficient to plead a RICO enterprise. For example, in *Leon*, the plaintiffs brought similar RICO claims based on allegedly defective automobile airbags, and alleged that "from 2008 to 2016, the [] Defendants 'were in regular contact' about the defective [airbag control units]." 301 F. Supp. 3d at 1235. The Court explained that such allegations "d[id] not mention who at each company was in contact, what they were in contact about, or when, where, and how these communications occurred and constituted a part of the scheme." *Id.* Here, the First Amended Complaint similarly "presents almost no detail—let alone the precise detail required by Rule 9(b)—to support the notion that there was 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id.* (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352 (11th Cir. 2016)). In fact, Plaintiffs hardly set forth any allegations regarding communications between members of the alleged enterprise—and those they do include fail to provide any detail whatsoever regarding the nature of such communications.[8]

---

[8] The one alleged communication that is perhaps sufficiently detailed is a TSB the Mercedes Defendants sent their dealerships in October 2008. FAC ¶ 161. But while that communication mentions a problem

The allegations here are particularly similar to those in *Shaw v. Nissan North America, Inc.*, 220 F. Supp. 3d 1046 (C.D. Cal. 2016). There, the plaintiffs alleged that defendants had participated in an enterprise "for the purpose of concealing the scope and nature of the . . . defects in order to sell more Subject Nissan Vehicles" with the additional shared purpose of "maximiz[ing] the revenue and profitability" through their design, manufacture, distribution, and testing of the defective vehicles. *Id*. at 1054. The court held that plaintiffs' complaint "only demonstrate[d] that the parties 'are associated in a manner directly related to their own primary business activities[,]'" which is insufficient to state a claim under § 1962(c). *Id.* at 1057 (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig*., 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011)).

Critically, the *Shaw* court distinguished plaintiff's complaint from other cases where complaints "include[] pages of references to specific communications [that] show[] the defendants acting as an enterprise and engag[ing] in a collaborative scheme to defraud." *Id*. That the defendants at times reached "independent conclusions" about which remedial measures to take upon discovering the defect further swayed the court toward finding that plaintiffs had failed to plead the existence of a RICO enterprise with a common purpose. *Id*. Thus, as here, there was no evidence that the defendants acted together to accomplish a fraudulent purpose, as opposed to acting independently according to the terms of a normal business relationship.

Compare this to cases in which plaintiffs *did* adequately plead the existence of an enterprise. In *Cardenas*, for example, the Court denied the defendants' motion to dismiss plaintiffs' RICO claims relating to the alleged nondisclosure of an automobile defect, where

---

with the headrests, it explicitly *disclaims* that there is an actual defect, noting instead that it "may be caused by damage to the seat wiring harness causing a short circuit." *Id*. Thus, this communication in no way demonstrates a fraudulent common purpose.

plaintiffs had pleaded the existence of an enterprise that included Toyota entities, dealers, distributors, other third parties, and officers and agents of the other members.  418 F. Supp. 3d at 1101-02.  In finding that the plaintiffs had plausibly alleged the existence of an enterprise, the Court found that the "[c]omplaint set[] forth numerous allegations, *including specific communications between separate Toyota entities*, showing the [members of the enterprise] had knowledge of the [d]efect, yet did not disclose, and actually concealed, the [d]efect from the public." *Id*. at 1102 (emphasis added).

The details of those communications are in stark contrast to the complete absence of any such evidence of common purpose here.  For example, one of the communications in *Cardenas* was an alleged dated message from a Toyota engineer to Toyota's corporate offices explaining how the defect had been one of the top issues over the previous years; that Toyota had stopped servicing vehicles that exhibited the defect for fear of exposing themselves to legal liability; and that dealerships had "started to tell customers the [defective] condition was normal." *Id*. at 1100.  Another dated communication in the complaint was from Toyota's American offices to their offices in Australia explaining that Toyota and its dealers were "hesitant" to attempt repairing the problems caused by the alleged defect because repairs would not fix the problem and would subject Toyota to legal liability.  *Id*.  Still another dated communication was from Toyota's office in Kansas to a dealership that "provided standardized language to give complaining customers . . . [explaining] that the [problem] was not a defect, but rather, 'an industrywide condition.'" *Id*.

Finally, the complaint included an allegation that a Toyota Pricing Manager had emailed the National Product Planning Manager asking: "[I]f this is a known issue with a [Technical Service Bulletin] for how to repair, why are we asking to charge customers . . . it does seem challenging to explain why to get what a customer should expect as a standard condition for the air conditioner (no odor) we charge more?"  *Id*.; *see also In re Takata Airbag Prod. Liab. Litig.*,

MDL No. 2599, No. 14-24009, 2015 WL 9987659, at *1 (S.D. Fla. Dec. 2, 2015) (finding plaintiffs adequately stated their RICO claim where the "[c]omplaint include[d] factual allegations of racketeering . . . , including *pages of references to specific communications among defendants, that the defendants, acting as an enterprise*, knew of a defect in the Takata airbag, knew that Takata had concealed the defect, and defrauded consumers by selling and servicing vehicles for more money than consumers would have paid had the vehicle not contained a defective airbag.") (emphasis added).

*Cardenas* makes clear just how inadequate the allegations of a common fraudulent purpose are here. To be sure, the Court is not saying that a RICO plaintiff's complaint *must* contain evidence of communications between members of the enterprise in order to state a claim. But what the complaints in *Cardenas* and other cases have—that the First Amended Complaint here lacks—is any evidence of collective conduct outside the regular course of Defendants' businesses, which is required to establish a RICO enterprise. *See City of New York v. Chavez*, 944 F. Supp. 2d 260, 277 (S.D.N.Y. 2013) (granting motion to dismiss RICO claim because, like here, "there [was] no allegation . . . of any symbiosis, of any meeting of the minds among the various actors acting as a single unit, or of any reliance of any . . . actor on any other such actor."). Without such allegations, complaints like the one here describe only routine business affairs and are thus ripe for dismissal because "[g]enerally, whether a RICO claim survives a motion to dismiss depends in part on if it is supported by specific factual allegations that enable courts to rule out the innocent explanation in favor of plaintiff's fraudulent scheme hypothesis." *Tam v. Quick Box, LLC*, No. 20-01082, 2020 WL 7226440, at *23 (S.D. Cal. Dec. 8, 2020); *see also Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 701 (E.D. Mich. 2020) ("Courts have overwhelmingly rejected efforts to characterize ordinary business relationships as RICO enterprises.") (citation omitted).

In sum, Plaintiffs have "alleged no facts that plausibly support the inference that the defendants [and their unnamed employees and associates] were *collectively* trying to make money in [automotive] sales *by fraud*, which is a common purpose sufficient to find a RICO enterprise, as opposed to the 'obvious alternative explanation,' that they were simply trying to make money in [automotive] sales, which is not . . . ." *Cisneros*, 972 F.3d at 1212 (first emphasis added). Accordingly, Plaintiffs have failed to adequately plead the existence of a RICO enterprise.

### 2. *Pattern of Racketeering Activity*

Even if Plaintiffs had pleaded the existence of a RICO enterprise, they would still fail to state a valid RICO claim because they do not plead with particularity that Defendants engaged in a pattern of racketeering activity consisting of at least two predicate acts of fraud. *See id*. at 1215 ("Beyond establishing the existence of a RICO enterprise, a plaintiff must allege that each defendant participated in the affairs of the enterprise through a 'pattern of racketeering activity,' which requires 'at least two acts of racketeering activity.'") (quoting 18 U.S.C. §§ 1962(c), 1961(5)).  The RICO Act defines racketeering activity comprehensively in 18 U.S.C. section 1961(1) to include a variety of enumerated criminal offenses.

In the First Amended Complaint, Plaintiffs cite two such offenses: mail fraud in violation of 18 U.S.C. section 1341 and wire fraud in violation of 18 U.S.C. section 1343.  FAC ¶ 240. These crimes have the same elements and "occur[] whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail [or wires] 'for the purpose of executing such scheme or artifice or attempting to do so.'" *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1341).  Thus, Plaintiffs must allege: "(1) intentional participation in a scheme to defraud; and (2) the use of the interstate mails or wires in furtherance of that scheme." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citations omitted).

A "scheme to defraud" requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property. *Id*. (citing *United States v. Svete*, 556 F.3d 1157, 1161, 1169 (11th Cir. 2009) (en banc)). It is not necessary that the transmitted information actually include any misrepresentation in itself in order to violate these statutes so long as the transmission is "incident to an essential part of the scheme" to defraud. *United States v. Hasson*, 333 F.3d 1264, 1272-73 (11th Cir. 2003) (citing *Schuck v. United States*, 499 U.S. 705, 715 (1989)). Importantly, however, "[a] plaintiff must put forward enough facts with respect to each predicate act to make it independently indictable as a crime." *Cisneros*, 972 F.3d at 1215-16 (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)).

RICO is not a run-of-the-mill consumer protection statute, as its goal "is to combat organized crime, not to police routine commercial dealings." *Ray v. Spirit Airlines*, 126 F. Supp. 3d 1332, 1341 (S.D. Fla. 2015), *aff'd*, 836 F.3d 1340 (11th Cir. 2016); *see also Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (noting "the exceptional seriousness of racketeering allegations"). Therefore, a RICO claim "must read like a 'mini-indictment,' alleging separate 'counts' of mail or wire fraud. Weasel words such as 'probably counterfeit' or 'probably knew' have no place in a RICO pleader's vocabulary for the plaintiff must demonstrate that the defendants acted with scienter, i.e., a specific intent to defraud." *Koch*, 847 F. Supp. 2d at 1376.

"To plead the necessary scienter for a racketeering claim premised on mail and wire fraud, a plaintiff must allege that defendants 'knowingly devised or participated in a scheme to defraud plaintiffs' and that they 'did so willingly with an intent to defraud.'" *Cardenas*, 418 F. Supp. 3d at 1102 (quoting *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000)). Thus, in a case such as this alleging fraud related to nondisclosure of a defect, courts look to whether the defendants had knowledge of that defect. *See Raymo*, 475 F. Supp. 3d at 703-04; *Cardenas*, 418

F. Supp. 3d at 1102.  Knowledge may be alleged "generally" under Rule 9(b), but the fact that knowledge and intent allegations are not subject to heightened pleading standards does not give Plaintiffs "license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686-87.

Plaintiffs' allegations of mail and/or wire fraud aver that Defendants represented the safety of their vehicles in communications transmitted via wire or the mail despite knowing that the headrests were defective.  *See, e.g.*, FAC ¶¶ 241a-k.  These communications—consisting primarily of one TSB, coupled with advertisements, brochures, owner's manuals, and press releases—are insufficient to support predicate acts because the First Amended Complaint does not adequately set forth that Defendants *knew of the defect* and therefore intended to defraud Plaintiffs.  *See id*.  Plaintiffs insist in their Response that they have adequately alleged Defendants' knowledge of the defect based on:

> (1) Defendants' involvement in the design and testing of the AHR systems, and choice to use a cheaper plastic instead of fiber-reinforced plastic.  *See* FAC ¶¶ 3, 7, 11, 118, 144-48, 192.
>
> (2) A TSB issued by Mercedes in October 2008 acknowledging the uncommanded 30 deployments and intentionally misattributing them to a wiring issue.  *See id*. ¶¶ 160-62.
>
> (3) NHTSA complaints filed between September 2013 and March 2018, which Mercedes monitored in the regular course of business.  *See id*. ¶¶ 155-57.
>
> (4) Consumer complaints on websites devoted to Mercedes vehicles between March 2013 and April 2019.  *See id.* ¶¶ 158-59.
>
> (5) Engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic data reports, aggregate warranty data, and repair order and parts data. *See id*. ¶ 149.

A survey of case law, however, demonstrates that there are deficiencies in each of these allegations, and they fare no better when considered in the aggregate. From the beginning, the First Amended Complaint seems to ask the reader to merely accept that Defendants knew or should have known of the AHR defect, rather than allege concrete facts on which a reader could reasonably infer that is the case.

First, the assertions regarding testing, reports, data, and analyses do not elaborate whatsoever as to what that information actually showed, which means such allegations do not make it more plausible that Defendants knew the AHR defect existed in hundreds of thousands of vehicles. These allegations are precisely the kind of conclusory allegations that *Iqbal* and *Twombly* caution courts to disregard. Similar allegations were recently made in *Hall v. General Motors, LLC*, No. 19-10186, 2020 WL 1285636 (E.D. Mich. Mar. 18, 2020), where plaintiffs alleged that the defendant automobile manufacturer had knowledge of a defect through, *inter alia*, "pre-production, pre-production design failure mode and analysis data, [and] production design failure mode and analysis data[.]" *Id.* at *3. Indeed, these allegations almost precisely mirror those here. *See* FAC ¶ 7 ("Defendants became aware of this safety defect as early as 2006 based on, among other things, engineering design reports, pre-production testing, pre-production design failure mode analyses . . ."). Here, as in *Hall*, "[t]hese allegations are too vague and pleaded at too high a level of generality to support a reasonable inference that [Defendants] had pre-sale knowledge of the [AHR] Defect. Plaintiffs have not alleged any *facts* about [Defendants'] pre-production testing [or] any particular analysis [Defendants] completed based on that testing . . . that, if proven, would establish [Defendants'] pre-sale knowledge of the [AHR] Defect." 2020 WL 1285636, at *3 (emphasis added); *see also id*. ("Courts routinely reject generalized allegations about 'testing' and manufacturer 'analyses,' like those Plaintiffs lodge here, 'made in support of finding knowledge of a defect.'") (collecting cases).

Likewise, in *Roe v. Ford Motor Co.*, the court found that plaintiffs' allegations about "pre-production testing, pre-production design failure mode analysis, and production design failure mode analysis testing performed in response to consumer complaints" did little to establish that the defendant knew or should have known of a defect. 439 F. Supp. 3d 922, 928 (E.D. Mich. 2020) (citing its prior opinion in the case). "The normal situation is that when a car manufacturer sells a vehicle, testing of a critical part revealed no significant issues (as opposed to the norm being that the critical part was defective, but the manufacturer nefariously chose to sell millions of vehicles anyway). So [p]laintiffs' [] complaint needed to rebut that commonsense notion." *Id*. at 929. As in this case, the *Roe* complaint was silent as to what the tests actually showed, and therefore "it [was] no more likely that the testing revealed a flawed [product] than a flawless [product]." *Id*. at 928 (citing *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.")).

Plaintiffs repeatedly mention that Defendants had exclusive knowledge of the defect, and to be sure, the Court understands that Plaintiffs do not necessarily have access to Defendants' internal product quality testing and other such records. Nonetheless, conclusory allegations are no substitute for such knowledge. "To accept Plaintiffs' general allegations about [Defendants]' internal testing . . . is to create a presumption of knowledge on the part of any large manufacturer of any alleged defect in its product line, and more than that, to assume that knowledge from some unknown time after the product has been on the market. Even though knowledge allegations do not require specificity pursuant to Rule 9(b), they cannot be speculative or conclusory—more is required." *Stewart v. Electrolux Home Prods., Inc.*, No. 17-01213, 2018 WL 1784273, at *9 (E.D. Cal. Apr. 13, 2018). In order for testing allegations to carry some weight, they cannot—as they do here—simply allege that testing was completed and showed a defect. *Cf. Pinon v. Daimler AG*,

No. 18-03984, 2019 WL 11648560, at *19 (N.D. Ga. Nov. 4, 2019) (finding plaintiffs' allegations "more than speculative" where they identified five specific test procedures and explained that such tests were conducted in simulated real-world conditions).

Plaintiffs' reliance on one TSB also fails to inch them any closer to adequately alleging Defendants' knowledge of the defect. *See* FAC ¶ 241b ("On . . . October 9, 2008, the Mercedes Defendants transmitted a TSB to their dealerships titled 'Restraints – Head Restraint Activate Without Cause,' which stated that the defective AHR 'may be caused by damage to the seat wiring harness causing a short circuit.'"). Generally, courts require more than one TSB to shed light on Defendants' knowledge of a defect. *Cf.*, *e.g.*, *Cardenas*, 418 F. Supp. 3d at 1099-11 (5 TSBs over 18 years); *Weiss*, 418 F. Supp. 3d at 1177 (10 TSBs over 5 years); *but see Pinon*, 2019 WL 11648560, at *20 (relying on one TSB where it explicitly stated the paint defect at issue and noted that it affected "all vehicles" with that paint).

More importantly, the TSB at issue explicitly disclaimed the notion that the problem with the headrest was caused by a defect in the plastic, stating instead that it "may be caused by damage to the seat wiring harness causing a short circuit." FAC ¶ 161.[9] One lone TSB that fails to suggest the product is defective—much less reference the specific defect at issue—does not lend much, if any, support to the notion that Defendants knew or should have known that faulty headrest components were present in "hundreds of thousands," *id.* ¶ 3, of vehicles.

Unfortunately for Plaintiffs, TSBs that only generally address the problem at hand are rarely considered persuasive. Consider, for example, *Sloan v. General Motors LLC*, No. 16-07244, 2017 WL 3283998 (N.D. Cal. Aug. 1, 2017). There, the plaintiffs argued that General

---

[9] Plaintiffs allege that in the TSB, Defendant took affirmative steps to conceal the defect by blaming the short circuit in the wiring. *See, e.g.*, FAC ¶ 166. But such an accusation is wholly conclusory without first sufficiently alleging—which they do not— that Defendants knew or should have known that the headrest malfunction was due to a defect.

Motors had knowledge of an engine defect that caused excessive oil consumption because of one TSB addressing the issue. *Id*. at *7. But the court was not persuaded because the TSB "explicitly stated oil loss could be caused by two conditions, neither of which were" the specific defect at issue in the case. *Id*. "The TSB d[id] not suggest that GM knew that all of the engines were inherently defective; indeed, the [allegedly defective product] [was] not even mentioned." *Id*. The court distinguished the cases relied upon by the plaintiffs because "the TSBs in those cases explicitly addressed the claimed defect." *Id*. (citing *Falco v. Nissan N. Am., Inc*., No. 13-00686, 2013 WL 5575065, at *6 (C.D. Cal Oct. 10, 2013); *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013)); *see also Hall*, 2020 WL 1285636, at *6 ("[W]hile it may be a plausible inference based on these allegations that GM was aware of *some* problem with the wheel sensors on the Class Vehicles, these TSBs do not plausibly establish that GM was aware of the specific [] [d]efect plaintiffs have identified."); *Grodzitsky v. Am. Honda Motor Co., Inc.*, No. 12-01142, 2013 WL 690822, at *2 (C.D. Cal. Feb. 19, 2013) (finding that plaintiffs had not adequately alleged knowledge because the three TSBs only discussed general problems with windows and did not explicitly mention the alleged window regulator defect).

Once again, it is useful to compare Plaintiffs' allegations to those cases in which TSBs were found to sufficiently indicate knowledge. In one case, plaintiffs alleged the nondisclosure of a defect in the defendant's air conditioning systems that caused the systems to crack and leak refrigerant, rendering the cars unable of providing cool air. *In re Gen. Motors Air Conditioning Mktg. and Sales Practices Litig.*, 406 F. Supp. 3d 618, 625 (E.D. Mich. 2019). The court relied on only two TSBs, but they "alerted" technicians to "'pervasive issues affecting particular models and model years . . . concerning cracks in the air conditioning components' causing the system to 'blow warm air instead of producing cold air.'" *Id*. at 636-37 (quoting the TSBs). Therefore, the TSBs identified and relied upon by the plaintiffs supported their contention that GM knew about

the air conditioning defect because the TSBs specifically referenced that defect.  *Id*.  Likewise, in *Cardenas*, the plaintiffs adequately alleged defendants' knowledge of the defect based in part on five TSBs sent over 18 years, which showed that Toyota had been aware of a general problem the entire time, but had acknowledged internally that there was "no way to eliminate" the problem by the time plaintiffs had bought their vehicles.  418 F. Supp. 3d at 1099-1100.  Needless to say, the allegations in these cases are a far cry from the information the TSB provides here.

Finally, in *Pinon*, the court found that one TSB weighed in favor of finding defendant's knowledge of a defect.  2019 WL 11648560, at *20.  Critically, though, it distinguished cases in which courts *did not* rely on TSBs: "The TSBs at issue in those cases either discussed problems with some vehicles in a particular class, identified possible causes of those problems, or both.  The TSB at issue here is not so equivocal.  It identifies, without any qualifying language, the specific cause of the exact [paint defect] [] that Plaintiffs experienced [and] states that the problem affects 'all vehicles' with Mars Red paint[.]"  *Id*.  This highlights the problem for Plaintiffs: they rely on only one TSB, which says almost nothing about the cause of the problem, and what little it does say points in the opposite direction of the defect claimed by Plaintiffs.  It therefore does not support a finding that Defendants plausibly knew or should have known of the AHR defect.

The final pieces of alleged evidence relied upon by Plaintiffs to establish Defendants' knowledge are the complaints made to the NHTSA, as well as those posted on internet fora.  "[C]onsumer complaints suffice to establish knowledge only where there were an *unusual* number of complaints, such that the manufacturer would be on notice of a specific problem."  *Sloan*, 2017 WL 3283998, at *7 (citing *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1026 (9th Cir. 2017)) (emphasis in original).  Specifically, Plaintiffs allege that consumers have filed "numerous" complaints with the NHTSA reporting that the headrests in the Class Vehicles were activating spontaneously, FAC ¶ 155, but they provide just seven such examples, which were made between

September 2013 and July 2019.[10]  Plaintiffs allege further that "Mercedes vehicle owners have also shared their experiences with the AHR defect on websites devoted to Mercedes vehicles." FAC ¶ 158.[11]  Again, Plaintiffs offer just five examples, ranging from March 2013 to April 2019. *Id*. ¶ 159.  Together, Plaintiffs can show just 12 examples of customer complaints regarding the headrests over a span of six years.  This is an exceptionally small number when compared to cases where complaints have been found to adequately establish defendants' knowledge of a defect.  *Cf., e.g.*, *Parris v. Volkswagen Grp. of Am., Inc*., 463 F. Supp. 3d 1043, 1052 (C.D. Cal. 2020) (finding plaintiff adequately alleged knowledge by providing over 100 complaints made to the NHSTA); *Weiss*, 418 F. Supp. 3d at 1177 (alleging over 100 NHTSA complaints); Compl. [ECF No. 1] ¶¶ 30-108, *Weiss*, No. 19-21552 (S.D. Fla. filed Apr. 23, 2019) (providing over 78 examples); *Cardenas*, 418 F. Supp. 3d at 1099 (alleging "numerous" complaints); Compl. [ECF No. 1] ¶¶ 67a-t, *Cardenas*, No. 18-22798 (S.D. Fla. filed July 12, 2018) (providing 20 examples).

Here, Plaintiffs' allegations mirror almost precisely those made by the plaintiff in *Espineli v. Toyota Motor Sales, U.S.A., Inc.*, No. 17-00698, 2019 WL 2249605 (E.D. Cal. May 24, 2019).  There, "[p]laintiffs d[id] not specify how many complaints were made about the defect, alleging

---

[10]  Because the claims at issue rest on the notion that the manufacturer was aware of the defect at the time the vehicles were purchased, only complaints *before* purchases were made are relevant to Defendants' knowledge.  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012). As explained in Section II.C(ii), *infra*, the only Plaintiffs whose claims survive are those of Mr. Lewis and Ms. Massa.  And only four of the seven NHTSA complaints pre-date the vehicle sales to these Plaintiffs.

[11]  Some courts have held that the mere existence of customer complaints is insufficient without a plausible allegation that the defendant actually saw the complaints.  *Compare Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 104 (3d Cir. 2013) (rejecting bare allegations of consumer complaints without any information about when or to whom the complaints were sent and finding insufficient factual support that Toyota knew about complaints filed with NHTSA), *with Grodzitsky*, 2013 WL 2631326, at *6 (finding that a sampling of NHTSA complaints combined with the allegation that Honda monitored NHTSA databases was enough to "support a plausible inference that Defendant saw and reviewed the specific complaints.").  Here, Plaintiffs specifically plead that "MBUSA regularly monitors NHTSA complaints in order to meet reporting requirements under federal law" and that Mercedes is "aware of and regularly review[s]" the websites on which complaints are posted.  FAC ¶¶ 156, 158.

only 'numerous' complaints and citing a total of thirteen." *Id*. at *7.  The court found that "this limited number of complaints and the absence of other allegations providing context for a conceivable inference that defendants knew of a widespread problem does not sufficiently plead defendants' knowledge of the purported defect." *Id*.

There is certainly no hard-and-fast rule on how many consumer complaints a plaintiff must show to sufficiently plead a defendant's knowledge; perhaps 12 examples could provide a sufficient factual assertion in the proper case.  But here, not only is it a very small number relative to the "hundreds of thousands" of vehicles that supposedly have this defect, but, like the plaintiffs in *Espineli*, Plaintiffs have offered no context as to how many complaints are normal such that someone could infer they were more than a "blip on [Defendants'] radar." *Roe*, 439 F. Supp. 3d at 931 ("Plaintiffs have reproduced only 14 complaints to NHTSA about the [allegedly defective product].  And these 14 span a three-year period.  True, Plaintiffs say the 14 NHTSA complaints are but a 'small sample.'  But do Plaintiffs mean there are 50 more?  500 more?  Their amended complaint does not say.").  Indeed, even significantly more consumer complaints have been deemed inadequate to establish knowledge if they are not sufficiently unusual to alert the defendant. *See, e.g.*, *Gregorio v. Ford Motor Co.*, -- F. Supp. 3d --, 2021 WL 778913, at *8 (E.D. Mich. Mar. 1, 2021) ("Plaintiffs provide approximately 36 NHTSA complaints from a 9-year span. Again, Plaintiffs give no indication of the total number of relevant complaints from this period. And only some of these complaints pre-date when Plaintiffs purchased their vehicles."); *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 19-01298, 2021 WL 62502, at *6 (C.D. Cal. Jan. 4, 2021) (finding 21 NHTSA complaints and three internet-forum complaints insufficient to plausibly allege knowledge); *Deras v. Volkswagen Grp. of Am., Inc.*, No. 17-05452, 2018 WL 2267448, at *4 (N.D. Cal. May 17, 2018) (concluding that 56 alleged consumer complaints over a period of

more than seven years was not an "unusually high" number to permit an inference of pre-sale knowledge).

Plaintiffs contend that even if there are problems with these pieces of evidence independently, the evidence taken together as a whole supports a plausible inference that Defendants knew about the defect. True, the Court must look at the whole picture. But stripping away—as the Court must—the conclusory allegations relating to testing and various unspecified written and oral communications, the Court is left with the following: one TSB that disclaims a defect; 12 consumer complaints made over the span of six years (some of which post-date certain Plaintiffs' purchases); and the allegations of two of the nine plaintiffs whose headrests have malfunctioned. That is simply not enough to reasonably infer that Defendants—large corporations that naturally encounter dozens (if not hundreds) of complaints about their vehicles every day—knew or should have known that the headrests in "hundreds of thousands" of vehicles were defective at the time of Plaintiffs' purchase.

"Not every business fraud case is a RICO case." *Cisneros v. Petland, Inc.*, 341 F. Supp. 3d 1365, 1372 (N.D. Ga. 2018), *aff'd in relevant part*, 972 F.3d 1204 (11th Cir. 2020). It could also be said that not every products liability case is a RICO case. As the Court found in its standing analysis, Plaintiffs have adequately alleged that their headrests are defective. But RICO demands more. Plaintiffs have not adequately alleged the existence of a RICO enterprise, nor have they asserted enough factual matter to reasonably infer that Defendants acted with the specific intent to defraud them, as is necessary to allege a pattern of racketeering activity. Therefore, Count I is **DISMISSED**.

### c. Section 1962(d) Claim

Count II is a RICO conspiracy claim alleging that Defendants conspired to commit the substantive RICO offense addressed above. A RICO conspiracy can be found through "the

conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007) (quotation omitted). However, "parties cannot be found guilty of conspiring to commit an act that is not itself against the law. And a complaint that 'simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation' must be dismissed.'" *Cisneros*, 972 F.3d at 1220 (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004)).

Such is the case here. Plaintiffs' claim under section 1962(d) alleges that Defendants "conspired to violate 18 U.S.C. § 1962(c)" and points to the allegations made in Count I. FAC ¶¶ 250, 255. Accordingly, given that Plaintiffs have failed to adequately allege an association-in-fact enterprise or a pattern of racketeering activity, as explained above, their RICO conspiracy claim must also fail. Count II is therefore **DISMISSED**.

Because the federal law claims have been dismissed, jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(C) is not applicable. And because Plaintiffs concede that the Court lacks jurisdiction over Grammer based on its contacts with Florida alone, Grammer is hereby **DISMISSED**. Consequently, Counts XII and XVI, which are brought only against Grammer, are **DISMISSED**.

### C. Remaining State Law Claims

Had the Plaintiff adequately stated a RICO cause of action, the Court could have exercised pendent personal jurisdiction over Defendants with respect to the state law claims without engaging in the traditional personal jurisdiction analysis. *Koch*, 847 F. Supp. 2d at 1377-78. However, because the only jurisdictionally sufficient claims have been dismissed, "it necessarily follows that Plaintiffs' pendent claims must also be dismissed." *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d at 1169-70 (citations omitted). Therefore, Plaintiffs' state law claims are

subject to dismissal unless they can "independently establish personal jurisdiction with respect to those claims." *Prou v. Giarla*, 62 F. Supp. 3d 1365, 1374 (S.D. Fla. 2014) (citation omitted).

The Court must "undertake a two-step inquiry to determine whether the exercise of personal jurisdiction over a nonresident defendant is proper.  First, [the Court] must determine whether the state's long-arm statute provides jurisdiction." *PVC Windoors, Inc. v. Babbitbay Const., N.V.*, 598 F.3d 802, 807 (11th Cir. 2010) (internal quotations and alterations omitted). "Only where the long-arm statute provides jurisdiction [does the Court] proceed to the second step and determine whether the defendant has minimum contacts with the forum state and, if it does, whether the district court's exercise of jurisdiction over that defendant would offend traditional notions of fair play and substantial justice." *Id.*  Florida's long-arm statute, section 48.193, provides two ways in which a defendant may be subject to personal jurisdiction in Florida courts: specific and general jurisdiction. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018).[12]

General jurisdiction is unavailable here, as the Supreme Court mandates that all-purpose jurisdiction is typically available only where the defendant is incorporated or maintains its principal place of business. *Daimler AG*, 571 U.S. at 137.  Plaintiffs concede that (i) MBUSA is incorporated in Delaware, FAC ¶ 55; (ii) Daimler and Grammer are German companies, *id.* ¶¶ 63, 90; and (iii) MBUSA's, Daimler's, and Grammer's principal places of business are Sandy Springs, Georgia; Stuttgart, Germany; and Amberg, Germany, respectively, *id.* ¶¶ 55, 63, 90.  As a result,

---

[12]  The general jurisdiction provision of Florida's long-arm statute provides jurisdiction over any claims against "[a] defendant who is engaged in substantial and not isolated activity within [Florida]."  FLA. STAT. § 48.193(2).  Section 48.193(2)'s "substantial and not isolated activity" requirement is "the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Fourteenth Amendment" to the United States Constitution.  *Meier*, 288 F.3d at 1269.  "Thus, in analyzing whether general jurisdiction is authorized under Section 48.193(2), the Court need only consider whether exercising such jurisdiction over Defendant comports with due process." *RG Golf Warehouse, Inc. v. Golf Warehouse, Inc.*, 362 F. Supp. 3d 1226, 1233 (M.D. Fla. 2019).

the Court's inquiry must focus on specific jurisdiction, which looks to the Defendants' case-related contacts with the State of Florida.  *See generally Weiner v. Podesto*, No. 19-60859, 2019 WL 7708494, at *3-7 (S.D. Fla. Aug. 2, 2019).

As explained below, although the Court has personal jurisdiction over the claims brought by the Florida Plaintiffs, the inapplicability of Florida's long-arm statute to the nonresident Plaintiffs' state law claims mandates dismissal of said claims for lack of personal jurisdiction.

### i)  *Nonresident Plaintiffs' State Law Claims*

When a suit is brought as a purported class action, personal jurisdiction over each defendant is assessed with respect to the named plaintiffs' causes of action.  *See Lee & Branch Banking & Trust Co.*, No. 18-21876, 2018 WL 5633995, at *4 (S.D. Fla. Oct. 31, 2018); *In re Dental Supplies Antitrust Litig.*, No. 16-00696, 2017 WL 4217115, at *6 (E.D.N.Y. Sep. 20, 2017) ("[T]he named class representative himself must satisfy all jurisdictional prerequisites before the action can go forward.") (citation omitted); Newberg on Class Actions § 6:25 (5th ed.) ("A putative class representative seeking to hale a defendant into court to answer to the class must have personal jurisdiction over that defendant just like any individual litigant must.").  "In other words, in a class action, personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the named plaintiffs' causes of action."  *Chernus v. Logitech, Inc.*, No. 17-00673, 2018 WL 1981481, at *3 (D.N.J. Apr. 27, 2018) (citations and quotations omitted).

Here, the named out-of-state Plaintiffs allege no connection with Florida whatsoever. Indeed, they are residents of North Carolina, New York, and California who did not purchase their Class Vehicles in Florida and did not suffer any injury in Florida.  Thus, as conceded by the out-of-state Plaintiffs, Florida's long-arm statute simply does not apply to them.  *See* Resp. at 13-15 (arguing that the Florida long-arm statute provides a basis for personal jurisdiction only as to the

Florida Plaintiffs' claims).  The inapplicability of Florida's long-arm statute is fatal to the Court's exercise of personal jurisdiction over the nonresident Plaintiffs' state law claims.[13]

Because the Court cannot exercise personal jurisdiction over the nonresident Plaintiffs, Counts IV, V, VI, VII, VIII, IX, X, XI, and XII are **DISMISSED**.[14]  Further, Count XV is **DISMISSED** as to nonresident Plaintiffs Monopoli, Fitzpatrick, Praglin, and Harris.

### ii)  *Florida Plaintiffs' State Law Claims*

Remaining in this case are Counts III and XV.  Count III asserts a violation of FDUTPA

---

[13]  As noted by Defendants, the Court's lack of personal jurisdiction is further confirmed by the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017).  There, a group of plaintiffs with no connection to California filed a tort action in California state court seeking damages from injuries caused by a drug manufactured by the defendant.  *Id.* at 1778.  The Court held that exercising personal jurisdiction over the drug manufacturer as to those claims brought by the non-resident plaintiffs violated due process because there was no "connection between the forum and the [non-residents'] specific claims."  *Id.* at 1781.  Further, "[n]othing in *Bristol-Myers* suggests that it does not apply to named plaintiffs in a putative class action; rather, the Court announced a general principle—that due process requires a connection between the forum and the specific claims at issue.  That principle applies with equal force whether or not the plaintiff is a putative class representative."  *Feldman*, 2018 WL 8300534, at *4 (quoting *Green v. Mizuho, Ltd.*, 289 F. Supp. 3d 870, 875 (N.D. Ill. Dec. 11, 2017)).  Here, the state law claims brought by the nonresident Plaintiffs arise from conduct that took place entirely outside of Florida, the forum in which they wish to bring suit.  Thus, *Bristol-Myers* further compels dismissal of these claims for lack of personal jurisdiction.  *See Chernus*, 2018 WL 1981481, at *7 (noting "[i]t must be stressed that, even in the context of a class action, it is the *named plaintiff's* claim that must arise out of or result from the defendant's forum-related activities, not the claims of the unnamed members of the proposed class, who are not party to the litigation absent class certification . . . . [T]he *Bristol-Myers* [d]ecision did not change this concept.") (emphasis added).

[14]  Although Plaintiffs do not attempt to raise this argument, the Court notes that the pendent personal jurisdiction doctrine would not permit the Court to exercise jurisdiction over the nonresident Plaintiffs' claims just because they are related to other Plaintiffs' claims over which the Court might have jurisdiction.  The doctrine only allows parties over whom the Court can exercise jurisdiction to bring additional claims that lack an independent basis for jurisdiction.  In other words, the doctrine only allows for the addition of *claims*, not parties.  *See Story v. Heartland Payment Sys., LLC*, 461 F. Supp. 3d 1216, 1229 (M.D. Fla. 2020) ("What plaintiffs here propose is that the Court expand the doctrine to include additional pendent *party plaintiffs*, not just pendent *claims*.  Plaintiffs argue the rationale is essentially the same—if the defendant is going to be in this forum defending claims brought by resident Florida named plaintiffs over which the Court can exercise personal jurisdiction, the Court should be able to exercise personal jurisdiction over similar claims against the same defendant brought by non-resident named plaintiffs.  The Court did not uncover (and the parties did not cite) any Eleventh Circuit authority adopting this theory.") (emphasis in original).

against Daimler and MBUSA on behalf of Lewis, Gazie, Massa, Schwartz, and a Florida subclass. Count XV asserts a claim for unjust enrichment against Daimler and MBUSA on behalf of the Florida Plaintiffs.[15]   In order to establish the Court's personal jurisdiction over Daimler and MBUSA, Plaintiffs must plead a *prima facie* case that Defendants are within the reach of Florida's long-arm statute.  *See Leon*, 301 F. Supp. 3d at 1214 (citing *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006)).

As explained above, the Florida long-arm statute provides two bases for the exercise of personal jurisdiction: specific and general jurisdiction.  The general jurisdiction provision, section 48.193(2), "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment."  *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010).  Thus, for the reasons noted above, general jurisdiction is unavailable here.

Plaintiffs rely instead on a theory of specific jurisdiction under sections 48.193(1)(a)(1), (2), and (6) of the Florida Statutes.  However, "[i]n Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action.'"  *PVC Windoors, Inc.*, 598 F.3d at 808 (quoting *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002)).  Therefore, the Court must first determine whether Plaintiffs' FDUTPA and unjust enrichment claims are subject to dismissal under Rule 12(b)(6).

a.   FDUTPA

Plaintiffs Lewis, Gazie, Massa, Schwartz, and Wallach bring a claim against Daimler and MBUSA on behalf of a Florida subclass for violations of FDUTPA.  They allege that Defendants'

---

[15]   Count XV was originally brought on behalf of all Plaintiffs and a national class, but the Court has dismissed the nationwide class allegations as well as the nonresident Plaintiffs.  *See* Sections I.A(ii), II.C(i), *supra*.

misrepresentation, nondisclosure, and suppression of problems with the allegedly defective NECK-PRO constitute "unfair, unconscionable, and deceptive acts or practices." FLA. STAT. § 501.204(1).  Defendants argue that three of the five Plaintiffs' claims are barred by the statute of limitations, and the remaining claims fail on the merits.  Mot. at 38-39.

### 1. *Statute of Limitations*

The parties agree that the statute of limitations for FDUTPA claims is four years.  FLA. STAT. § 95.11(3)(f).  "When a FDUTPA claim is based on a product purchase, the statute begins to run from the date of sale." *Fisher v. Harley-Davidson Motor Grp., LLC*, No. 19-14154, 2019 WL 8014364, at *2 (S.D. Fla. Oct. 18, 2019) (citation omitted).  This presents a problem for several Plaintiffs.  Ms. Gazie bought her E350 Mercedes Benz in December 2011, FAC ¶ 23; Ms. Schwartz bought her C300 in August 2011, *id*. ¶ 33; and Mr. Wallach bought his E350 in April 2012, *id*. ¶ 27.  As to all of these claims, the filing of this case in August 2019 was beyond the four-year statute of limitations.  Plaintiffs, however, argue that Defendants' fraudulent concealment of the defect tolls the statute.[16]

"Under Florida law, fraudulent concealment may toll the statute of limitations when a defendant 'engages in the willful concealment of the cause of action using fraudulent means to achieve that concealment.'" *Fisher*, 2019 WL 8014364, at *2 (quoting *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003)) (alteration omitted).  A plaintiff seeking to toll the statute of limitations as a result of fraudulent concealment must allege "(1) successful concealment of the cause of action, (2) fraudulent means to achieve that concealment, and (3) plaintiff exercised

---

[16]  The doctrine of delayed discovery, under which the statute of limitations begins to run when "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence," does not apply to FDUTPA claims. *Martin v. World Wide Child Care Corp.*, No. 17-80188, 2017 WL 9618895, at *4 (S.D. Fla. Dec. 1, 2017) (quoting *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, No. 14-20107, 2014 WL 1745050, at *6 (S.D. Fla. Apr. 30, 2014)).

reasonable care and diligence in seeking to discover the facts that form the basis of his claim." *Burr v. Philip Morris USA Inc.*, No. 07-01429, 2012 WL 5290164, at *3 (M.D. Fla. Sept. 28, 2012) (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811-12 (Fla. 4th DCA 1995)). Critically, however, "the 'fraudulent means' alleged must go beyond mere non-disclosure, and must constitute active and willful concealment." *Licul v. Volkswagen Grp. of Am., Inc.*, No. 13-61686, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) (citing *Raie*, 336 F.3d at 1282 n.1; *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976)).

Moreover, a defendant's concealing conduct must occur after the plaintiff's cause of action has already accrued, which, in this case, occurred on the date of purchase. *In re Engle Cases*, No. 09-10000, 2012 WL 12904243, at *5 (M.D. Fla. Nov. 26, 2012) (finding that the assertion of an underlying cause of action for fraud and conspiracy was insufficient and instead requiring "an affirmative act that served to dupe, trick or hoodwink the plaintiff such that he or she was falsely enticed into inaction after her cause of action accrued"). Finally, fraudulent concealment must be pleaded with particularity under Federal Rule of Civil Procedure 9(b). *Fisher*, 2019 WL 8014364, at *2.

Applying these standards to FDUTPA claims stemming from alleged defects in motor vehicles, courts have consistently held that even assuming the defendants knew of the defect, the nondisclosure itself does not toll the statute of limitations. In *Licul*, the plaintiffs alleged that Volkswagen "'ha[d] not publicized the defect to the public,' ha[d] not 'warned its customers of the defect' . . . and 'fail[ed] to notify Plaintiffs . . . of the [defect] in the [vehicles].'" 2013 WL 6328734 at *6 (quoting plaintiff's complaint). "These allegations of Volkswagen's inaction and non-disclosure [were] wholly insufficient to supply the affirmative steps taken to prevent [p]laintiffs from discovering the basis of their claims that would be necessary before tolling based on fraudulent concealment becomes appropriate." *Id.* (citations omitted). Allegations of more

"dastardly behavior, for example that Volkswagen 'actively concealed and failed to disclose the [defect,]'" were also insufficient because they were conclusory and "devoid of actual facts showing Volkswagen's purported intent or actions taken to conceal the defects[.]" *Id.* at *7.

Likewise, in *Fisher*, the plaintiffs alleged that defendant Harley-Davidson repeatedly represented a defective product as effective in the defendant's motorcycles via their user manuals, advertisements, customer service interactions, and communications with its network of dealers. 2019 WL 8014364, at *3. The court found that "[t]he real thrust of [p]laintiff's allegations [was] that the manuals failed to disclose the defect. Accepting as true that Harley-Davidson knew of the defect when these statements were made, these statements would amount to mere nondisclosure." *Id.* (citing *Licul*, 2013 WL 6328734, at *6). Moreover, the plaintiff's assertions "regarding Harley-Davidson's advertisements and product descriptions—that the [product] was 'designed and carefully tested to work superbly' and would 'reduce risk in real-world riding conditions'" —did not establish a misrepresentation as opposed to a mere nondisclosure. *Id.* And in any case, these statements could not establish fraudulent concealment since the plaintiff did not allege that he relied on the statements *after* his cause of action accrued. *Id.*

The Court in *Fisher* made two other findings that are particularly salient here. First, the plaintiff alleged that Harley-Davidson's customer service representative told him that the malfunction of his brakes was an "isolated incident." *Id.* The court held that that such an allegation might suffice in other circumstances to support a claim for fraudulent concealment, but this phone call occurred after the statute of limitations had already expired. *Id.* Finally, plaintiff argued that a filing with the NHTSA in which Harley-Davidson stated that it was "conducting a study to gather [the allegedly defective products'] reliability data" was an affirmative representation that "there was no persistent failure of its product[,]" but the Court rejected this argument because "the language of the filing d[id] not bear such an inference." *Id.*

Both *Licul* and *Fisher* make clear that the claims of Ms. Gazie, Ms. Schwartz, and Mr. Wallach are not saved by the doctrine of fraudulent concealment. Aside from the general claims throughout the complaint that Defendants "actively concealed" the AHR defect, Ms. Schwartz and Mr. Wallach do not plead any affirmative acts whatsoever, alleging only that "[p]rior to purchasing the[ir] vehicle[s], [they were] aware of, reviewed, or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability" and "[t]hese materials and advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicle was not, in fact, fit for everyday use." FAC ¶¶ 31, 34.

Like the allegations in *Licul*, Plaintiffs' general claims of concealment fail because they are conclusory and, as explained above, unsupported by any factual assertions demonstrating affirmative steps taken to conceal the defect. Plaintiffs allege only two concrete acts of concealment. First, they allege that "Mercedes has taken affirmative steps to conceal this defect by, among other things, notifying NHTSA and dealers that the issue is a 'short circuit' in the wiring." *Id*. ¶ 166. However, the TSB disclaims that the issue is a defect, and consequently, as in *Fisher*, the language of the TSB does not support the argument that it should be evidence of fraudulent concealment. Moreover, there is no factual support for the assertion that Defendants knew of the defect at the time the TSB was sent, and it necessarily follows that the TSB cannot amount to a misrepresentation. In any event, the TSB was sent in 2008, prior to all Plaintiffs' purchases in this suit, and it therefore cannot provide a basis to toll the statute of limitations.

Likewise, the alleged misrepresentations in Defendants' marketing materials amount to mere nondisclosure. And even if they did not, Plaintiffs do not allege that these materials played any role in preventing them from learning of their lawsuit *after* the FDUTPA claim accrued at the time of sale. Quite the opposite: Plaintiffs allege that they only relied on such materials *before* purchasing their vehicles. *See Burr*, 2012 WL 5290164, at \*4 n.5 ("Fraudulent concealment

concerns itself with a defendant's conduct after it has injured a plaintiff and the defendant's efforts to conceal the resulting claim the plaintiff might assert.").

Ms. Gazie makes the same allegations as Ms. Schwartz and Mr. Wallach, but she also alleges that when she took her vehicle to an MBUSA dealership in June 2019 to have the headrest inspected, a service representative informed her that he could not provide any information about the inspection results and would not allow her to take her vehicle elsewhere until MBUSA had completed an investigation.  FAC ¶ 174.  As in *Fisher*, this conduct could perhaps, under different circumstances, constitute affirmative conduct sufficient to toll the statute of limitations.  But these events took place in 2019—a full three-and-a-half years after the statutory period expired for her claims in December 2015 (based on her December 2011 purchase).  Thus, her claims fare no better.

Accordingly, Count III is **DISMISSED** as to Plaintiffs Gazie, Schwartz, and Wallach.[17]

### 2.  *Sufficiency of FDUTPA Claim*

The Court proceeds to address the FDUTPA claims of Mr. Lewis and Ms. Massa.  A consumer claim for damages under FDUTPA has three elements: (1) an objectively deceptive act or unfair practice; (2) causation; and (3) actual damages.  *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).

In addition to the Rule 8(a) plausibility pleading requirement generally applied to a motion to dismiss, the parties disagree as to whether Rule 9(b)'s particularity requirements apply to Plaintiffs' FDUTPA claims.  There is a split of authority on this issue among courts in this District. *Compare Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1333 (S.D. Fla. 2012); *Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel Ltd.*, No. 10-22153, 2011 WL 4434891, at *5 (S.D.

---

[17]  Mr. Lewis bought one of his two C250s in April 2015.  FAC ¶ 20.  Any FDUTPA allegations relating to this purchase are also barred by the statute of limitations.  However, because he also purchased one of his vehicles in November 2016, there is no need to dismiss his FDUTPA claim on this basis.

Fla. Sept. 23, 2011); *Llado-Carreno v. Guidant Corp.*, 09-20971, 2011 WL 705403, at *5 (S.D.

Fla. Feb. 22, 2011) (all holding that Rule 9(b) applies to the extent the FDUTPA claim at issue

sounds in fraud), *with Weiss*, 418 F. Supp. 3d at 1175; *FTC v. Student Aid Center, Inc.*, 281 F.

Supp. 3d 1324, 1334 (S.D. Fla. 2016); *Toback v. GNC Holdings, Inc.*, 13-80526, 2013 WL

5206103, at *2 (S.D. Fla. Sept. 13, 2013); *Harris v. Nordyne, LLC*, 14-21884, 2014 WL 12516076,

at *4 (S.D. Fla. Nov. 13, 2014) (all holding that Rule 9(b) does not apply to FDUTPA claims).

This Court joins the latter line of cases in holding that the requirements of Rule 9(b) do not

apply to claims under FDUTPA. As the Court explained in *Harris*:

> FDUTPA claims seek a remedy for conduct distinct from traditional
> common law torts such as fraud. As such, the uniqueness of the
> cause of action place it outside the ambit of Rule 9(b). "FDUTPA
> is a remedial statute designed to protect consumers." *Fonte v. AT&T
> Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005).
> FDUTPA itself instructs courts to construe its provisions "liberally."
> FLA. STAT. § 501.202(2); *see Intercoastal Realty, Inc. v. Tracy*, 706
> F. Supp. 2d 1325, 1333 (S.D. Fla. 2010). "FDUTPA was enacted to
> provide remedies for conduct outside the reach of traditional
> common law torts such as fraud," *Guerrero v. Target Corp.*, 889 F.
> Supp. 2d 1348, 1355 (S.D. Fla. 2012); *Florida v. Tenet Healthcare
> Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005), which is why a
> FDUTPA "plaintiff need not prove the elements of fraud to sustain
> an action under the statute." *Davis v. Powertel, Inc.*, 776 So. 2d 971,
> 974 (Fla. 1st DCA 2000). And, as Florida courts explain, "[a]
> deceptive or unfair trade practice constitutes a somewhat unique
> tortious act because, although it is similar to a claim of fraud, it is
> different in that, unlike fraud, a party asserting a deceptive trade
> practice claim need not show actual reliance on the representation
> or omission at issue." *Office of A.G., Dep't of Legal Affairs v.
> Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004).
> Therefore, even where a FDUTPA claim includes allegations which
> implicate fraudulent conduct, it need not meet the heightened
> pleading requirements of Rule 9(b).

2014 WL 12516076, at *4. Apart from reliance, there is another element of fraud that need not be

shown in a FDUTPA claim, and that element happens to have a dispositive impact on Plaintiffs'

FDUTPA claim here: knowledge that the act was deceptive. To prove fraud under Florida law, a

plaintiff must establish that the defendant made a "deliberate and knowing misrepresentation designed to cause, and actually causing[,] detrimental reliance by the plaintiff." *First Interstate Dev. Corp. v. Ablanedo*, 511 So. 2d 536, 539 (Fla. 1987).  But "Florida courts appear to be split on whether the FDUTPA requires a defendant to know that its practice is unconscionable, deceptive, or unfair." *Rojas v. Am. Honda Motor Co. Inc.*, No. 19-10136, 2020 WL 8515177, at *5 (C.D. Cal. Nov. 30, 2020).  *Compare Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011) (finding that FDUTPA does not require intent to deceive), *with Matthews v. Am. Honda Motor Co.*, No. 12-60630, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012) ("Florida courts have recognized that a FDUTPA claim is stated where the defendant *knowingly* fails to disclose a material defect that diminishes a product's value.") (emphasis added) (citation omitted).

A review of the statute, as interpreted by the Florida Supreme Court, makes clear that knowledge of a deceptive act is not required to state a claim under FDUTPA.  "The Florida Supreme Court teaches that a deceptive act occurs when 'there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'  Thus, the Act focuses on whether an act is deceptive, not whether a defendant knew that the allegedly violative conduct was occurring." *Gavron*, 819 F. Supp. 2d at 1302 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).

Moreover, as *Gavron* pointed out, FDUTPA explicitly states that in deciding what is a "deceptive or unfair" act, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to . . . the Federal Trade Commission Act . . . ."  819 F. Supp. 2d at 1302 n.4 (citing FLA. STAT. § 501.204(2)).  And the Eleventh Circuit, in interpreting the Federal Trade Commission Act, has held "that a practice may be deceptive without a showing of intent to deceive," and therefore "a practice may be found unfair

to consumers without a showing that the offending party intended to cause consumer injury." *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988).

Finally, the statute's provision regarding civil penalties makes clear that not all "deceptive or unfair acts" that give rise to liability under the statute are *knowingly* deceptive or unfair. Section 501.2075 permits an "enforcing authority" to recover a penalty of "not more than $10,000 for each . . . violation" if the court finds that the person or entity has willfully used a method, act, or practice found to be an unfair or deceptive act under section 501.204. FLA. STAT. § 501.2075. "Willful violations occur when the person *knew or should have known* that his or her conduct was unfair or deceptive or prohibited by rule." *Id*. (emphasis added). If all conduct that was "unfair or deceptive" under the statute required knowledge that such acts were unfair or deceptive, then the entire previous sentence would be superfluous. But much like the United States Supreme Court's guidance regarding federal law, the Florida Supreme Court has cautioned that in interpreting Florida law, "courts are required to give significance and effect to every word or phrase in a statute." *Polite v. State*, 973 So. 2d 1107, 1113 (Fla. 2007).

Even if one thought that the Florida Legislature intended to allow civil penalties for *all* violations of the statute, that would be incompatible with the attorney's fees section, which provides fees to any "prevailing party" in FDUTPA litigation. *See* FLA. STAT. § 501.2105(1). When the Florida Legislature wishes to grant fees for *any* violation, it knows just how to do it. And the Florida Legislature also knows how to provide a good faith defense when it wants to. *See* FLA. STAT. § 501.211(2) (providing that damages are not available against a "retailer who has, in good faith, engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.").

The Court thus concludes that knowledge of a deceptive act is not required to state a claim under FDUTPA. This means Plaintiffs do not need to allege that Defendants were aware that the

NECK-PRO was defective in order for Defendants' misrepresentations regarding the product to constitute "unfair or deceptive" acts. *See Gavron*, 819 F. Supp. 2d at 1302 ("[T]he Court finds that [defendant] does not succeed in its argument that [plaintiff]'s FDUTPA claim fails merely because [plaintiff] does not allege that [defendant] had knowledge of the alleged defects."). This also means there are two significant differences between FDUTPA and fraud claims: under the former, one does not need to prove knowledge on the part of the defendant nor reliance on the part of the plaintiff. Because of these differences, the heightened pleading standard of Rule 9(b) does not apply to FDUTPA claims.

Turning now to Plaintiffs' FDUTPA allegations, the Court finds that the Plaintiffs have stated a claim for relief. Plaintiffs allege that Defendants engaged in unfair and deceptive trade practices by representing that the Class Vehicles have safety features that they do not have and representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not. FAC ¶ 264a-b. They state further that "[h]ad they been aware of the defect that existed in the headrests in Class Vehicles, [they] either would have paid less for their vehicles or would not have purchased or leased the vehicle." *Id*. ¶ 274. Taken as true, these allegations satisfy all three elements of a FDUTPA claim, as they are supported by enough factual assertions regarding the plausible existence of the defect itself.

These representations are deceptive because they are likely to mislead a reasonable consumer into believing that the NECK-PRO is safe when it is not. *See In re Horizon Organic Milk Plus DHA Omega-3 Mktg. and Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1332 (S.D. Fla. 2013) ("Plaintiffs' allegations that [defendant] represents on its products' labels and in its advertising that [an ingredient] in its products 'supports brain health' when the [ingredient] in its products actually do[es] not support brain health are sufficient to allege a 'deceptive act' under the FDUTPA because these alleged misrepresentations are likely to mislead a reasonable customer

into believing that the [ingredient] in [defendant]'s products supports brain health."); *Feiner v. Innovation Ventures LLC*, No. 12-62495, 2013 WL 2386656, at *3 (S.D. Fla. May 30, 2013) (finding defendant's representations that its 5-Hour Energy product would provide five hours of energy without a crash when it actually did not so perform was "deceptive because they [were] likely to mislead a reasonable consumer into believing that 5-[H]our Energy would last for five hours with producing a crash.").

With respect to causation, Defendants argue that Plaintiffs' FDUTPA claim must fail because they do not allege they viewed any specific advertisements that contained alleged misrepresentations or omissions. But this argument has been squarely rejected, as federal courts and Florida courts alike have stated that "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) (quotation omitted); *see also Carriuolo*, 823 F.3d at 985 ("General Motors is incorrect to suggest that the plaintiffs must prove that every class member saw the sticker and was subjectively deceived by it. As the district court correctly observed, these arguments simply seek a reliance inquiry by another name."); *Vazquez v. Gen. Motors, LLC*, No. 17-22209, 2018 WL 447644, at *7 (S.D. Fla. Jan. 16, 2018) ("Defendant [] argues that [p]laintiffs fail to plead causation because they fail to allege that they actually saw the allegedly deceptive advertisements and that seeing the advertisements caused them to purchase their vehicles. In other words, [d]efendant objects that [p]laintiffs have not alleged actual reliance. Defendant misunderstands the FDUTPA standard, which requires only an objective inquiry."); *Davis*, 776 So. 2d at 973 ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").

"Instead of actual reliance, a plaintiff must simply prove that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *BPI Sports v.*

*Labdoor, Inc.*, No. 15-62212, 2016 WL 739652, at *5 (S.D. Fla. Feb. 25, 2016) (quoting *Cold Stone Creamery*, 332 F. App'x at 567). Plaintiffs have met this element, as they allege that Defendants' unfair or deceptive acts "were likely to, and did in fact, deceive reasonable consumers, including the Florida Plaintiffs and the Florida Subclass members, about the safety and reliability of Class Vehicles; the quality of the Mercedes brand; and the true value of the Class Vehicles." FAC ¶ 265.

Finally, Plaintiffs adequately plead damages. "[U]nder Florida law, a plaintiff who alleges that he or she has paid a premium price for a product as a result of a defendant's misrepresentation has pled damages under FDUTPA." *Marty v. Anheuser-Busch Cos., LLC*, 43 F. Supp. 3d 1333, 1346 (S.D. Fla. 2014); *see also In re Horizon Organic Milk*, 955 F. Supp. 2d at 1333 (finding that plaintiffs had sufficiently pleaded damages under FDUTPA where they "alleg[ed] that . . . they would not have purchased the products but for [defendant]'s misrepresentations, and that they were damaged in the amount of the difference between the premium price paid for the DHA-fortified milk products and the price they would have paid for other milk products"). Here, as in *Horizon Organic Milk*, Plaintiffs allege that they paid a "premium price" because they "trusted Mercedes to provide high-quality and safe automobiles." FAC ¶¶ 21, 31. They further allege that "[h]ad they been aware of the defect that existed in the headrests in Class Vehicles, the Florida Plaintiffs and Florida Subclass members either would have paid less for their vehicles or would not have purchased or leased the vehicle[s]." FAC ¶ 270. This is sufficient to plead damages under FDUTPA.

In sum, Mr. Lewis and Ms. Massa have adequately pleaded a *prima facie* case under FDUTPA. Thus, the Motion is **DENIED** as to these Plaintiffs' FDUTPA claims in Count III.

b. Unjust Enrichment

The second and final claim remaining for the Florida Plaintiffs is that of unjust enrichment in Count XV.  This doctrine applies only where (1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit; (2) the defendant voluntarily accepted and retained the benefit; and (3) under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it.  *Shands Teaching Hosp. & Clinics, Inc. v. Beech Street Corp.*, 899 So. 2d 1222, 1227 (Fla. 1st DCA 2005).

These claims fail for two reasons.  First, the statute of limitations for unjust enrichment is four years, and therefore, for the same reasons that their FDUTPA claim is time-barred, the unjust enrichment claim of Ms. Gazie, Mr. Wallach, and Ms. Schwartz is time-barred.  *See Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1308-09 (S.D. Fla. 2012) (providing that the statute of limitations for unjust enrichment claims in Florida is four years from the time the benefit is conferred on the defendant and that the delayed discovery doctrine does not apply to such claims).

In addition, the unjust enrichment claim of Mr. Lewis and Ms. Massa also fails because it is based on precisely the same conduct as their FDUTPA claim.  "It is well settled in Florida that unjust enrichment is an equitable remedy and is, therefore, not available where there is an adequate legal remedy."  *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005).  As a result, unjust enrichment claims are unavailable where they are based, as here, on precisely the same allegedly deceptive conduct that forms the basis of a FDUTPA claim.  *See id.* ("The [d]efendants' quasi contract claim is predicated on the same set of allegations supporting their claims under [] FDUTPA.  Accordingly, because an adequate remedy exists at law, the Defendants have not stated a claim upon which relief may be granted for . . . unjust enrichment.").  Although Plaintiffs believe they should be permitted to bring these claims

in the alternative, courts do not allow alternative pleading in these circumstances. *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1196 (S.D. Fla. 2017) ("[W]here the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those causes of action and warrants dismissal.") (citing *Licul*, 2013 WL 6328734, at *7).

"[I]f [Defendants] [] employed a deceptive or unfair trade practice that caused Plaintiffs damages, then Plaintiff[s] ha[ve] a remedy at law as a properly pled claim under Florida law.  In other words, although a plaintiff ordinarily may plead in the alternative, here, if Plaintiff[s] cannot prevail with [their] available legal remedies, [they] cannot prevail on [their] unjust enrichment claim." *Jovine v. Abbott Laboratories, Inc.*, 795 F. Supp. 2d 1331, 1342 (S.D. Fla. 2012) (internal citation omitted); *see also Guerrero*, 889 F. Supp. 2d at 1356-57 ("Despite [p]laintiff's contention that her unjust enrichment claim is an alternative to her FDUTPA claim, [p]laintiff seeks recovery for the exact same wrongful conduct as in her FDUTPA claim.  Thus, if [d]efendant's sale of honey was deceptive, misleading or unlawful, causing damage to [p]laintiff, she has an adequate remedy under Florida law.  Although a plaintiff ordinarily may plead in the alternative, here, if [p]laintiff cannot prevail on her FDUTPA claim, she cannot prevail on her unjust enrichment claim.  Thus, [p]laintiff's claim for unjust enrichment must be dismissed.").

Accordingly, Count XV is **DISMISSED**.

### c.   The Florida Long-Arm Provisions

Having assessed the sufficiency of Plaintiffs' state-law claims, the Court moves to the jurisdictional analysis under Florida's long-arm statute.  Because Daimler clearly lacks sufficient Florida contacts to justify the exercise of general jurisdiction, the Court cannot simply look to Daimler's various contacts with Florida in the aggregate.  Rather, it must carefully examine Plaintiffs' claims to determine whether they have met their burden of establishing specific personal

jurisdiction over Daimler with respect to each claim.  *See Weiner*, 2019 WL 7708494, at *3.

Plaintiffs allege that Daimler is subject to personal jurisdiction under subsections (a)(1), (2), and

(6) of the Florida long-arm statute.  Those subsections provide, in relevant part, that a non-resident

is subject to jurisdiction in Florida for "any cause of action arising from any" one of the following

acts:

> (1)  Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> (2)  Committing a tortious act within this state.
>
> (6)  Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>
> > a. The defendant was engaged in solicitation or service activities within this state; or
> >
> > b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

FLA. STAT. § 48.193(1)(a)(1), (2), (6).

As an initial matter, Plaintiffs cannot rely on subsection (6).  "It is well settled that

allegations of economic injury alone do not establish the type of injury to persons or property

within Florida required to establish personal jurisdiction pursuant to Section 48.193(1)(a)(6).

Instead, this provision of the long-arm statute contemplates personal injury or physical property

damage within the State of Florida."  *Leon*, 301 F. Supp. 3d at 1216 n.7 (citations omitted).

Because Plaintiffs allege only economic injuries, Defendants cannot be subject to jurisdiction

under subsection (6).

Nevertheless, the Court has specific jurisdiction over Daimler for Plaintiffs' FDUTPA

claim pursuant to subsection (2).  "The Supreme Court of Florida previously has held that

allegations of a defendant's violation of the Florida Deceptive and Unfair Trade Practices Act is a tortious act in Florida for the purpose of Fla. Stat. § 48.193(1)[(a)(2)]." *Rogers v. Omni Solution, Inc.*, No. 10-21588, 2010 WL 4136145, at *4 (S.D. Fla. Oct. 19, 2010) (citing *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000)). "The Supreme Court of Florida's decision in *Execu-Tech* leaves little doubt that a violation of the Florida Deceptive and Unfair Trade Practices Act, which causes injury in Florida, confers jurisdiction under Florida's long arm statute." *Id*.

Following such guidance, courts in this district have held that where plaintiffs adequately plead their FDUTPA claim and allege an injury in Florida, jurisdiction lies under subsection (2) of the Florida long-arm statute. *Weiner*, 2019 WL 7708494, at *5 ("[B]ecause [plaintiff] has stated a FDUTPA claim and alleged injury in Florida, she has established that [defendant] is subject to personal jurisdiction under the 'tortious act' provision of Florida's long-arm statute for her FDUTPA claim."); *Rogers*, 2010 WL 4136145, at *5 (out-of-state defendant who allegedly engaged in "deceptive" conduct by selling inferior and counterfeit product that caused injury in Florida subject to jurisdiction under Florida long-arm statute).

So too here. Plaintiffs have adequately alleged that Defendants engaged in "deceptive and unfair" conduct in violation of FDUTPA by representing that their vehicles have a safety feature that they do not in fact have—and misrepresenting that the vehicles are of a certain quality or grade when they are not. Mr. Lewis and Ms. Massa, as Florida residents who purchased their vehicles in Florida, allege that their economic injury occurred in Florida. As a result, jurisdiction is proper under section (1)(a)(2) of the Florida long-arm statute.

### iii)   *Federal Due-Process Considerations*

Having assured itself of the statutory basis for jurisdiction, the Court next turns to the constitutional inquiry. Because it is a state statute that serves as the basis for jurisdiction, the Court

looks to the Due Process Clause of the Fourteenth Amendment. Such an analysis requires consideration of whether: (1) the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) the non-resident defendant "purposefully availed" itself of the privilege of conducting activities within the forum; and (3) the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (citing *Burger King*, 471 U.S. at 472-73, 474-75; *Helicopteros*, 466 U.S. at 413-14*; Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Plaintiffs allege that Daimler, which markets itself to American consumers as Mercedes Benz, took a number of actions directly aimed at selling its vehicles in Florida. They allege that Daimler, together with its wholly-owned subsidiary MBUSA, designed and manufactured the Class Vehicles for sale in Florida, and developed, reviewed, and approved marketing and advertising campaigns designed to promote the NECK-PRO system and sell the class vehicles in Florida. FAC ¶¶ 65, 67.

Further, Plaintiffs claim that Daimler maintains a unity of interest with MBUSA and does not distinguish itself from MBUSA for purposes of selling and leasing Mercedes-branded vehicles and providing related services in the United States. *Id.* ¶ 69. The relationship between Daimler and MBUSA is purportedly governed by a General Distributor Agreement that gives Daimler the right to control nearly every aspect of MBUSA's operations, including the sales and marketing of the class vehicles. *Id.* ¶ 67. Pursuant to that agreement, Daimler has allegedly directed the actions of MBUSA's marketing and representations made to consumers, including consumers in Florida, about the AHR defect in Class Vehicles. *Id.* ¶¶ 65, 67, 68, 71. Specifically, Daimler and MBUSA

worked to develop the owner's manuals, product brochures, advertisements, and other promotional materials related to the NECK-PRO system, with the intent that those materials and advertisements be disseminated in all 50 states, including Florida. *Id*. ¶¶ 72, 81.

Plaintiffs also allege that Daimler licensed its trademarks to dealerships in Florida, engaged in the financing of dealerships in Florida that sold its vehicles, and—through its control of MBUSA—managed a distribution network by which its vehicles were physically brought to Florida for sale or lease. *Id*. ¶¶ 76, 79. Daimler has allegedly sent its employees, managers, and officers regularly to Florida to facilitate the sale and service of its vehicles, and Daimler also advertises its connection to Florida on its website, representing that its Jacksonville, Florida parts distribution center "supports dealers in the region with parts supply and houses parts inventory." *Id*. ¶¶ 64, 83.

Presented with these allegations, the Court turns to the three prongs comprising the due process analysis.

a. Arise Out of or Relate To

Defendants argue that Daimler's contacts with Florida do not satisfy this prong because there is no nexus between the contacts and Plaintiffs' claim. Mot. at 12. For example, Defendants believe it is of no moment that Daimler—albeit through MBUSA—maintains offices and a parts distribution center in Florida because Plaintiffs do not allege that the defective AHR systems in the vehicles they purchased originated from this distribution center. The Supreme Court has made clear, however, that this prong is not quite this stringent.

The Eleventh Circuit has previously "held that a tort 'arises out of or relates to' the defendant's activity in a state only if the activity is a 'but-for' cause of the tort." *Waite*, 901 F.3d at 1314 (quoting *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222-23 (11th Cir. 2009)). But during the pendency of Defendants' Motion, the Supreme Court did away with this view,

explaining that the Court has "never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. ___, Slip Op. at 9, 2021 WL 1132515, at *5 (Mar. 25, 2021).   Because the prong is separated by an "or," specific jurisdiction may also exist where a claim "relate[s] to the defendant's contacts with the forum." *Id.*; *see also id.* at *10 (Alito, J., concurring) ("Ford [] asks us to adopt an unprecedented rule under which a defendant's contacts with the forum State must be proven to have been a but-for cause of the tort plaintiff's injury.  The Court properly rejects that argument . . ."); *James Lee Constr., Inc. v. Gov't Emps. Ins. Co.*, No. 20-00068, 2021 WL 1139876, at *2 (D. Mont. Mar. 25, 2021) (finding that *Ford* overruled the Ninth Circuit's similar "but-for" specific jurisdiction test) (citing *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991)).

In *Ford*, the plaintiffs were injured in the forum states in car accidents involving the defendant's vehicles, but the actual vehicles at issue were not designed, manufactured, or sold in the forum states.  *Id.* at *3.  Nevertheless, the defendant still had contacts with the states that were related to the plaintiffs' claims because the defendant had advertised, sold, and serviced those two car models in both states for many years.  *Id.* at *7.  "In other words, Ford had systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States."  *Id.*  Therefore, there was "a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction."  *Id.* (quoting *Helicopteros*, 466 U.S. at 414).

Here, Plaintiffs' allegations as to Daimler—which are uncontradicted and thus must be accepted as true at this stage, *Madara*, 916 F.2d at 1514—show an equally strong relationship. Daimler directed the distribution and sales of its vehicles to Florida and maintains, through a

subsidiary which it directs, a parts distribution center in the state.  Most importantly, Daimler specifically targeted Floridian consumers through the ostensibly misleading advertisements and communications that form the basis of Plaintiffs' FDUTPA claim.  Thus, Plaintiffs' FDUTPA claim "arises out of or relates to" Daimler's contacts with Florida.

       b.  <u>Purposeful Availment</u>

The second prong requires that "there . . .  exist 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . ., thus invoking the benefits and protections of its laws.'"  *Oldfield*, 558 F.3d at 1220 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person."  *Burger King*, 471 U.S. at 475 (quotations omitted).  The contacts "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there."  *Ford*, Slip. Op. at 6, 2021 WL 1132515, at *4 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

Daimler has purposefully availed itself of jurisdiction in Florida because it directed the distribution of its vehicles to the state, targeted Florida consumers through advertising, and sold Florida residents its cars through its distributor MBUSA at dealerships in Florida.  This is not the case of mere "placement of a product into the stream of commerce, without more."  *Asahi*, 480 U.S. at 112.  Indeed, Justice O'Connor observed that examples of "something more" than mere placement of an item into the stream of commerce that would establish purposeful availment include "designing the product for the market in the forum State," and/or "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  *Id*. at 112-13 (O'Connor, J., concurring).  Daimler has allegedly done both of those here.

Although the Court recognizes that Daimler and MBUSA are legally separate entities, this does not insulate Daimler from a finding that it has purposefully availed itself of the privileges and responsibilities of conducting business in Florida.   Many courts have held that a foreign manufacturer that utilizes an American subsidiary to target distribution of its product to the forum state are appropriately subject to those states' jurisdiction.   *See, e.g.*, *Young v. Mitsubishi Motors N. Am. Corp.*, No. 19-02070, 2020 WL 4584391, at *3-4 (W.D. Wash. Aug. 10, 2020) (finding jurisdiction adequately alleged against foreign parent company where plaintiff alleged that the company utilized its U.S. subsidiary to implement an integrated distribution plan to sell vehicles to the United States, including Washington); *Helicopter Transp. Servs., LLC, v. Sikorsky Aircraft Corp.*, 253 F. Supp. 3d 1115, 1130-31 (D. Ore. 2017) (finding that the foreign manufacturer of a helicopter acted within the forum state through its wholly-owned subsidiary and their coordinated replacement part and communication/advertising strategy); *Johnson v. Chrysler Can., Inc.*, 24 F. Supp. 3d 1118, 1139-40 (N.D. Ala. 2014) ("The conduct by Chrysler Canada in this case (manufacturing the allegedly defective vehicle to the specifications of the United States market, and using Chrysler United States to distribute it specifically in Alabama)" constitutes purposeful availment); *King*, 2012 WL 1340066, at *8 ("Here, GM Canada, the entity who built certain vehicles for GM Corporation to distribute specifically in the United States, including Alabama, cannot genuinely maintain that it does not serve the Alabama market. Stated differently, if not Alabama, what market does GM Canada serve?").   To borrow the *King* court's phrasing: if not Florida, what market does Daimler serve?

Daimler's utilization of its subsidiary MBUSA to cultivate business in Florida, which included licensing its trademarks to MBUSA as well as to dealerships in the State of Florida, properly subject Daimler to the jurisdiction of Florida courts.   *See Patterson v. Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170, 1183 (D. Ariz. 2010) (holding that a foreign corporate defendant

purposefully availed itself of the privileges of conducting activities in the forum state because the company placed its design for the defective product into the stream of commerce and directed that design toward U.S. consumers by establishing an American subsidiary and giving that subsidiary a license to disseminate products manufactured in accordance with an allegedly defective design). Thus, Plaintiffs have alleged enough facts to plausibly infer that Daimler purposefully availed itself of jurisdiction in Florida to answer a claim related to its representations regarding the safety of its NECK-PRO product.

c.   Fair Play and Substantial Justice

Even where a defendant has purposefully established minimum contacts with the forum state, the Court must still evaluate jurisdiction in light of several other factors to determine whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Meier*, 288 F.3d at 1276.  When assessing fairness, courts look to: "(a) the burden on the defendant, (b) the forum State's interest in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (e) the shared interest of the several States in furthering fundamental substantive social policies." *Id*. (citations omitted).  At this juncture, Daimler bears the burden of establishing a compelling case that the exercise of jurisdiction is unreasonable. *Burger King*, 471 U.S. at 477; *see also Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008) ("Where these factors do not militate against otherwise permitted jurisdiction, the Constitution is not offended by its exercise.") (citation omitted).

Daimler has not attempted to argue—and therefore has not presented the requisite "compelling case"—that this Court's exercise of jurisdiction over it would be constitutionally unfair.  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1274 (11th Cir. 2010) (quoting *Burger King*, 471 U.S. at 477).  There is no indication that requiring Daimler to

litigate in this jurisdiction would impose an unreasonable burden on Daimler, especially given its significant contacts with the United States and the State of Florida.  Moreover, "Florida has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."  *R&R Games, Inc. v. Fundex Games, Ltd.*, No. 12-01957, 2013 WL 3729309, at *7 (M.D. Fla. July 12, 2013).  Personal jurisdiction is therefore proper over Daimler as to Plaintiffs' FDUTPA claim.

## CONCLUSION

Although Plaintiffs have standing to bring this lawsuit, they do not have standing to represent a nationwide class for claims based on state law.  Moreover, the Court is without subject matter jurisdiction to hear Plaintiffs' claim under the Magnuson-Moss Warranty Act because this suit is brought as a class action with less than 100 named plaintiffs.

Defendants Grammer and Daimler have sufficient minimum contacts with the United States for the Court to consider the RICO claims against all Defendants.  However, Plaintiffs' allegations fail to state a RICO claim, so those claims must be dismissed and cannot serve as a jurisdictional anchor through which the Court could exercise pendent personal jurisdiction over the remaining state law claims.  Plaintiffs must establish an independent basis for personal jurisdiction for their remaining state law claims, and because Plaintiffs concede that Grammer lacks sufficient contacts with the State of Florida for the Court to exercise jurisdiction over Grammer for any of the state law claims, Grammer must be dismissed from this suit.

As to Daimler and MBUSA, the nonresident Plaintiffs' claims have no connection to Florida, so the Court is without jurisdiction over those claims.  The Florida Plaintiffs, conversely, are able to establish personal jurisdiction, but only the FDUTPA claims of Mr. Lewis and Ms. Massa are not barred by the statute of limitations.  Those Plaintiffs' allegations state a claim under

FDUTPA, but because that claim provides an adequate legal remedy, they cannot proceed on their unjust enrichment claim that is based on the same alleged conduct by Defendants.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Renewed Motion to Dismiss Plaintiffs' First Amended Complaint [ECF No. 66] is **GRANTED IN PART**.

2. Counts I, II, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, and XVI are **DISMISSED**.  To be clear, the only remaining claim is Count III—Plaintiffs' FDUTPA claim—which may be pursued by Plaintiffs Lewis and Massa against Defendants Daimler and MBUSA.

3. This case is set for a status conference on **April 14, 2021 at 2:00 p.m.**

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 30th day of March, 2021.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**